# EXHIBIT C

Jacob Dolinger*

# Brazilian Confirmation of Foreign Judgments

## I. Introduction

Brazil has a tradition of confirming and enforcing foreign judgments. During the monarchy,[1] Brazilian courts would confirm judgments of States with which Brazil had a specific foreign judgment-enforcement treaty,[2] or on the basis of reciprocity.[3] Various procedural statutes were passed in the late nineteenth century[4] abolishing the requirement of reciprocity and, contrary to the majority of European and South American countries which adhered to the reciprocity rule,[5] the Brazilian judiciary enforced foreign judgments without considering whether the rendering State confirmed Brazilian judgments.

---

*Professor of Private International Law, School of Law, of State University of Rio de Janeiro, Brazil; practices law in Rio de Janeiro and Sao Paulo.

The author expresses his appreciation to Carmen Beatriz Figueiredo de Lemos, Instructor of Private International Law of the State University of Rio de Janeiro, for her research assistance.

1. In the first 67 years after its independence from Portugal (1822 to 1889), Brazil was under a monarchic regime.

2. 5 J. MOREIRA, COMENTÁRIOS AO CÓDIGO DE PROCESSO CIVIL 68 (4th ed. 1981).

3. O. DA CUNHA, HOMOLOGAÇÃO DA SENTENCA ESTRANGEIRA E O DIREITO JUDICIÁRIO CIVIL BRASILEIRO 35 (1933); 3 H. VALLADÃO, DIREITO INTERNACIONAL PRIVADO 186, 187 (1978).

4. Decree No. 6982 of July 27, 1878 (prescribing recognition would be given without reexamination of the merits), Decree No. 7777 of July 27, 1880 and, after the proclamation of the Republic in 1889, Law 221 of November 20, 1894, Decree 3.084 of November 5, 1898.

5. The U.S. Supreme Court, for example, stated in 1895:
[I]n the great majority of the countries on the continent of Europe—in Belgium, Holland, Denmark, Sweden, Germany, in many cantons of Switzerland, and in Russia and Poland, in Romania, in Austria and Hungary, perhaps in Italy and in Spain—as well as in Egypt, in Mexico, and in a great part of South America, the judgment rendered in a foreign country is allowed the same effect only as the courts of that country allow to the judgments of the country in which the judgment in question is sought to be executed. . . [t]he rule of reciprocity has worked itself firmly into the structure of international jurisprudence.
Hilton v. Guyot, 159 U.S. 113 (1895).

854    THE INTERNATIONAL LAWYER

## A. Theoretical Bases and Comparisons

Conceptually, there are two different theories about foreign judgment recognition. The first conceives it as a process of extending the effects of a foreign judgment to the territory of another state; the second holds that recognition transforms the foreign judgment into a local judgment.[6] In the practice, recognition involves the question of which law—foreign or local—will govern the effects of the recognized foreign judgment.[7]

Brazil has followed the Italian system of *giudizio di delibazione*, which limits the scope of judicial inquiry to form, not substance. Courts review judgments for their external, formal requisites, without any kind of reexamination of the merits of the foreign judgment. While the Italian Code of Civil Procedure provides an exception to this rule,[8] Brazil has remained more loyal to the system of *delibazione*.

Brazilian courts do not demand, for example as French courts do,[9] that the foreign tribunal must have applied the law to the merits of the case indicated by the French choice of law rules. This French attitude is also not in accord with the Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters, which in article 7 provides: "Recognition and enforcement may not be refused for the sole reason that the court of the State of origin has applied a law other than that which would have been applicable according to the rules of Private International Law of the State addressed."[10] Similarly, the Brussels Convention only demands that the foreign judgment should comply with the recognizing State's private international law rules in matters concerning status and capacity of persons, matrimonial property and inheritance.[11]

---

6. Moreira, *supra* note 2, at 77.

7. Moreira concludes in favor of the first theory in accordance with the tradition of confirming foreign judgments on matters unknown to the Brazilian legal system; one cannot transform a foreign judgment into a local one if it refers to a non-existent or unknown institution in the confirming state, but one can conceive of accepting the foreign judgment's effects. "Public policy requirements may often block enforcement of a foreign judgment when the obligation giving rise to the judgment would not support an action under the recognizing country's laws . . ." which does not coincide with Barbosa Moreira's theory and also does not follow Valladao's constant references to the "aproximacao and adaptacao" theory by which Brazil may enforce a foreign judgment based on an unknown institution to our legal system and—when public policy reasons object—there will still be enforcement, albeit with partial effects. Larsen, *Enforcement of Foreign Judgments in Latin America: Trends and Individual Differences*, 17 Tex Int'l Law J., 216, 217 (1982); *see* H. Valladão, *supra* note 3 at 204.

8. Codice di Procedure Civile, art. 798 (1940), in effect since 1942, provides that Italian courts will reexamine the merits of a foreign judgment against defendants in default.

9. *See* Carbonneau, *The French Exequatur Proceeding: The Exorbitant Jurisdictional Rules of Articles 14 and 15 (Code Civil) as Obstacles to the Enforcement of Foreign Judgment in France*, 2 Hastings Int'l Comp. L. Rev. 307, 310 (1979).

10. The Convention is reproduced in 5 I.L.M. 636 (1966) and in 15 Am. J. Comp. L. 362 (1967).

11. Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters ("Brussels Convention"), 2 Common Mkt. Rep. (CCH) ¶ 6003.

## B. Today in Brazil

The current law for enforcement of foreign judgments in Brazil is the Law of Introduction to the Brazilian Civil Code.[12] In article 15, the following requirements for the enforcement of a foreign judgment are indicated: (1) the judgment was rendered by a competent court; (2) the parties were given notice and participated in the proceedings or allowed the judgment to go by default;[13] (3) the judgment was final and contained the necessary formalities for execution at the place where it was rendered; (4) the judgment is translated by an authorized interpreter; and (5) the judgment is homologated[14] by the Federal Supreme Court of Brazil. Article 17 of the Law of Introduction further states that: "Laws, acts and judgments of another country, as well as any kind of private legal acts shall not be effective in Brazil when they offend national sovereignty, public policy and good customs."

Consequently, the only intrinsic aspect of a foreign judgment that the Supreme Court of Brazil looks at is whether there is an offense to Brazilian *ordre public*. Despite the liberal attitude of Brazilian statutes on the recognition and enforcement of a foreign judgment discussed above, the actual jurisprudence of the Supreme Court (the only competent court to homologate foreign judgments since the decree of 1880) has followed a different philosophy, frequently denying confirmation of foreign judgments based on considerations of improper jurisdiction. Although Brazil does not have strict rules as the French Civil Code,[15] one could almost apply to Brazilian jurisprudence the words used by a well-known commentator to French courts' tendencies: "French courts have construed the relevant Code provisions to grant them exclusive jurisdiction to hear matters involving French nationals or domiciliaries. As a general rule foreign judgments rendered against French nationals or domiciliaries by non-Common Market jurisdictions will not be enforceable in France."[16] In Brazil, there is no preferential treatment for nationals, but there is for domiciliaries. Unless a Brazilian domiciliary expressly agrees to be tried in a foreign court, any judgment enacted against him will not be homologated.

---

12. Decree-Law No. 4.657 of Sept. 4, 1942, *as amended* by Law No. 3.238 of August 1, 1957. Composed of 19 articles, the Law of Introduction to the Civil Code is applicable to the whole system of Brazilian law. The Bustamante Code, also known as Code of Private International Law of Havana, 1928, is a valid source of Brazilian law on conflicts of law, since it has been ratified by federal decree No. 18.871 of August 13, 1929; but the Montevideo Treaty on International Procedural Law, 1940, signed by Brazil, but not ratified, is not a source of law. *See* VALLADÃO *supra* note 3, at 218 and Larsen *supra* note 7, at 213.

13. The exact meaning of this item is that the parties (the defendants) have been properly notified and have either taken part in the action or allowed the judgment to go by default.

14. "In modern Civil Law. To approve; to confirm." BLACK'S LAW DICTIONARY, 869 (4th ed. (1968).

15. *See supra* note 9 and accompanying text.

16. Carbonneau, *supra* note 9, at 307.

856   THE INTERNATIONAL LAWYER

This article addresses some of the important aspects of the subject of the confirmation and enforcement of foreign judgments in Brazil. In the sections that follow, it will focus on the aspects of competent jurisdiction, notice, rogatory letters, unfounded foreign judgments, foreign arbitral awards, and judgments on division of property located in Brazil.

## II.  Competent Jurisdiction

### A.  Definition and Basic Rules

In a request for confirmation of a foreign judgment, the Brazilian Supreme Court, in accordance with Article 15 of the Law of Introduction to the Civil Code and the Regiment of the Supreme Court,[17] analyzes whether the rendering foreign court was competent to render judgment, i.e., whether the forum that rendered judgment was competent to do so under Brazilian private international law. This analysis of whether Brazilian jurisdiction is exclusively competent or whether the jurisdiction of another State can be accepted is a matter of "general or international competence." This is to be distinguished from "internal or special competence," which refers to the competence of courts in each State to deal with a specific case. In the United States, the same distinction is referred to as "jurisdiction in the international sense and jurisdiction in the domestic sense."[18] Questions concerning "internal or special competence" are not dealt with by the Brazilian Supreme Court in the procedure of confirmation of foreign judgments, i.e., there will be no examination of whether the foreign court was the competent jurisdiction according to that State's rules of procedure; this is an internal matter of the foreign State. The Supreme Court only examines whether Brazilian jurisdiction is exclusively competent in this specific case or whether Brazilian conflict rules also allow for foreign jurisdiction over the matter.[19]

When Brazil did not accept divorce for its nationals, but agreed to foreign divorce judgments of non-Brazilians even though resident and domiciled in

---

17. Article 217 of the Regiment of the Supreme Court, October 15, 1980, specifies the indispensable requirements to the confirmation of foreign judgments: (1) rendered by a competent judge; (2) defendant was summoned to Court; (3) judgment is final and contains the necessary formalities to be executed in the place where it was rendered; and (4) legalized by a Brazilian consul and duly translated.

18. See Casad, *Civil Judgment Recognition and the Integration of Multi-State Associations: A Comparative Study*, 4 Hastings Int'l and Comp. L. Rev., 13 (1980).

19. 2 O. Tenório Direito Internacional Privado 382 11th ed. (1976); 5 P. C. Aragao, Comentarios ao Codigo de Processo Civil 216, 217 (1975); A. de Castro, Direito Internacional Privado 530, 532 (3d ed. 1977); *contra* Valladão, *supra* note 3, at 199, A. Dias da Silva, Direito Processual Internacional 68, 69 and 120, 121 (1971), and Larsen *supra* note 7, at 220. The Supreme Court decided in "Sentenca Estrangeira" (Foreign Judgment confirmation proceedings, hereinafter cited as SE) No. 2227 (*see* 74 RTJ 336) that the court only discusses the international competence of the foreign tribunal but not "the state competence within the North-American federation."

Brazil,[20] the Supreme Court analyzed the competence of the rendering divorce court. The Court accepted the jurisdiction of the State of the nationality of both or one of the divorcees, the jurisdiction of the State where they had formerly been domiciled, or where they had been married, but would not accept a completely strange jurisdiction which the couple had chosen to get an easier, quicker divorce. This was considered fraud, equivalent to the American notion of forum-shopping.[21]

### 1. Concurrent and Exclusive Jurisdiction

The competence of Brazilian courts is established by article 12 of the Law of Introduction to the Civil Code and, with more precision, by articles 88 and 89 of the 1973 Code of Civil Procedure. Articles 12 and 12(1) read that:

> The Brazilian judiciary has jurisdiction when the defendant is domiciled in Brazil or when the obligation is to be carried out in Brazil. (1) Only the Brazilian Judiciary has jurisdiction over acts regarding immovable property located in Brazil.

Brazilian jurisprudence has established that there is a clear distinction between the first rule of article 12 establishing a simple, concurrent jurisdiction, which admits the jurisdiction of other states to sue defendants domiciled in Brazil or to judge obligations that are supposed to be carried out in Brazil, and the rule of Article 12(1), which establishes an exclusive jurisdiction and which forbids the acceptance of a foreign jurisdiction to decide matters related to immovable property located in Brazil. *Forum rei sitae* is a mandatory rule, which does not allow for exceptions.[22]

The Code of Civil Procedure has introduced more specific and detailed rules in its articles 88, 89, and 90 under the title, "International Competence."[23] Articles 88 and 89 read as follows:

*Article 88*—The Brazilian judiciary is competent when:

(1) the defendant, whatever his nationality, is domiciled in Brazil;[24]
(2) the obligation has to be carried out in Brazil;
(3) the case originated from a fact that occurred in Brazil or an act that was practiced in Brazil.

---

20. Divorce was introduced in Brazil by Amendment 9 to the 1969 Constitution, of June 28, 1977 and is ruled by Law No. 6.515 of December 26, 1977.

21. Supreme Court decisions are published in REVISTA TRIMESTRAL DE JURISPRUDENCIA (hereinafter cited as RTJ). *See* SE 1.594, 34 RTJ 283; SE 1.879, 37 RTJ 437; SE 1.924, 40 RTJ 503; SE 1.920, 42 RTJ 557; SE 1.926, 43 RTJ 505; SE 1.980, 54 RTJ 712; SE 2.014, 54 RTJ 211; SE 2.040, 56 RTJ 216; SE 2.082, 64 RTJ 24; and SE 2.295, 76 RTJ 47.

22. VALLADÃO, *supra* note 3, at 139; Tenório, *supra* note 16, at 360, 364; *Castro, supra* note 19, at 510–511; Aragao, *supra* note 19, at 218–19; V. FILHO, HOMOLOGACAO DE SENTENCA ESTRANGEIRA 72 (1978). *See* P. GARLAND, BILATERAL STUDIES AMERICAN—BRAZILIAN PRIVATE INTERNATIONAL LAW 91 (on the exclusive jurisdiction for actions affecting real property).

23. *See* Larsen, *supra* note 7, at 214.

24. "Domiciled" here should be understood as "resident." *See* O. TENÓRIO, LEI DE INTRODUÇÃO AO CÓDIGO CÍVIL BRASILEIRO (2d ed. 382).

858    THE INTERNATIONAL LAWYER

For the purpose of (1), a foreign juridical person is considered as domiciled in Brazil when it has an agency or a branch here.

*Article 89*—The Brazilian judiciary is solely competent, to the exclusion of any other jurisdiction:

(1) For suits related to immovable property located in Brazil;
(2) For inheritance and procedures of division of property located in Brazil, although the deceased was a foreigner and had lived abroad.

Incidentally, article 12(1) of the Introductory Law to the Civil Code and article 89 of the Code of Civil Procedure have an equivalent rule in article 325 of the Bustamante Code.[25]

## B. Voluntary and Involuntary Submission

These rules confirm the doctrinal distinction between concurrent jurisdictions (*i.e.*, where Brazilian as well as foreign courts are competent) and exclusive jurisdiction (which occurs in matters of immovables located in Brazil and inheritance-division procedures of property located in Brazil). When there are concurrent jurisdictions, Brazil accepts submission of Brazilian–domiciled parties to foreign courts.[26]

But when there is no free submission, can a Brazilian-domiciled party be sued in a foreign jurisdiction? Or, without free submission, can one be sued abroad concerning an obligation to be carried out in Brazil or concerning an act practiced in Brazil? In other words, will judgments of foreign courts in cases such as these be confirmed in Brazil? This is probably the most important aspect of the subject of confirmation and enforcement of foreign

---

25. "For the exercise of real actions in respect to real property and for that of mixed actions to determine boundary and partition of common property, the competent judge shall be the one where the property is situated," Article 325 Convention of Private International Law, signed at Havana, Feb. 20, 1928, League of Nations Treaty Series (1929) No. 1.950.

26. Acceptance of submission to foreign jurisdiction was not always the rule. In 1929, the Supreme Court accepted in SE 778 that if a Brazilian-domiciled party submitted himself voluntarily to a foreign jurisdiction its decisions should be accepted by the Brazilian Judiciary (56 Rev For. 369), reversing an earlier decision in the same case which had not accepted submission as a valid support for foreign jurisdiction. 79 Rev. de Direito 583. In SE 874 the contrary happened. Initially, in 1930, the Supreme Court agreed to the foreign judgment because the Brazilian-domiciled defendant had accepted the jurisdiction of the French court by presenting her defense without a motion of incompetent jurisdiction (99 Rev. de Direito 99). Later, however, the Supreme Court reversed its original decision and accepted the theory that matters of jurisdiction have an *ordre public* nature and cannot be decided against the rules of procedure by the will of the parties. (68 Rev. For. 108, 109). This decision was followed by SE 943, decided in 1936. (68 Rev. For. 108).

Justice Philadelpho de Azevedo returned to the theory of accepting submission to foreign jurisdiction in SE 1.036, as reported in an opinion of the Attorney General. (102 Rev. For. 251, 252). After this decision, it became common practice for the Supreme Court to accept the submission of Brazilian–domiciled parties to foreign jurisdictions, provided the case did not concern real estate matters. And Brazilian doctrine is unanimous today about the legality of submission to a foreign court. *See supra* note 22.

judgments in Brazil and the one that contains the most interesting decisions of the Brazilian Supreme Court.

In *Cesar Yazigi and Herbert S. Burr v. M. Dedini S.A. Metalurgica, et al.*,[27] now a classic case on these matters, the Supreme Court examined subjects such as notice by mail, judgment in default, submission to foreign jurisdiction, and extra-judicial negotiations between attorneys and a Brazilian-domiciled defendant represented by an attorney without written powers of attorney. The case originated in the New York Supreme Court and the defendants, domiciled in Brazil, were served by way of service of process on the Secretary of State, and then by mail containing a copy of the summons and complaint. A New York attorney, representing the Brazilian-domiciled defendants, entered into an agreement with the plaintiffs' attorney for a postponement "to answer or otherwise move" and, on a later date, another agreement to postpone in order "to answer or make any motion with respect to the complaint" while the defendants' attorney awaited news from Brazil. The defendants did not move to dismiss for want of jurisdiction; neither did they present any kind of defense in court, which finally decided the case against the defendants in default.

By seven to one, the Brazilian Supreme Court denied confirmation of the New York court judgment. Justice Bilac Pinto, in accord with the position of the Attorney General of the Republic, was the only opinion in favor of the confirmation. He understood that there had been a tacit submission of the defendants to the New York jurisdiction through the agreed postponements, and considered that according to the law of New York there is no need that the attorneys of the defendant obtain a written authorization for that purpose. He felt there is a *juris tantum* presumption that the attorney is authorized to act in the name of his client, and in doing so, had submitted the defendants to the jurisdiction of the New York court. The only act that would be considered as a denial of jurisdiction would be a straight motion to dismiss for want of jurisdiction, in accordance with article 322 of the Bustamante Code which provides: "Implied submission shall be understood to have been made by . . . the defendant from the fact of his having filed any plea, unless it is for the purpose of denying jurisdiction. . . ."[28]

The majority opinion against the confirmation was written by Justice Rodrigues Alckmin. He first referred to the distinction between general and special competence established in French doctrine by Etienne Bartin.[29] Under that doctrine, the general, or international, competence is the preliminary question of international procedural law—that is, which State is

---

27. SE No. 2114, 87 RTJ 384 (1974).

28. Convention of Private International Law signed at Havana, February 20, 1928, LEAGUE OF NATIONS, TREATY SERIES (1929) No. 1.950; *see supra* note 12.

29. E. BARTIN, PRINCIPES DE DROIT INTERNATIONAL PRIVE (1930).

jurisdictionally competent. The special, or internal, competence consists of determining amongst the courts and judges of the particular State which one is the competent one for the specific case.[30] General competence is enacted by municipal rules which establish the competence of the national judiciary; in Brazil, Article 12 of the Brazilian Law of Introduction to the Civil Code and Articles 88 and 89 of the Brazilian Code of Civil Procedure establish general competence. This established competence has indirect effects on the general competence of foreign courts, because it leads to denial of confirmation of foreign courts' judgments when the municipal legislation orders the exclusive competence of the national courts. Justice Alckmin referred to Henri Batiffol, who says that "The question of international competence is settled in accordance with the rules of the State where the exequatur is being requested."[31] Therefore, continued Justice Alckmin, the question is not whether the defendants have submitted themselves to the jurisdiction of New York in accordance with the rules of that State, but whether, according to the Brazilian rules on competence of the Brazilian judiciary, there had been a renouncement of the competence of the Brazilian courts and a submission to the jurisdiction of another country. Acceptance in Brazil of foreign rules on the submission to foreign courts would amount to attributing to foreign States the power of fixing, indirectly, the general competence of the Brazilian judiciary, said the Justice.

The majority opinion, therefore, held that only the Brazilian rules concerning submission to a foreign court should be considered. Indeed, the Bustamante Code[32] refers to tacit acceptance of a foreign jurisdiction when the defendant appears in court and practices any procedural act other than the motion to dismiss based on want of jurisdiction. But the same rule, Article 322, adds that there will be no submission if the defendant lets himself be judged in default.[33]

In this case, proceeded Justice Alckmin, the matter was adjudged in default, for there had been no act of the defendants in court which could imply their acceptance of the New York jurisdiction. The extra-judicial

---

30. See supra note 19.
31. 2 H. BATIFFOL, DROIT INTERNATIONAL PRIVE, 424.
32. See supra note 28.
33. Article 322 of the Bustamante Code in its full text reads:

> Implied submission shall be understood to have been made by the plaintiff from the fact of applying to the judge in filing the complaint, and by the defendant from the fact of his having, after entering his appearance in the suit, filed any plea unless it is for the purpose of denying jurisdiction. No submission can be implied when the suit is proceeded with as in default.

This rule is similar to the U.S. Uniform Foreign Judgments Recognition Act § 5(a)2, 13 U.L.A. 419 (1962) which indicates that an appearance by a defendant merely to contest the jurisdiction of the court over him, will not give the foreign court personal jurisdiction, and Royal Bank of Canada v. Trentham Corp., 491 F. Supp. 404, 406 (S.D. Tex. 1980) which decided that if the defendant did not appear in the foreign action, he will be allowed to contest the issue of jurisdiction when the judgment is presented for recognition by an American court.

agreements between the attorneys to postpone the time limit for the presentation of a defense or to present any other motion while awaiting news from Brazil, did not exclude the possibility of a motion to dismiss for want of jurisdiction. This extra-judicial agreement, therefore, did not amount to an acceptance of jurisdiction, the subsequent default did not represent submission. Under those facts, the Court could not find any renouncement of Brazilian jurisdiction. Moreover, because of the exclusive competence of Brazilian law to establish jurisdiction, the Court could not accept the eventual foreign rules, by which an attorney without due written powers could establish submission to the court of the jurisdiction by merely asking for time "to await instructions from Brazil."[34]

In *Mariana Albertina Goncalves v. Mateus Varela*,[35] the Supreme Court also denied confirmation of an Angolan judgment, because the defendant—domiciled in Brazil, and duly summoned to the foreign court by letter rogatory—did not present a defense in the Angolan court. The Angolan court judged him in default, but in Brazil, default does not amount to submission to a foreign court.

## III. Notice

In certain legal systems, unlike the Anglo-American one, the matter of court notice is considered separately from the subject of "competency." A noted authority on these matters has written: "A foreign judgment will not be accorded recognition unless it satisfies the 'international' standards not only as to the bases for jurisdiction (or competency), but also as to notice."[36]

One of the most important procedural aspects that the Brazilian Supreme Court looks into when examining a request for confirmation of a foreign judgment is the form of service that was employed by the foreign court. If the defendant appeared at the foreign court and presented a defense or any

---

34. Justice Alckmin referred to a rule he derived from 6 C.J.S. 2D, 5: "A general appearance is one whereby the party appears and submits to the court's jurisdiction for all purposes, while a special appearance is made for the sole purpose of questioning the court's jurisdiction." Although claimant maintained that the request for a postponement is to be accepted as a general appearance and that therefore the jurisdiction of New York had been accepted, the court felt otherwise, quoting again 6 C.J.S. 20, at 11: "In some courts an attorney cannot appear for a non-resident unless he accompanies his appearance with a writing properly executed by the client authorizing the appearance of the attorney."

In comparing this approach to that of the Bustamante Code, the court felt that only if the party submits to the court any question, other than the specific aspect of want of jurisdiction, does it result in recognition of correct jurisdiction. As there was no real appearance in court, the matter of correct summons had to be examined. In Brazilian procedure, the appearance of the defendant corrects a missing or faulty citation. But here, as there was no actual appearance, the summons had to be examined. And considering that it was done through mail, it was unacceptable according to Brazilian standards.

35. SE No. 2.227, 74 RTJ 336.

36. Casad, *supra* note 18, at 14.

862    THE INTERNATIONAL LAWYER

kind of motion, he will not be able to claim at the homologation procedure that he has not been properly served.[37] If he has been judged in default, however, the procedure by which the foreign court served the summons to the defendant turns into a fundamental and sometimes decisive matter, especially when there had been a prior contractual agreement about the foreign court's competency which bars the defendant from pleading that the foreign jurisdiction was not competent.

## A. SERVICE BY LETTER ROGATORY

The basic attitude of the Brazilian Supreme Court in requests for confirmation of foreign judgments against Brazilian-domiciled defendants is that no other service but personal summons may be served by a Brazilian court in compliance with a request of the foreign court through a letter rogatory. Service by mail, which is frequently employed by American courts in suits against foreign-domiciled parties, has been systematically rejected by the Brazilian Supreme Court and, consequently, the confirmation of judgments in these suits has been denied.[38]

In 1925, the Supreme Court denied confirmation to a Portuguese paternity judgment in *Alzira da Silva Abreu v. Isabel Narciza Pinho* because the defendant was not duly summoned to court.[39] Confirmation was also denied a judgment of the New York Supreme Court which ordered a Brazilian bank to pay a certain amount of money because it was found that the defendant's domicile was Brazil and, therefore, the New York court did not have jurisdiction. The confirming Brazilian Supreme Court also indicated that even if the New York court had jurisdiction, the defendant was not summoned by letter rogatory.[40] In still another case requesting confirmation of a Portuguese judgment ordering defendant to pay a certain debt,[41] the Brazilian Supreme Court found that defendant had been served by registered mail with request of return receipt rather than by letter rogatory, and denied confirmation.

---

37. Code of Civil Procedure, art. 214.

38. Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, art. 10, *done* Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. 6638, to which the U.S. is a party (entered into force for U.S. on Feb. 10, 1969) states that "provided the state of destination does not object, the present Convention shall not interfere with the freedom to send judicial documents by postal channels, directly to persons abroad." Brazil is not a party to this Convention.

39. 79 REV. DE DIREITO 583 (applying Law 221 of Nov. 20, 1894).

40. Kappel Indust. Cal. & Equipment Co. v. Banco de Recife, SE No. 4811, 85 REV. DE DIREITO 481 (1927).

41. Arnaldo and Antonieta Cruz v. Joaquim Correia da Silva, SE No. 1347. *Also see* SENTENCAS ESTRANGEIRAS, 191. This publication of the Supreme Court contains decisions made on confirmation requests of foreign judgments between 1950 and 1978.

## B. PUBLIC POLICY

The Brazilian Supreme Court has held that effecting a procedural act in Brazilian territory in order to comply with an order of a foreign court in accordance with foreign rules of procedure is tantamount to a disregard of Brazilian sovereignty and, as such, is against public policy.[42] Two Supreme Court decisions of 1958 have guided the courts in refusing confirmation of foreign judgments against Brazilian domiciliaries who were not summoned according to Brazilian rules of procedure. In the first decision,[43] the Supreme Court decided that, because valid service is essential for the confirmation of a foreign judgment, service must be done through letter rogatory if the defendant is domiciled in Brazil, which would depend on the Supreme Court's "exequatur."[44] In the facts of the first case, the defendant had been summoned to a Portuguese court by publication of edicts, although his exact address in Brazil was known to the foreign court. By a vote of six to three, the Supreme Court decided that service not in accord with Brazilian rules of procedure, *i.e.*, letter rogatory, made confirmation impossible.

In the second case, the Supreme Court decided on a request to confirm a German judgment, which involved a Brazilian-domiciled defendant who was served by the German court through the diplomatic representative of Germany in Brazil.[45] By a vote of eight to one, the Supreme Court initially decided that service on the defendant by a foreign diplomatic representation offended Brazilian sovereignty. This decision was reconsidered,[46] and the Supreme Court reversed its original judgment, concluding also by eight to one that considering service by diplomatic representative as an offense against Brazilian sovereignty was too severe. At most, the court indicated that the lack of letter rogatory could cause damage to the defendant and bring about the nullity of the case, but the defendant did not claim this point.[47] Later cases in which the defendants were served through diplomatic or consular representatives, however, were denied confirmation.[48]

---

42. This idea is also found in the Hague Convention 1965, *supra* note 38, at article 13: "Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security." *See also* SE No. 2.114 (rejecting confirmation because defendants were served in Brazil by mail); SE No. 2.522, 87 RTJ 782 (1978) (denying confirmation for lack of proper service on Brazilian defendant).

43. SE No. 1,529, 8 RTJ 275 (1958).

44. The procedure of letters rogatory is addressed *infra*.

45. SE No. 1.578, 8 RTJ 276 (1958).

46. 14 RTJ 272 (1960).

47. Aragao, *supra* note 19, at 226 (criticizing reversal and arguing service by letter rogatory is foreseen by German law, ZPO article 199); and VALLADÃO, *supra* note 3, at 200. *See also* Castro *supra* note 19, at 548–49; Valladão, *Force exécutoire des jugements étrangers au Brésil*, JOURNAL DE DROIT INTERNATIONAL PRIVE, 608 (1931); R OTAVIO, MANUAL DO CÓDIGO CIVIL 441; CUNHA, *supra* note 3, at 116.

48. SE No. 1914, 44 RTJ, 357 (1967); and SE No. 2730, 98 RTJ 44 (1981).

864    THE INTERNATIONAL LAWYER

Service by mail is only acceptable when the plaintiff and defendant are both domiciled in Brazil and the case is brought before a Brazilian court. When a suit is brought in a foreign court against a defendant domiciled in Brazil, service must be done by an officer of the Brazilian court pursuant to a letter rogatory remitted by the foreign court, in order for the Supreme Court to confirm the judgment. Similiar conclusions have been reached when confirmation of a foreign arbitral award is sought.[49]

## III. Letters Rogatory

### A. The *Exequatur* Institution

In France and other civil law systems, *exequatur* refers to the confirmation of a foreign judgment; in Brazil it refers exclusively to the Chief Justice's order to comply with a foreign letter rogatory,[50] and the confirmation of foreign judgments is known as "homologação." The Federal Code of Civil Procedure of 1973 provides in article 211 the competence of the Supreme Federal Court's Regiment to rule on matters concerning the execution of rogatory letters. These rules of procedure follow the former and the present Constitution of Brazil, which provides the competence of the Supreme Court to order compliance of foreign letters rogatory.[51] According to article 226 of the Regiment, a letter rogatory may be denied execution if it offends local public policy, sovereignty, or if it is not authentic.

Letters rogatory may be used to obtain any kind of discovery in a foreign jurisdiction, i.e., to hear testimony, to obtain expert reports and mainly to summon a person to a foreign court where a case has been proposed against him. Brazil does not condition the compliance of foreign letters rogatory on reciprocity by the requesting State.[52]

---

49. SE No. 2736, 97 RTJ 537 (1981). For other cases, *see* SE No. 2.311, 89 RTJ 742 (1978); SE No. 2.512, 89 RTJ 743 (1978); SE No. 2.476, 95 RTJ 23 (1980); SE No. 2671, 95 RTJ 1011 (1980); SE No. 2732, 99 RTJ 570 (1981); and SE No. 2.582, 99 RTJ 28 (1981).

50. Several laws clarify the *exequatur* institution. The Law of Introduction to the Brazilian Civil Code 12(2); states: "The Brazilian judicial authorities will comply with the actions requested by a competent foreign authority, observing the law of the latter as to the object of the actions, provided that an "exequatur" has been granted and that Brazilian law is followed as to the form of the execution." The Bustamante Code also addresses letters rogatory in articles 388 to 393. Article 391 reads: "The one receiving a rogatory letter should comply with the law of the country that issued the letter in what concerns its object, and as to the manner of discharging the request, he should comply with his own law." The Federal Code of Civil Procedure of 1939 article 797 ruled that: "Rogatory letters requested by foreign authorities do not depend on homologation (as foreign judgments do) and will be executed after the Chief Justice gives his *exequatur* . . . ."

51. Constitution of the Federal Republic of Brazil of 1967, *as amended* by Constitutional Amendments No. 1 of 1969 and No. 7 of April 13, 1977, article 119(3)d.

52. Reciprocity also has not been demanded for confirmation of foreign judgments since decree No. 7777 of 1880. *See supra* note 4.

There is a distinction between confirmation of foreign judgments and *exequatur* of letters rogatory. In the former, the defendant can claim that he insists on being sued in the competent Brazilian jurisdiction based on one of the various rules of procedure that establishes Brazilian jurisdiction. If there has been no contractual obligation to submit to foreign jurisdiction or if the Brazilian defendant did not expressly submit to the foreign jurisdiction by presenting a motion of defense on the merits of the case, the Supreme Court will accept a motion by the defendant to dismiss the confirmation procedure.

Where a letter rogatory for court summons is concerned, however, the situation differs. The *exequatur* does not imply that Brazil has recognized the competence of the foreign court to decide the matter; the defendant can await the procedure of confirmation of an eventual foreign judgment to raise the question of competence.[53]

## B. SOME CASE DEVELOPMENTS

The first instance of recent history in which the Supreme Court dealt with *exequatur* was one in which the court revoked an earlier decision that allowed service of a Brazilian-domiciled defendant who claimed that he did not accept the competence of a foreign jurisdiction.[54] Soon after that decision, in a case concerning a Swiss letter rogatory,[55] Chief Justice Luiz Gallotti granted "*exequatur*" to summon both defendants as requested by the Swiss Court. After being duly served, one of the defendants appealed to the Chief Justice by way of the embargo procedure[56] and argued that as a Brazilian-domiciled company, it had the right to demand that any lawsuit against it should be brought before Brazilian courts. In accepting the defendant's arguments, the Chief Justice revoked the *exequatur*. The Swiss

---

53. VALLADÃO, ESTUDOS DE DIREITO INTERNACIONAL PRIVADO, 527, 552; DE MIRANDA 4 COMENTÁRIOS AO CÓDIGO DE PROCESSO CIVIL, 493 (1939); *contra* LOPES, 3 COMENTÁRIO TEÓRICO E PRÁTICO DA LEI DE INTRODUÇÃO AO CÓDIGO CIVIL, 277.

In the past, under the Introduction Law to the Civil Code of 1916, there was at least one case in which the Supreme Court considered the foreign court incompetent and denied "*exequatur*" to a letter rogatory from Portugal. Agravo de Peticao No. 4436, 3 ARQUIVO JUDICIARIO 114 (1927). The court relied on Article 15 which states: "Brazilian courts are *always* competent in actions against persons domiciled or resident in Brazil, arising from obligations contracted or responsibilities accrued in this or in another country." This rule has since been replaced by Article 12 of the Law of Introduction of 1942, which provides: "The Brazilian Judiciary has jurisdiction when the defendant is domiciled in Brazil or when the obligation is to be carried out in Brazil. . . . (1) Only the Brazilian judiciary has jurisdiction over acts regarding immovable property located in Brazil." Comparing the rules from the 1916 and 1942 laws, one sees that the former one established a much more exclusive system of Brazilian jurisdiction because Brazilian courts would *always* be competent in cases against local-domiciled persons, whereas in the 1942 statute exclusive Brazilian jurisdiction only applies over real property.

54. Exequatur No. 1.328, 45 RTJ 317 (1968).

55. Exequatur No. 1.408, 52 RTJ 299 (1969).

56. An appeal to the same authority.

866   THE INTERNATIONAL LAWYER

plaintiff thereafter appealed through the "Agravo Regimental" procedure[57] and, the full Supreme Court decided unanimously (the chief justice abstaining in accordance with the court's internal rules) that the letter rogatory had to be complied with, regardless of considerations of competent jurisdiction.

In another instance, the full Supreme Court accepted Justice Aliomar Baleeiro's opinion to revoke an *exequatur*, basing its decision on the defendant's appeal that as a Brazilian domiciliary he was entitled to be sued in Brazil and did not have to accept rogatory service from the Uruguayan court.[58] The opinion, however, regrettably confuses compliance of letters rogatory with confirmation of foreign judgments—[59] so much so that the learned Justice quoted from Henri Batiffol's "Droit International Prive" chapter on *exequatur*, which, in France—as was pointed out above—refers to confirmation of foreign judgments and in Brazil is restricted to compliance with requests contained in foreign letters rogatory. But in 1974, with the dissenting opinion of Justice Gallotti, the Court decided in favor of the service of the defendant by letter rogatory from a Swiss court.[60]

During Justice Neder's Presidency of the Supreme Court (1979–1980), the court returned to its former position and denied *exequatur* to several letters rogatory based on the jurisdiction argument.[61]

A noteworthy case—but one which seems to ignore that a Brazilian-domiciled defendant can accept a foreign jurisdiction except in real estate cases—was the denial of the *exequatur* of an Argentinian letter rogatory by Chief Justice Neder and the confirmation by the Supreme Court *en banc*. It concerned the popular Brazilian singers Roberto and Erasmo Carlos and their successful song "Amigo,"[62] which the Argentinian composer Fausto Frontera claimed in the Argentinian court to be a plagiarism of his composition. Justice Neder's opinion to deny the *exequatur* was based on the rule of *lex loci delicti commissi* (the law of the place of the tort) and most probably wanted to refer to the *forum delicti commissi* (the jurisdiction of the tort). He based his decision on the Code of Civil Procedure[63] which declares that the Brazilian jurisdiction is competent when the case relates to a fact that occurred in Brazil, and in this suit the alleged plagiarism had taken place in Brazil. The Chief Justice considered further that matters of jurisdiction are

---

57. A procedure allowing a party to submit the Chief Justice's decisions to the full Supreme Court.
58. Exequatur No. 1.835, 60 RTJ 323 (1971).
59. *See supra* note 50 and accompanying text.
60. Exequatur No. 1.395, 72 RTJ 659 (1974).
61. *See* Rogatory Letter No. 3.166, 93 RTJ 969 (1980), and 95 RTJ 42 (1980); Rogatory Letter No. 3.054; 96 RTJ 61 (1980); (invoking *Exequatur* previously given to a German request of service and indicating matter was not within the German court's jurisdiction).
62. No. 3.119, 97 RTJ 69 (1980).
63. Art.88 (III).

related to public policy (*ordre public*), and therefore a motion of incompetent jurisdiction can be raised in the procedure of a letter rogatory.

In a subsequent case,[64] under the Presidency of Chief Justice Xavier de Albuquerque, this trend of the Supreme Court was modified. In that case, Chief Justice Albuquerque stated that the incompetence of a foreign jurisdiction can only be claimed in a letter rogatory when it is a question of absolute incompetence. But when the foreign and the Brazilian jurisdiction are equally competent, the Brazilian-domiciled party's right to insist on being sued in a Brazilian court can only be brought up in the request for confirmation of a foreign judgment, not in the preliminary matter of the adequacy of service. The Chief Justice also introduced a novelty in this case: that the letter rogatory, duly accomplished, should be returned to the requesting foreign court with the information that the Brazilian-domiciled defendant does not wish to submit himself to the foreign jurisdiction.[65]

## IV. Unfounded Foreign Judgments

### A. Present Judicial Attitude

A problem arises when the foreign judgment is rendered without any indication by the court of the grounds for its decision. The Brazilian Code of Civil Procedure article 458 provides that a judgment must include three items: (1) the "report" containing the names of the parties, a summation of the plaintiff's and the defendant's presentations and of the main procedural developments throughout the judicial process; (2) the analysis of the facts and legal issues of the case constituting the grounds for the judgment; and (3) the decision, in which the judge determines the questions submitted to him by the parties.[66]

The Supreme Court has indicated in *Dr. Karl F. Nagele Feinmaschinenbau GMBH Comp. v. Herbert Alberts*[67] that a foreign judgment without these qualities will not be confirmed. In that case, Chief Justice Neder

---

64. Rogatory Letter No. 3.268, 98 RTJ 47 (1981).

65. 2 W. Batalha, Direito Internacional Privado 324 (1961) wrote that if the full Supreme Court decides an appeal confirming the *exequatur* granted by the Chief Justice, it recognizes the competence of the foreign court and cannot decide otherwise in the request for recognition of the final judgment from the same foreign court. Chief Justice Albuquerque's position is also consistent with Article 13, ¶ 2 of the Hague Convention, *supra* note 38 of which Brazil is not a signatory.

The Inter-American Convention on Letter Rogatory (approved by the Inter-American Specialized Conference on Private International Law held in Panama City, in January 1975), 14 I.L.M. 339 (1975), to which Brazil is a party, contains a similar rule in Article 9:

Execution of letters rogatory shall not imply ultimate recognition of the jurisdiction of the authority issuing the letter rogatory or a commitment to recognize the validity of the judgment it may render or to execute it.

66. *See* Art.458.

67. SE No. 2.521, 95 RTJ 34 (1980).

decided that a foreign judgment without an enunciated legal basis cannot be confirmed; such a judgment does not comply with the mandatory requirements of article 458 (2) with which foreign judgments must be in harmony to obtain judicial confirmation.

Supporting its decision, the Court indicated that requirement number 2 of article 458 benefits the losing party, who has the right to know the grounds on which he lost in the original court so as to be able to appeal to a higher court. It is related to the right of defense of the parties, and therefore a matter of public policy (*ordre public*), said the Court. In accord with the Brazilian Introductory Law to the Civil Code art. 15, which provides that confirmation of a foreign judgment depends on whether the defendant was duly notified by the foreign court of its proceeding to guarantee his right of defense, the Court found that a foreign court's decision which does not contain any ground whatsoever makes it impossible for the defendant to present an appeal. Furthermore, the Court reasoned, a foreign judgment, after being duly recognized by the Supreme Court can be enforced in a federal Brazilian court as if it were a Brazilian judgment.[68] As such, the defendant still has certain rights of defense, including some that can relate to the reasons for the original judgment.[69] But if the defendant does not know the grounds of the judgment, he may be unable to raise such defenses in the enforcement procedure.

Chief Justice Neder added that one could argue that the writing of a judgment is a procedural act and as such it should be submitted exclusively to the procedural rules of the place wherein it was rendered. But, proceeded Justice Neder, this principle is not absolute, since the State that confirms the foreign judgment has the choice to deny its homologation partially or totally, whenever it is contrary to the forum's public policy. He quoted Redenti[70] who states that one can only obtain confirmation of a foreign judgment if the legal system of the state that rendered the judgment implements policies compatible with the state being requested to confirm and enforce the judgment. In that sense, Chief Justice Neder said, Brazil would refuse to enforce foreign judgments that accept polygamy or slavery. Therefore, according to the chief justice, a foreign legal system which does not require that judgments contain their grounds is not compatible with the Brazilian legal system, and those judgments cannot be confirmed since they are contrary to Brazilian public policy.[71]

---

68. Code of Civil Procedure, art. 484.
69. The Code of Civil Procedure, art. 741, provides for defenses that can be raised against enforcement of a final judgment such as any event which may have changed the situation that existed at the time of the judgment (*e.g.*, payment, compensation, novation or limitation).
70. 3 DERECHO PROCESAL CIVIL 87 (S. Melindo & A. Rudin, trans.).
71. Before Chief Justice Neder's decision, a different opinion had been expressed by the Supreme Court in Cesar Yazigi and Herbert S. Burr v. M. Dedini S.A. Metalurgica et al. (*see*

## B. Critique

Considering procedural rules on the same level as the fundamental substantive questions of polygamy and slavery is a misapplication of *ordre public*. Legal systems of advanced countries that do not demand that courts explain the grounds of their judgments have other ways of preserving the losing party's right and possibility of appeal to a higher court. In addition, Justice Neder argued that recognizing foreign judgments, which would not be valid if rendered by a Brazilian court, would grant the foreign jurisdiction superiority and deny Brazilian Private International Law, which is intended to control, in Brazil, the effectiveness of foreign jurisdictional acts. This point, too, is an overstatement. It is analogous to saying that a foreign judgment can only be confirmed in Brazil if the procedural acts in the foreign courts obey the rules of Brazilian procedure. Certainly, this is not the spirit of Brazilian Private International Law, which acknowledges different systems of law and different methods of exercising jurisdiction. Demanding identity among legal systems of different States would be tantamount to eliminating Private International Law in favor of uniform law.

Last, Justice Neder's argument that "a judgment without grounds is an absurdity which common sense repels" is misguided. It relies on the Brazilian Code of Civil Procedure art. 129, which gives courts authority to thwart parties perpetrating frauds on the court. Article 129, however, is an internal Brazilian rule of procedure that does not apply to foreign courts, which have their own methods of checking the bad faith and malice of the parties. Expressing the grounds of a judgment is a purely procedural matter to which we apply *lex lociactionis*, and each civilized country has a way of guaranteeing the parties' rights and opportunities to appeal to a higher court. The Brazilian Introductory Law specifies that in the confirmation of a foreign judgment the Supreme Court shall look into the method of defendant's service of process to ascertain whether he had an opportunity to present his defense, but there is no legal basis by which to demand more. If all the procedural details of a Brazilian judgment could be required of a foreign judgment, it would be the end of our system of confirmation and enforcement of foreign judgments. It seems quite clear that the Introductory Law[72] indicated that the only aspect of a foreign judgment which could be contrary to Brazilian public policy is the lack of notice given the defen-

---

*supra* note 27), the lack of grounds of the New York court's judgment was one of the various arguments raised against its enforcement. Justice Bilac Pinto in his decision stated that he had not found "one precedent in which a foreign judgment was considered against *ordre public* for not containing the structure ordered by our law of civil procedure." The majority's opinion against enforcement did not resort to the lack of grounds argument. Paulo César Aragao (*see supra* note 19, at 229 n. 258) writes, referring to various Italian authors, that in Brazil foreign judgments can be confirmed even when they do not express their grounds.

72. *See supra* note 12 and accompanying text.

dant or foreign procedure which would make it impossible for him to present his defense. The *ordre public* need to pronounce the grounds of a judgment, referred to by Chief Justice Neder and various writers,[73] is a matter of internal, municipal public policy, not of international public policy that would affect the recognition of a foreign judgment.[74]

## V. Foreign Arbitral Awards

Although a reference to foreign arbitral awards was contained in the first Brazilian book on Private International Law,[75] Professor Valladão in 1931[76] and Redig de Campos in 1955[77] wrote that they had no knowledge of the Supreme Court's recognition of foreign arbitral awards. This lack of judicial recognition of foreign arbitral awards is due in large part to the fact that until 1942[78] the applicable law was not sufficiently clear that "foreign judgments" included those by arbitral tribunals as well as by courts.[79] Today, there is no doubt that the law applies to any kind of foreign judgment. Current concerns involve the focus on the procedural requirements for recognition and enforcement.

### A. FOREIGN COURT CONFIRMATION

In 1958, the Supreme Court ruled on a confirmation of a foreign arbitration award for the first time,[80] holding that foreign arbitral awards could be

---

73. 3 L. DA COSTA, DIREITO PROCESSUAL CIVIL BRASILEIRO, 22, No. 14 (1945); 3 J. MARQUES, INSTITUIÇÕES DE DIREITO PROCESSUAL CIVIL 522, n. 847 (1959); 4 M. AMARAL SANTOS, COMENTÁRIOS AO CÓDIGO DE PROCESSO CIVIL 436, n. 324 (1977) and 5 J. MOREIRA, COMENTÁRIOS AO CÓDIGO DE PROCESSO CIVIL (3d ed. n. 64 1978).

74. *See* Dolinger, *World Public Policy: Real International Public Policy in the Conflict of Laws*, 17 TEX. INT'L L.J. 167. For French decisions on the subject, *see* 66 REVUE CRITIQUE DE DROIT INTERNATIONAL PRIVE 831, 2 (1977); J. DOLINGER, A EVOLUCAO DA ORDEM PUBLICA NO DIREITO INTERNACIONAL PRIVADO 190 (1979); D. DIAMEDO, 70 REVUE CRITIQUE DE DROIT INTERNATIONAL PRIVE 113 (1981). *See also* LOUSSOUARN and BOUREL, DROIT INTERNATIONAL PRIVE 628 n.6 (1978) and P. MAYER, DROIT INTERNATIONAL PRIVE 277 (1977).

75. *See* J. PIMENTA BUENO, DIREITO INTERNACIONAL PRIVADO E APLICACAO DE SEUS PRINCIPIOS COM REFERENCIA AS LEIS PARTICULARES DO BRASIL (1863). In that book, the author describes a request by the French legation granted in 1846 for the confirmation of a French arbitral award to be enforced in the Brazilian state of Bahia. *Id.* at 145.

76. VALLADÃO, *supra* note 53, at 723.

77. Campos, *Sentenca Estrangeira, Juizo Arbitral Homologação*, 166 REVISTA FORENSE, 117 (1955).

78. The year of enactment of the current Law of Introduction to the Civil Code.

79. Decree 6982, article 13 of 1878 provides for the enforcement of arbitral awards "duly homologated by foreign tribunals." The Bustamante Code, article 432, extended the rules of confirmation existing for foreign judgments provided that the award was given on a matter that could be a subject of an arbitration agreement in the forum where the enforcement is requested. The introduction to the Civil Code of 1916 referred to the recognition of judgments from "foreign courts." The 1942 law refers to "judgments enacted abroad" without any reference to "courts."

80. SE No. 1556, *Sentencas Estrangeiras*, 281; *see* Rosenn, *Enforcement of Foreign Arbitral Awards in Brazil*, 28 AM. J. COMP. L. 498, n.2 (1980).

recognized and enforced in Brazil only after being duly recognized by a court of the country of its origin.[81] This requirement derives from the constitutional guaranty providing that "no injury to any individual right may be excluded from examination by the Judiciary."[82] Since Brazilian arbitral awards can be enforced only after judicial confirmation,[83] it was felt the same should apply to awards from arbitrators abroad.[84]

In 1978, Brazilian Supreme Court added a condition for invoking this requirement:[85] if a foreign arbitration award is issued in a State where it is enforceable without judicial confirmation, then the Supreme Court will homologate it for local enforcement purposes. If, however, an award comes from a jurisdiction where awards are submitted to a court for recognition before they can become enforceable, then the Brazilian Supreme Court will only homologate them after recognition by a court of the jurisdiction where the arbitration was effected.[86]

## B. Effect of Conventions

There are some commentators[87] who mistakenly argue that an arbitration award from one of the parties to the Bustamante Code[88] will be confirmed and enforced without homologation by a court of the State where the award was enacted. But the basic purpose behind recognizing foreign judgments is that they become as enforceable as they are in the rendering State. If an award from a Bustamante Code signatory is enforceable in that State only after it is duly ratified by a local court, this means that the award is not enforceable without such ratification and could not be recognized by our Supreme Court. Article 432 of the Bustamante Code[89] states that the procedures and effects that apply to foreign judgments are likewise applicable to arbitral awards. Among the Bustamante Code's rules on confirmation of foreign judgments, article 423(4) demands that it should be enforceable in the rendering State.

---

81. *See* SE No. 1982, 54 RTJ, 714 (1970) (denying homologation to an award from the American Arbitration Association because it had not been confirmed by a U.S. court).
82. Art. 153, § 4 of the 1967 Constitution, as amended in 1969.
83. Code of Civil Procedure, art. 1096.
84. *See* SE No. 2.006, 60 RTJ, 28 (1971) (denying confirmation to award rendered in London because it had not been confirmed by a British court). *See also* SE No. 2.398, *Sentencas Estrangeiras* 641 (1978) (confirmation when a New York court had given prior confirmation).
85. SE No. 2.486, *Sentencas Estrangeiras* 681 (1978).
86. P. de Miranda, 10 Comentarios ao C.P.C. 583; Moreira, *supra* note 2, at 85–86.
87. Valladão *supra* note 3, at 217–18; Aragão, *supra* note 19, at 181–2; and Rosenn, *supra* note 80, at 503.
88. Art. 432 of the Bustamante Code states:
> The procedure and effects regulated in the preceding articles shall be applied in the contracting states to awards made in any of them by arbitrators or friendly compositors, whenever the case to which they refer can be the subject of a compromise in accordance with the legislation of the country where the execution is requested.
89. *Id.*

872    THE INTERNATIONAL LAWYER

Thus, if an arbitral award does not need court confirmation in the State of its rendition and is immediately enforceable, it will also be in the confirmation State. But if the law of the State where the judgment was produced demands a court's confirmation before it can be enforced, it cannot have different effects in the State of confirmation. The Bustamante Code did not change the municipal laws of the signatory states as to whether arbitration awards have to be confirmed, or not, by the judiciary. Brazil, for instance, has maintained the need for confirmation by a court of any arbitration award, both in the Code of Civil Procedure of 1939 and in the new 1973 Code.[90]

The important lesson that one derives from Brazilian case law[91] is that the presence of the parties at the foreign arbitration proceedings is not sufficient to satisfy the notice requirement when a foreign court's confirmation is involved. It the defendant appears at the arbitration and acknowledges its award, in a country where awards have to be confirmed by a court, he has to be properly summoned to the court for the confirmation procedures, and if domiciled in Brazil, service of process will have to come via letter rogatory.

Professor Rosenn has written[92] that the Panama[93] and Montevideo[94]

---

90. Code of Civil Procedure, art. 1041(1939) and art. 1096(1973); *see also* Civil Code, art. 1045.

91. *See* SE No. 2.178, 91 RTJ 48 (1979); 92 RTJ 515; SE No. 2.424, 92 RTJ 1074 (1979); *see also* Rosenn, *supra* note 80, at 500, and 108 JOURNAL DE DROIT INTERNATIONAL.

92. Rosenn, *supra* note 80, at 504.

93. Inter-American Convention on International Commercial Arbitration, approved at the Inter-American Specialized Conference on Private International Law, Panama, Jan. 30, 1975, in 14 I.L.M. 336–39 (1975). Articles 4 and 5(e) read:

Article 4—An arbitral decision or award that is not appealable under the applicable law or procedural rules shall have the force of a final judicial judgment. . . .

Article 5(e)—The recognition and execution of the decision may be refused, at the request of the party against which it is being made only if such party is able to prove to the competent authority of the State in which recognition and execution are requested:

(e) That the decision is not yet binding on the parties or has been annulled or suspended by a competent authority of the State in which, or according to the law of which, the decision has been made.

These rules indicate that the foreign arbitral decision has to be *final* and *binding*, which is not the case when the foreign law prescribes the need of judicial confirmation of the arbitral award, and this confirmation does not materialize.

94. Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards, approved at the Second Inter-American Specialized Conference on Private International Law, Montevideo, May 8, 1979, in 18 I.L.M. 1224 (1979).

The Montevideo Convention, arts. 2(g) and 3(c), reads:

Article 2—The foreign judgments, awards and decisions referred to in Article 1 shall have extraterritorial validity in the State Parties if they meet the following conditions:

g. They are final or, where appropriate, have the force of *res judicata* in the State in which they were rendered.

Article 3—The documents of proof required to request execution of judgments, awards and decisions are as follows:

Conventions, signed by Brazil, if ratified, "may make the enforcement process faster and less complicated."[95] Upon a close reading, however, one should find that both Conventions are in harmony with the Brazilian Supreme Court's position that foreign arbitral awards have to be confirmed by the foreign court (if the law of the State in which the award was made demands it), before confirmation is requested of the Brazilian judiciary.

## VI. Division of Property Located in Brazil

Before the 1942 Law of Introduction to the Civil Code,[96] the Supreme Court homologated foreign judgments which adjudicated distribution of estates among foreign-domiciled inheritors, provided they would pay the local inheritance tax.[97] Because there was no equivalent rule in the former Introductory Law of 1916,[98] doubts arose after 1942, having to do with article 12 (1) which declares that "only the Brazilian judiciary has jurisdiction over actions regarding immovable property located in Brazil." Specifically, the questions included: whether this provision applied to inheritance procedures when the deceased was domiciled abroad and his estate contained immovables located in Brazil; and whether inheritors had to come to the Brazilian courts in order to request the succession judicial procedures, or could they proceed with them in their jurisdiction and have the foreign decision confirmed in Brazil for purposes of the Brazilian immovables.

Valladão thinks that Brazil is the only competent jurisdiction since the law refers to "actions regarding immovable property" in a general sense.[99] In practice, the problem has been avoided by autonomous inheritance procedures in each country where the deceased had property.[100] For example, it often happens that estates composed of properties are located in Brazil and Portugal, or in Brazil and Italy.

---

c. A certified copy of the document stating that the judgment, award or decision is final or has the force of *res judicata*.

There seems to be no *res judicata* in a foreign arbitral award which has to be confirmed by the court of the State in which it was rendered and has not yet been so confirmed.

95. *See supra* note 92. Professor Rosenn is not persuasive when he writes at pages 504–5 that article 4 of the Panama Convention eliminates the "prevailing double confirmation requirement" because, as seen above, everything depends on what the foreign law prescribes concerning judicial confirmation. For example, he does not explain why he thinks that the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (*see* 9 U.S.C. §§ 201–08) "eliminate[s] the need for judicial confirmation prior to seeking enforcement of a foreign arbitral award."

96. *See supra* note 12.

97. Valladão, *supra* note 53, at 721–2; Cunha, *supra* note 3, at 80, n. 8.

98. *See supra* note 79 and accompanying text.

99. H. Valladão, 2 Direito Internacional Privado, 232.

100. Valladão, *supra* note 3, at 195.

## A. Case and Statutory Developments

Valladão has written that for many years no foreign judgment of inheritance division had been presented to the Supreme Court.[101] This has now changed, and in the last decade the Supreme court decided various requests of inheritances of estates that included properties located in Brazil. The first of such recent inheritance cases was decided in 1969 by the Supreme Court.[102] It concerned public bonds, not real estate. The court confirmed a judgment from the Court of Appeals of São Paulo, which had thrown out an inheritance procedure of an estate composed of Brazilian public bonds because the deceased was domiciled in England and therefore the Brazilian courts had no jurisdiction. In another case, the *Estate of Raul Valdivieso Delaunay*, immovables located in Brazil which were distributed among his heirs in a judicial inheritance procedure in Chile, the court of the deceased's domicile. The Brazilian Supreme Court homologated the decision, providing that the heirs submit the Brazilian properties to the local inheritance taxes.[103]

This case reflects the precedents of the early part of the century and was based on the understanding that inheritance procedures are not necessarily included in the rule of "actions regarding immovable property" of article 12 (1) of the Law of Introduction. However, when the new Code of Civil Procedure became effective containing article 89—which provided that the Brazilian judiciary has exclusive jurisdiction over actions related to immovables located in Brazil and over inheritance procedures of properties located in Brazil, even if the deceased was a foreigner and resided abroad—the Supreme Court denied several requests for confirmation of foreign judgments concerning estates that contained properties located in Brazil.

In one such case,[104] a request was made for confirmation of a judgment of a Michigan court in the estate of Charles Arthur Draft, involving an estate that included properties located in Brazil. The Supreme Court denied homologation basing its decision on article 89, which confers to the Brazilian courts exclusive jurisdiction over such property. The same criterion was followed in other cases.[105]

## B. Bustamante Code

This legal development appears to contradict article 327 of the Bustamante Code which reads: "In cases of inheritance the competent court will

---

101. Valladão, *supra* note 99, at 236.
102. Extraordinary Appeal No. 66.608, Inheritance of George Aber to Chanbers de Souza, 53 RTJ 593 (1969).
103. SE No. 2.211, 68 RTJ 27 (1973).
104. SE No. 2.289, 76 RTJ 41 (1975); *see* 108 Journal de Droit International, 605 (1981).
105. SE No. 2.293, 78 RTJ 675 (1976); and SE No. 2.151.

be that of the place where the deceased had his last domicile."[106] Since the Code refers to the "residence" of the deceased and not to his "domicile," one interpretation might be that the article 89 of the Code of Civil Procedure only applies when the deceased had kept his domicile in Brazil and only resided abroad.[107] Another interpretation is that article 89 (2) only refers to cases in which the whole estate of the deceased is located in Brazil, whereas article 327 of the Bustamante Code, as its author has stated,[108] was meant to keep the unity of the inheritance procedure, which can be applied when the estate contains properties in more than one State. Thus, the competent jurisdiction will be the State of the decedent's last domicile. In other words, when the whole estate is located in Brazil, the Code of Civil Procedure applies, and Brazilian courts will be exclusively competent. But, when the deceased leaves property in two or more States, the Bustamante Code applies and competent jurisdiction is the one of the decedent's last domicile.

## C. Divorce Decrees

Foreign decrees of divorce which divide properties in Brazil between the two ex-spouses pose other questions. The first time the Supreme Court was asked to confirm such a foreign judgment, the requesting party presented a divorce decree from a Texas court which had divided the couple's property located in Brazil.[109] The Supreme Court confirmed the foreign judgment by deciding that article 89 (2) of the Code of Civil Procedure only refers to inheritance division of estates, not to divisions resulting from divorce proceedings. This remains an isolated precedent because all the subsequent cases of foreign judgments of divorce and separation of property have been confirmed by the Supreme Court as far as the divorces were concerned but not with respect to the division of properties located in Brazil.[110]

One could argue that article 89 (2) only refers to partitions of property in cases of inheritance, *mortis causa*. The entire article 89 is intended to apply to any actions, (*i.e.*, litigation), concerning immovables located in Brazil. Such "actions" are subject to the exclusive jurisdiction of the Brazilian courts[111] and inheritance and property-division procedures of estates located in Brazil are also subject to the exclusive competence of Brazilian

106. *See* Casad, *supra* note 18, at 5.
107. J. Dolinger, *O STF e a Universalidade do Direito Sucessorio in O Estado de São Paulo* (April 27 and May 4, 1975).
108. Lopes, *supra* note 53, at 255.
109. SE No. 2.396, 90 RTJ 11 (1978).
110. SE No. 2.446, 92 RTJ, 522 (1979); SE No. 2544, (3 RTJ 36 (1979); SE No. 2.654, 94 RTJ 524 (1979); SE No. 2.619, 96 RTJ 569 (1980); SE No. 2.722, 97 RTJ 533 (1980); and SE No. 2.709, 97 RTJ 67 (1980).
111. Art.89(1).

876    THE INTERNATIONAL LAWYER

courts.[112] This, however, does not include decrees of property-division in cases of *inter vivos* divorce without litigation.

## VII. Conclusion

Brazil was a pioneer in liberalizing foreign judgment recognition by: eliminating the reciprocity requirement over a century ago, never demanding a *revision de fond*, applying the system of *giudizio di delibazione* with fewer exceptions than the Italians, and caring not whether the foreign court applied the law indicated by the Brazilian rules of conflict of laws. Yet, in the last few years, the Supreme Court has imposed extensive controls over the recognition of foreign judgments process. The consequence is that the principle of *ordre public* has been playing an exaggerated role in this procedure. Hopefully, the Court will reexamine this policy and return to its former philosophy.[113]

---

112. Art.89(2).

113. The words of Professor Andreas E. Lowenfeld in *Sovereignty, Jurisdiction, and Reasonableness: A Reply to A. V. Lowe*, 75 A.J.I.L. 629, 637 (1981), are appropriate: "I would have thought that all civilized nations would strive to assist and not block each others' judicial proceedings, and would strive to enforce and not thwart each others' judgments."