UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 13-24583-CIVIL-SEITA

CHRIS P. CARTER, Individually and on behalf of all others similarly situated,

Plaintiff,

vs.

FORJAS TAURUS, S.A., TAURUS INTERNATIONAL MANUFACTURING, INC., and TAURUS HOLDINGS, INC.,

Defendants.

Miami, Florida

April 23, 2014

10:05 a.m. to 12:49 p.m.

Pages 1 to 107

---

RULE 16(B) SCHEDULING CONFERENCE
BEFORE THE HONORABLE PATRICIA A. SEITZ,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

DAVID L. SELBY, II, ESQ.
BAILEY & GLASSER, LLP
300 Riverchase Galleria
Suite 905
Birmingham, Alabama 35244
-and-
TODD WHEELES, ESQ.
MORRIS, HAYNES, HORNSBY & WHEELES
3500 Colonnade Parkway
Suite 100
Birmingham, Alabama 35243
-and-
ANGELO MARINO, JR., ESQ.
645 Southeast Fifth Terrace
Fort Lauderdale, Florida 33301

FOR THE DEFENDANTS: JOHN PATRICK MARINO, ESQ.
SMITH GAMBRELL RUSSELL
50 North Laura Street
Suite 2600
Jacksonville, Florida 32202
-and-
TIMOTHY A. BUMANN, ESQ., and
DAVID A. MOBLEY, ESQ.
SMITH GAMBRELL RUSSELL
1230 Peachtree Street, Northeast
Suite 3100
Atlanta, Georgia 30309

REPORTED BY: LISA EDWARDS, RDR, CRR
Official Court Reporter
United States District Court
400 North Miami Avenue
Twelfth Floor
Miami, Florida 33128
(305) 523-5499

THE COURTROOM DEPUTY: Case No. 13-24583-Civil-Chris Carter versus Forjas Taurus.

Counsel, please state your appearances.

MR. SELBY: David Selby on behalf of the Plaintiff.

THE COURT: Say it again.

MR. SELBY: David Selby on behalf of the Plaintiff.

THE COURT: Mr. Selby. Okay.

I suspect by the accent you're from Alabama.

MR. SELBY: Yes, your Honor.

THE COURT: Okay.

MR. WHEELES: Todd Wheeles on behalf of the Plaintiff.

THE COURT: And?

MR. ANGELO MARINO: Angelo Marino on behalf of the Plaintiff.

THE COURT: Okay, Mr. Marino.

Anyone else? There's someone sitting behind you.

MR. BRENNAN: William Brennan.

MR. ANGELO MARINO: He's a law clerk, your Honor.

THE COURT: You can have him sit up there next to you if you want to.

MR. JOHN MARINO: I'm John Marino on behalf of the Defendants, your Honor.

THE COURT: Any relation to Mr. Marino?

MR. JOHN MARINO: Not that we've figured out yet. But we haven't tracked that down yet.

THE COURT: Okay.

MR. MOBLEY: David Mobley on behalf of the Defendants, your Honor.

THE COURT: Okay.

MR. BUMANN: Tim Bumann on behalf of the Defendants, your Honor.

THE COURT: "Human"?

MR. BUMANN: "Bumann," B-u-m-a-n-n.

THE COURT: Please have a seat.

Since I do not know any of you personally, I thought that this would be a good opportunity if you all could give me your elevator speech so that I can sort of find out about each one of you and get to know each one better, since there are six of us, so that we could do this within ten minutes. Do you think we could do that within ten minutes?

We'll start with you, Mr. Selby. Just sort of give me your elevator speech. I gathered you grew up in Alabama. But just sort of share with me a little bit about your background and otherwise make me comfortable in knowing you --

MR. SELBY: Sure, your Honor.

THE COURT: -- since you're *pro hac*.

MR. SELBY: Sure, your Honor.

I actually grew up in Florida in the Panhandle area. I moved to Alabama to attend law school in the early '80s and attended law school in Alabama, Cumberland School of Law.

I graduated Cumberland School of Law in 1990 and practiced for a period of time in the District Attorney's Office in Tuscaloosa, Alabama, and actually worked specifically in the violent crime division for that office.

I left there and went --

THE COURT: How long did you work in the District Attorney's Office?

MR. SELBY: I apologize. How long?

THE COURT: Yes.

MR. SELBY: I was there two and a half years.

THE COURT: Okay.

MR. SELBY: And after leaving the District Attorney's Office, I went to work for a defense firm in Birmingham, worked there for a period of time and then went to another larger firm and was there for a considerable amount of time.

I was a partner there, and myself and one other equity partner with that firm left to establish our own firm and built that up to 10 to 12 lawyers over a 10-year period.

I joined Bailey & Glasser, the firm I'm presently with, two and a half years ago as my class-action practice continued to grow and joined a firm that specifically concentrates in class-action work.

THE COURT: So how long did you do the defense side before you decided, like some of the other members of the Bar, that, "No. I should really be on the plaintiff side"?

MR. SELBY: Your Honor, I did only defense work for probably a period of 10 to 12 years. But then, after that period of time, I was doing defense and plaintiff work for a number of years. And then it was probably in the last five years that I've been primarily doing plaintiff work only.

THE COURT: And primarily class action?

MR. SELBY: Primarily class action, product liability and a good mix of commercial plaintiff work as well on behalf of some business clients.

THE COURT: Tell me the product liability types of class actions that you've handled.

MR. SELBY: Specifically, a large group of cases handled against manufactured housing manufacturers and component manufacturers of those dealing with defective manufactured homes, which also somewhat morphed into deceptive trade practices act cases out in California and here in Florida, dealing with improper insulation in mobile homes.

I have also done car cases. Those primarily have been under some our State Rule 15, under more of a mass tort scenario, in which -- suing car dealers and car manufacturers over a particular common defect or common fraud.

THE COURT: So it's been primarily those two big class actions in the last five years?

MR. SELBY: Primarily -- no, your Honor.

I have also outside of the product liability side been

doing some class-action work, have done and am currently in TCPA cases dealing with the Telephone Consumer Protection Act, with the Fair Credit Reporting Act. Those cases are pending in California, some in Alabama.

I also work on the MDL with Stryker hip cases currently. I am not in any kind of lead position on those cases, but am very involved because our firm has several cases. And we are working in the MDL in Minnesota on those cases.

THE COURT: Okay. Thank you.

And Mr. Wheeles?

MR. WHEELES: Yes, ma'am.

My name is Todd Wheeles.

THE COURT: Or "Wheeles." Okay.

MR. WHEELES: "Wheeles." Yes, ma'am.

THE COURT: Accent on the last syllable as well.

MR. WHEELES: Yes, ma'am.

Born and raised in Alabama. Auburn undergraduate. I have only been practicing law going on 12 years. Before that, I worked for the State of Alabama as a state trooper and agent with the state police for the last seven.

I was with the Alabama Bureau of Investigation, went back to law school at Birmingham School of Law in Birmingham and passing -- I passed the Bar and have been practicing law. August will be 12 years.

I'm a partner in a personal injury firm in Alabama. We

have two offices. One is in Alexander City and one's in Birmingham.

I primarily focus on -- 100 percent of my practice is personal injury, wrongful death. It includes some product liability work with firearms.

We have worked on tread separation product liability cases as well. The vast majority of my cases are commercial trucking litigation issues.

THE COURT: Okay. Any idiosyncrasies of either one of you that I should be aware of or special vices or passions? You can disclose that you're a chocoholic.

MR. WHEELES: Well, no, ma'am.

I have done some firearm work before. Mr. Bumann and I know each other well. I've handled several Taurus personal injury cases over the last five or six years.

THE COURT: Mr. Who?

MR. WHEELES: Bumann.

THE COURT: Oh. Okay.

MR. WHEELES: Defense counsel. Yes, ma'am.

THE COURT: So known entities.

MR. BUMANN: Yes, your Honor.

THE COURT: I'm going to get to you, too.

And Mr. Marino?

MR. ANGELO MARINO: Good morning, your Honor.

I was born and raised in New Jersey -- Paterson, New

Jersey, very close to New York, and at 17 I left there to go to school in West Virginia.

I graduated from West Virginia in '68 and, due to the Vietnam War, I sat out a year and then went to law school at Ohio State University. I graduated in '72.

I'm licensed in Ohio and, also, in Florida. I've been practicing basically 42 years in Florida.

THE COURT: A young kid.

MR. ANGELO MARINO: No.

THE COURT: A young kid, from my perspective.

MR. ANGELO MARINO: I first started out in a law firm of about seven lawyers, and we did personal injury, criminal law, basically.

I was a partner in the law firm after three years and then, after about five years, I opened up my own law firm. And, I guess, over the 30-plus years I've been practicing, I've had various partners on and off.

But today I practice solo with the exception of having my law clerk behind me, Billy Brennan, who has just recently passed the Bar and hopefully will be joining me shortly.

My practice basically has been a lot of medical negligence practice with the exception of probably the last ten years, where the changes in the law have greatly affected that.

I've done products liability. I've done all types of personal injury cases. I've done consumer litigation, which

includes bank fraud, mortgage fraud, auto fraud, things along those lines.

THE COURT: And when did you move to Florida?

MR. ANGELO MARINO: 1972.

THE COURT: What made you decide to come to Florida?

MR. ANGELO MARINO: Well, my parents, who lived in New Jersey, loved Florida, always intended to retire here. And because I left home at an early age and never returned, I thought I would spend my time being with them their last years in life. Unfortunately, my father never made it, but my mother does visit.

THE COURT: Okay. Let me hear from the defense counsel.

Mr. Marino, any roots --

MR. JOHN MARINO: Well, I'm originally from New York, your Honor, Upstate New York.

THE COURT: That's not far from -- oh. From Upstate New York, you said.

MR. JOHN MARINO: Upstate New York, a little town called Geneva. I still have a lot of family up there.

When I was a teenager, we moved to Lakeland, Florida. I attended high school in Lakeland and then I attended Florida State University and went to the University of Florida Law School after that. I graduated in 1989.

THE COURT: You didn't feel like you were being

disloyal?

MR. JOHN MARINO: I did a little bit. I was very convicted about that, your Honor. I'm still a die-hard Seminole. When people asked me, "Why did you go to the University of Florida?" I said, "Because that's where I got in."

But yes. I'm still conflicted about that to this day. My wife is a die-hard Seminole; so, we are Seminole fans. But I'm obviously proud of having gone to the University of Florida as well.

We moved to Jacksonville right out of law school. I've been in Jacksonville for 25 years. Originally, I joined a firm called LeBoeuf Lamb, which was a big New York-based firm.

THE COURT: Didn't it recently die?

MR. JOHN MARINO: Well, it recently -- it merged with --

THE COURT: An inglorious death?

MR. JOHN MARINO: It did die. It merged with Dewey Ballantine and they didn't do well for them. I tell people I was never a partner at Dewey. At LeBoeuf, I was just in civil law.

I left LeBoeuf about ten years and joined Fowler White Boggs in Jacksonville and was the managing partner there for ten years. About a year ago I joined Smith Gambrell Russell in their Jacksonville office, where we have about 35 attorneys.

Since about my second or third year as an associate at LeBoeuf, I've done class-action litigation all on the defense side, primarily insurance and consumer stuff, some products stuff. But, you know, right now probably 95 percent of my practice is class-action defense work.

THE COURT: Thank you very much.

Mr. Mobley?

MR. MOBLEY: Good morning, your Honor. David Mobley.

I am a --

THE COURT: "Mobley." Okay.

MR. MOBLEY: -- fourth-generation-born-and-raised Floridian. I happen to be living in Atlanta right now. I grew up in --

THE COURT: When did Smith Gambrell open up an Atlanta office?

MR. MOBLEY: Smith Gambrell has been in Atlanta for over 120 years. Our firm --

THE COURT: I always thought it was a Florida firm. Okay.

MR. JOHN MARINO: It opened in Florida in about 1990.

MR. MOBLEY: Yes. The firm stretches back quite a bit over the years through some predecessor firms.

I graduated with an engineering degree from Auburn University in 1992 and went to work in the construction business and actually worked in South Florida for several years

before I went back to law school.

I went to University of Alabama Law School. So I have some --

THE COURT: Were you there when Mr. Selby or Mr. --

MR. MOBLEY: I was not. I knew of Mr. Selby because I think he was at the DA's Office around the same time. I think some of my classmates may have worked in that office. But we didn't know each other.

THE COURT: Okay.

MR. MOBLEY: I left -- when I graduated from law school, I went to work for the US Department of Justice through the honors program and got assigned to Atlanta to the antitrust division. I was doing criminal work, investigation, prosecution.

THE COURT: And how long were you with the DOJ? Just the two years or three years?

MR. MOBLEY: Two years almost to the day. Two years I was there. And then I worked for a large law firm in Atlanta with, at one time, probably 750 lawyers, Kilpatrick Stockton.

I worked for their construction group because of my background in construction. So I was working on a number of complex construction cases all over the country.

I came to Smith Gambrell in 2007 and had -- was working in their construction group, and somewhere along the way I got an opportunity to work with Mr. Bumann and have been doing

products cases for several years with him.

THE COURT: Why did you decide to switch from construction to products? Because the substance matter and the industry is just so different.

MR. MOBLEY: When I -- when the economy took a downturn, I had to move to survive. I went into commercial litigation and -- in my firm and I handled a high-volume creditors' rights practice.

I was handling probably at the height of it somewhere between 100 and 150 cases for large banks in the Southeast, doing commercial litigation for them.

And then one day I met Mr. Bumann and realized we both enjoy firearms and I liked what he did and I liked him. So he took me on. So I haven't really looked back since.

THE COURT: How did you meet Mr. Bumann?

MR. BUMANN: We're in the same firm, your Honor. I'm a partner in the Atlanta office of Smith Gambrell. I came over in 2006.

I was a managing partner for a New York firm in their Atlanta office and came over in 2006. I've been practicing -- doing product liability work for 25 years.

THE COURT: I didn't realize New York firms did products liability other than pharmaceutical cases.

MR. BUMANN: Well, they kind of wanted my practice for the size and volume and revenue. So I don't think they liked

firearms that much, but they put up with it.

Most of my practice has been --

THE COURT: Are you saying that --

MR. BUMANN: I'm sorry?

THE COURT: They found you attractive because of the dollars that you were dressed in.

MR. BUMANN: That's exactly correct.

THE COURT: Everyone can be bought.

MR. BUMANN: But not cheaply.

THE COURT: That's the important thing in the negotiation process.

MR. BUMANN: Exactly.

Most of my practice has been firearms, but I've also done a variety of other things. I do a lot of industrial machinery cases, and I also do some medical device work.

I do -- I represent the company that makes the pill cam that you swallow and has cameras in it. I do their work as well.

And most of my clients have large retained risks; so, I'm -- I do all their work in North America. So I travel and try cases in many jurisdictions constantly.

THE COURT: Where did you grow up, again?

MR. BUMANN: My parents were both in the Navy. I was born outside of Washington, DC, and my family's from the Savannah area.

We went back to Savannah and then I went on active duty right out of high school and have been from all over.

THE COURT: In the Navy?

MR. BUMANN: No. No, ma'am. I flew rescue helicopters in the Coast Guard from '77 to '83 and was out. I went back in a few years back.

I'm currently serving as a lieutenant colonel in the Georgia National Guard, anti-terrorism officer. I'm also a municipal court judge in my home jurisdiction.

THE COURT: And you have 15 clones that you troop out so that you can do this 24/7, all of the --

MR. BUMANN: My -- I do, actually. I have several people that help me out. I've got a great team of folks that do that. And I do my judicial stuff and my military stuff almost -- just because I enjoy it. It's almost a hobby for me.

THE COURT: What was your undergraduate degree in?

MR. BUMANN: Political science. So that -- you know, I went to law school by accident. I had gone through -- come up active duty and started college and I needed to made an age gate to go back --

THE COURT: An age gate?

MR. BUMANN: You had -- to go back to Pensacola and go back to flying, I had to be under a certain age. So I went through college in two and a half years.

And then I had a year wait so I could -- I still had

some GI Bill money left. So I ended up applying to law school and got in law school. And when my orders came in, I turned them down and stayed in law school.

THE COURT: Where did you go to law school?

MR. BUMANN: I went to Georgia State University in Atlanta. I was in one of the first classes, was recruited to go there.

I've been doing this ever since because I don't really have any marketable skills.

THE COURT: It's nice to know that a poli sci degree can get you into sophisticated prospects.

MR. BUMANN: It's totally by accident, your Honor.

THE COURT: I appreciate the little background on everyone, because what I'd like to do is three things today.

I need some additional information on the motion to dismiss.

The second thing is I'd like to -- although there's not been a motion to dismiss and I don't invite one, since time has passed, I would like to talk to the Plaintiffs, though, about looking at this case long range and how do we simplify this case so that we are very focused.

And then the last thing is that I saw the parties' case management plan and respect that. I just want to make sure that it is something that will actually work because, once I adopt the dates, it's put in concrete.

Let me tell you a little something about myself. I'm a very practical person. I see us as a three-party team. I look at counsel as being first and foremost an officer of the Court.

I recognize that you are advocates for your respective side and that ours is an adversary process. I've been very impressed by the parties' papers and, so, that gives me confidence that I'm looking at a great team of lawyers.

But I ask you all to remember that, ultimately, your responsibility, as an officer of the Court, needs to trump any questionable or -- how do you say it? -- cabin zeal with which one represents one's client.

And the reason for that, of course, is because, as an obligation to your client, you need to make sure that the system works, that it works the way it's intended and that it is not abused, because, if you getting something cheaply, it'll come -- what goes around comes around.

And I would like to make sure that counsel always remember that, ultimately, you owe it to your clients to make sure that the system works fairly and impartially and dispassionately.

I understand very much that litigation is not cheap. I understand here that the Plaintiffs are on a contingency and, so, they need to be as efficient as humanly possible.

I also understand that the Defendants' clients do treat lawyers as if you are going to the dentist. They do not like

to be bothered to have to look backwards, find documents, provide people to assist and that they look at -- the legal department of any corporation is not a profit center and, therefore, is viewed as something that has to be tolerated. I recognize you all are outside counsel; so, you have to keep the in-house counsel happy.

So the bottom line for both sides is that I am, I said before, very practical and understand the need for both sides to be as cost efficient as humanly possible, consistent with what is fair, impartial and dispassionate so that, ultimately, if this case does not resolve, we try it to a jury and we do it in a fashion that both sides feel that they can have an opportunity to present their case fully and fairly.

I also have a great desire -- because I'm a past president of the Florida Bar, but, as I said, that was back in the early '90s. So I'm a little bit with Mr. Marino as far as how long I've been in the trenches.

And it's hard for me to take off that old hat of being the Bar president because I had an opportunity to look at lawyers nationally and like lawyers and want to show off lawyers to the jury that is going to come in here.

And I want the jury, because this is their first opportunity to see the law in action, to understand that lawyers do provide value in our society.

And I figure that you all do this because you enjoy

trying cases and, so, I want to be able to give you the opportunity to demonstrate why you are masters of the craft. The bottom line is I like to show you off.

So keep those principles in mind as you understand and work with me on this case.

One of the procedures that we use to keep the costs down is that, when there is a discovery issue that both sides have met and conferred and cannot resolve in good faith, you simply call my magistrate judge, Judge Turnoff, and he will hear you the next week without filing motions.

Of course, you have to do this within 14 days of the problem and there can't be a problem that you let fester for a long time. And this is -- all of this will be in the order when it comes out setting the scheduling and the case management plan and the trial date. But I just want to give you a heads-up.

I am also open to any suggestions that you all have as to how we can tee up the critical essential issues in the most cost-effective, speedy way.

I promise you that I will rule on any motions for summary judgment before the pretrial stip needs to be prepared. You will see what I need in that pretrial stip because the pretrial conference will really be a dress rehearsal for the trial.

I try and deal with all of the motions in limine before

the pretrial conference so that counsel can make the transition from the discovery mindset, where you turn over every rock, to "How do I decide which of the rocks in my box I am going to arrange so that I can persuade the jury as to the righteousness of my position?"

You all have been trying cases long enough to know that you spend, especially in a complex case, two years uncovering everything. The repository in your brain of the information of the case is beyond what the jury in two weeks is going to be able to digest.

And your job, as teachers, is to pick the gems of those rocks and array it in a fashion that is absolutely dazzling, mesmerizing and has them fill out the verdict form the way you want it to be. And that's the great fun for me, is seeing great trial lawyers in action.

So any questions about sort of my mindset? Because I think that that is very helpful to counsel, to know that we try and make sure that motions are ruled on and things like that.

Let me also introduce my law clerk that's working with me on the case. Unfortunately, his tour of duty ends on September 1st.

I'm going to miss him very much because he has come to me from -- also from Atlanta, a double Emory, and he practiced law in New York and then served for four years in the -- as a Marine in the JAG Corps and has come down here from the

criminal side and has become an in-house resident on patent cases, which he never thought he would, and he's actually found that he enjoys them as much as I do and that they are great fun.

We are on -- I am on -- one of the national patent project judges. As part of that, we have probably a larger diet of patent cases than some of my other colleagues in the Southern District.

Any questions? This is Arun Ravindran. I didn't give you his name. Arun Ravindran.

He cannot give you any legal advice. But if there is an issue, the two of you, a representative from each side, you know, for scheduling purposes, can get on the phone, call him sort of -- we try and work with counsel, in other words. Of course, we ask that you not abuse that. Okay?

And the magistrate judge that I'm now paired with is Judge William Turnoff. He has two -- in fact, I'm the one that he's priming handling. He is renowned in this district as a mediator as well, and he is ready, willing and able to do anything and everything for me. So we truly work as a team.

Unfortunately -- because today he is duty judge. Otherwise, his law clerks would have been here so that you could have had an opportunity -- the law clerk that is responsible for this case would have been here so you at least could have seen the face that goes with the voice on the phone.

But any questions as to -- now that you've told me a little bit about yourself and I've told you a little bit about ourselves?

MR. SELBY: No, your Honor.

THE COURT: Let's turn to Item No. 1, which is the motion.

And give me a couple of facts. What is the cost -- I'm a very practical person. What is the cost of translating the complaint into Portuguese?

MR. BUMANN: That's probably a question --

THE COURT: But you all represent your clients. So certainly you all have run into these issues before and are familiar with Portuguese.

I will share with you all I lived in Brazil in the '50s and my family moved back down in the late '60s. And so I have very rusty Portuguese. But I am somewhat familiar with their legal system.

MR. BUMANN: Excellent.

Your Honor, the cost is not tremendous and the cost of the letters rogatory process is not tremendous either.

THE COURT: What is it? Give me some data. Give me some facts.

MR. BUMANN: If I had -- when I have to translate a document into Portuguese, I have somebody at the firm that does it; so, it costs essentially nothing. But I don't know what it

would cost the Plaintiff to have it translated.

THE COURT: You have a reason to hire a full-time in-house translator from English to Portuguese and Portuguese to English. Correct?

MR. BUMANN: Yes, your Honor.

THE COURT: And how much do you pay her a year?

MR. BUMANN: Well, it's actually one of my partners who's out of our European office. We have an office in Europe and she's fluent in Portuguese as well as some other languages.

THE COURT: Smith Gambrell now has -- you're with Smith Gambrell?

MR. BUMANN: Yes, ma'am. I hope to still be. Anything can happen.

THE COURT: So it's only 30 in Jacksonville?

MR. BUMANN: Yes, ma'am. There's a couple hundred lawyers. We have an office in Europe. We have an office in New York, an office in Jacksonville and Atlanta and DC. We have a large patent practice out of DC. We also have a nonpermanent presence in Israel as well as Hong Kong.

THE COURT: I notice that nobody wants to have their business located in Brazil anymore. They all want to have their headquarters here in Miami.

MR. BUMANN: Our client, Forjas Taurus, was in -- you may be familiar with Port Alegre, which is down south.

THE COURT: Right.

MR. BUMANN: And we have other clients. We have a lot of clients out of Brazil.

THE COURT: It is the sleeping giant if it ever gets its --

MR. BUMANN: It is.

THE COURT: -- if I were not an American, I would be a Brazilian.

MR. BUMANN: Well, I'm sure they would be pleased to have your Honor as a citizen.

THE COURT: And they are very aggressive. If you were born there or you are a child of someone that is born there, you are automatically a Brazilian citizen.

MR. BUMANN: They're very protective of their sovereignty, as the Court must be aware.

THE COURT: I'm very sensitive to that.

MR. BUMANN: And that's really what the -- what our 12(b)(5) is bottomed on.

THE COURT: And this is my practical side again for the Plaintiff, is that, in looking at the case law, the Eleventh Circuit's decision discussing the Ninth Circuit's decision, it would appear to me that you've satisfied -- my concern for the Plaintiff is, if I deny the motion to dismiss, you all are going to have a problem enforcing your judgment in Brazil.

And so my question back to you is: What prevents you from -- if I deny the motion, but you proceed with the letters

rogatory if you want to make sure that you have an enforceable judgment?

The problem that I have is that the purposes of service -- and this is my additional question that I need the Defendants to answer -- is that, in Brazil, I cannot -- I do not know and none of the affidavits have discussed what does the Brazilian judge do.

What is the process? What is the criteria whereby the judge evaluates the sufficiency of the complaint? Is it like a motion to dismiss that you look at -- I mean, if the causes of action are causes of action that are cognizable in either federal law -- US federal law or US common law, Brazil, being a code country, may not have similar.

So how does a Brazilian judge make that evaluation or is it simply a form issue that they -- sort of like a pleading standard has to put the Defendant on notice? What is involved in that? How long does that take?

MR. BUMANN: I've represented Forjas Taurus for 25 years. And my experience, myself, has been, if the service is not by letters rogatory, the Brazilian Supreme Court doesn't even look any further. The complaint -- the judgment is not honored.

THE COURT: Okay. And that I understand.

Mine right now is a practical question as to: What is involved in the process of issuing the letters rogatory?

It goes to a Brazilian judge. The Brazilian judge then examines. What is the standard that the Brazilian judge uses? Where is that in the law so that it's clear for the Plaintiff as to what is the standard? What is the time sequence? What is the cost of doing all of this?

MR. BUMANN: And this is to give -- is going to be from my personal experience, your Honor.

It's not tremendously expensive. I've seen it take as little as 90 days, recently, to get the process done.

The letters rogatory are transmitted to the Brazilian Supreme Court in Brasilia. At that point, as you note, it is a code law country and one of their administrative folks at the Brazilian Supreme Court looks at the papers and, if they're in Portuguese -- translated into Portuguese and they are on a diplomatic letter of rogatory that's a valid letter of rogatory, it's then transmitted to a magistrate in the state, in this case, down at Port Alegre, who then has it served on the company down there.

And it used to take a long time. But, as I said, we had a case recently that it was -- it may have been less than 90 days. It was are quite a quick one.

THE COURT: How long ago was that case?

MR. BUMANN: This was 2013.

MR. MOBLEY: 2013.

MR. BUMANN: 2013, your Honor.

THE COURT: Okay. And where was the -- so the case originated up here in the United States?

MR. BUMANN: Yes, ma'am. It was out of Utah. It sure was.

THE COURT: And what was the -- when you say 90 days, 90 days from when the letters rogatory hit Brasilia?

MR. BUMANN: No, your Honor. It was about 90 days after the order was signed for the -- setting in motion letters rogatory by the state court judge in Utah.

It was quite brisk a pace. In the past, it would take much longer. But it's taking shorter and shorter periods of time.

THE COURT: And why is that? Because it's been infamous as to how long it's taken in the past.

MR. BUMANN: It has. It violates the rule of in perpetuity almost. I think it's just technology and, as the Court observed, the country is a sleeping and they want to stop sleeping. They want to do away with some of the ideas that people have about Brazil and about their legal system there and about how difficult it is.

So I think they're sort of picking up the pace in order to sort of join the first world, if you will, and become that industrial giant in South America and get on the world stage. So they're sort of joining everybody else.

They haven't signed on The Hague, for example. So

discovery still can be a challenge. But we can work through those challenges. I just think that they realize they have to sort of get with the program.

THE COURT: You know, under 4(d) of the Federal Rules of Civil Procedure, any corporation that is amenable to service under any other of the subsections, if the Plaintiff asks them to waive service and they refuse to waive service, particularly here, where they are on notice of the lawsuit and have a copy of the lawsuit and have able counsel and -- the corporation can insist on service, but then the corporation will be liable for all of the costs that are incurred in that process.

MR. BUMANN: Yes, your Honor.

THE COURT: From a business perspective, what does the Defendant propose to keep those costs down?

MR. BUMANN: What does the Defendant propose?

We don't really have a proposal, your Honor. But they understand that whatever the costs are they'll bear. But they -- they're protective of their sovereignty, your Honor.

THE COURT: I understand.

What I'm asking you, as an officer of the Court, how do we keep this case moving and make sure we do not -- because right now, because the Defendant has notice that satisfies the due process considerations that the Eleventh Circuit has talked about, the question is: How do we respect the Brazilian sovereignty, but keep the case moving and keep the costs down?

And since I'm going to ask the Plaintiff to make a formal request on you to accept service and if you choose not to, then you will be obligated to pay the costs, because I anticipate that they will do that.

My question to you is: What do you propose to do if you choose not to accept service? Because your client can choose to accept service if your client wants to.

MR. BUMANN: Absolutely, your Honor. They can.

THE COURT: And that would still respect the sovereignty of the state -- of Brazil.

MR. BUMANN: No question.

THE COURT: So why haven't you done that? Is it because they haven't formally asked?

MR. BUMANN: No. No, your Honor.

My client historically has demanded that service be made by letters rogatory. What I've discussed --

THE COURT: For what purpose in this particular case?

MR. BUMANN: In this particular case?

THE COURT: Uh-huh.

MR. BUMANN: My discussion with the client concerning this particular case was fairly brief because they indicated that they -- they didn't have any reason to change their policy.

What I'm understanding from the Court is that, for all practical purposes, the demand has been made. And I understand

that. And what I need to do is go and talk to the client and determine whether they're in this case willing to waive that service. And I'm happy to do that.

And I will educate them concerning -- or make sure that they understand and remind them -- because they do have new corporate counsel down south -- about the service costs issue and they may very well change their mind.

THE COURT: Or what they can do, if they want to go through the form, they can work in tandem with the Plaintiff to facilitate and move it through the process. Don't you think?

Because I'm trying to figure out what to do here because I am concerned for the Plaintiff that the realities are, if you try and -- if you get a judgment and you try and enforce it in Brazil, I think you're going to have problems. So all of this is a waste of time.

It's the old adage: If the judgment is not collectible, it's not worth the paper that it's printed on. I don't think any of us here are interested in just churning our wheels for that purpose.

So I think you need to start the process. The question that I have here is: Given the very respected counsel that I have on both sides, how can we take care of the concerns that your client has?

And I can understand you don't want to open the floodgates to anyone willy-nilly, you know, sending stuff down.

You need to be aware of it. But I think, in this case, the Plaintiff really has tried to make an effort to work with you all to make sure that your client has the complaint.

I'm going to work with Plaintiff's counsel here today as to how do they simplify their complaint and I'm going to require that Plaintiff's counsel work with you or we can use your partner to translate the complaint into Portuguese.

Because I, having worked with in-house counsel, and you, having worked with in-house counsel, know that they don't have a fun job.

MR. BUMANN: Your Honor --

THE COURT: Right?

MR. BUMANN: Correct.

THE COURT: I want to make sure that he looks good with his in-house client because, if he looks good with his in-house client, his in-house client is calmer and, you know, let's solve the problem.

MR. BUMANN: I don't have any authority to agree to this, but I'll throw it out anyway.

I think, to date, the complaint has not been translated into Portuguese.

MR. SELBY: Correct.

MR. BUMANN: I have a practical problem in that the GC down there is on maternity leave.

THE COURT: Okay.

MR. BUMANN: Her second, who is fluent in English, is not -- this is not his area of the law, product liability.

THE COURT: So he's nervous.

MR. BUMANN: No. He's terrified. He's past nervous.

Because they don't understand class action. They look at that and go, you know, "What are you on? Meth? What is this? This makes no sense to us."

So -- and the other lawyer doesn't speak any English at all, which is why I'm taking Portuguese lessons.

So I think --

THE COURT: Molto ben.

MR. BUMANN: Well, you know, I don't have any marketable skills other than this; so, I have to do something to keep it going.

At a minimum -- and I would be concerned about having us translate the complaint, our firm. What I would propose would be that we get one of the -- somebody that's on the panel of Court-approved translators to translate the complaint.

THE COURT: Okay.

MR. BUMANN: And, in the meantime, I will see if I can't pull a rabbit out of the hat and have them -- and we do some -- achieve some level of formality that the client is comfortable with short of the entire letters rogatory process and the time involved.

I'll explain to them the cost and the importance,

really, of having all the Defendants in lockstep procedurally as we move forward with the case. I would anticipate that I can have some word back within the week.

THE COURT: Mr. Selby, does that sound like a -- does that sound like a workable plan?

MR. SELBY: Yes, your Honor.

THE COURT: And, you know, what the parties will need in this case is a translator that you both agree on so that both of you have comfort that this is -- that the person knows what they're doing, in other words, it's not just somebody who speaks Portuguese and is certified, but who understands the American legal system and, hopefully, some of the Brazilian legal system.

So I suggest that you begin to look to find somebody that you all have comfort with that you can agree on and maybe just split the cost.

MR. BUMANN: Is there somebody on the panel -- approved panel down here that's approved for Portuguese? I know the district courts have --

THE COURT: We have. And she's very nice -- or at least the last time I used her she was very nice.

MR. BUMANN: She has to be nice to you, your Honor.

THE COURT: That's true.

Do me a favor. Call Linda and see if she can call down to the translating section.

Linda, if you're listening, can you please call down to translation and see if the -- whom the Court uses for Brazilian Portuguese translation.

What about the University of Miami law professor?

MR. BUMANN: Are they for the affidavit?

THE COURT: Yes.

MR. BUMANN: I'd be fine with that.

THE COURT: But he's probably so expensive.

MR. BUMANN: He's not cheap.

THE COURT: Yeah. That's why the cost of legal education is so outrageous nowadays.

MR. BUMANN: I've bought cars cheaper than that thing cost. Just something about the cars I own, I suppose.

THE COURT: He's even older than Mr. Marino and I.

MR. BUMANN: He is very good. He knows what he's about.

THE COURT: I think what you need is somebody that's probably a little cheaper and will be more responsive. I don't know how responsive he is.

MR. ANGELO MARINO: Mr. Rosen was my professor at Ohio State University, constitutional law.

THE COURT: No kidding.

MR. ANGELO MARINO: He's probably very expensive.

THE COURT: Yes.

MR. BUMANN: He's not cheap.

THE COURT: That's what they do. They charge the law schools an arm and a leg. I mean, they make much more than federal judges, although federal judges don't make that much anymore. We just got a COLA. We're very happy.

MR. SELBY: Judge, I would say, too, the only issue for -- even if it was cost-effective with him, if down the road for whatever reason from a procedural standpoint we had to challenge anything, just, for example -- you know, certainly we're not going to get into that here today.

But, you know, I am aware of some inconsistent positions he's taken with what is in his affidavit in the motion to dismiss support.

So I don't want to get somebody that may be, you know, in that role and then have to sit across a table from him taking a deposition if it came down to that.

THE COURT: I think Mr. Bumann's recommendation to see who the Court uses as a certified translator -- the problem is that where we use the certified translator most frequently is in criminal cases.

And so they are not that -- and she's very knowledgeable as far as the idiosyncrasies of federal criminal procedure. She may not be as knowledgeable. But she always has struck me as being a quick study. And so, if both sides would sit down and sort of help....

Did Linda -- was Linda -- is she back there? Just call

down to Jean Vera. Find out if we can and then let me know. Okay? Thanks.

This is Aatif Iqbal, who is my other law clerk.

Thanks, Aatif.

So the plan of action is, by this time next week, you will let the Plaintiff know whether or not your client will accept service and we will come up with a plan to get the complaint translated.

And, given that, I think that we might be able to resolve this motion to dismiss in a productive fashion and keep the case moving or, actually, almost make it moot.

MR. BUMANN: We'll do it, your Honor.

THE COURT: Thank you, sir.

Then, let's turn, if I can, to the Plaintiff. It is a beautiful complaint. I preface it with that because, ordinarily, I don't see anything that has -- even in class actions, I don't always get the privilege and pleasure of reading something that reads well --

MR. SELBY: Thank you, your Honor.

THE COURT: -- and seems to cross the T's and dot all of the I's as far as the allegations are concerned.

Having said that, I'm going to ask you, as the drafter of the complaint -- and I say this constructively -- if this case goes to the jury and it is a class action, what is the simplest way to deal with the case in front of the jury?

Because I have a number of counts that in some ways are cumbersome, if this is a class, because the proposed class description, which I'd like to talk to you about, has some issues as far as -- well, let me outline the four things.

I have some questions about the class representative. The first question I have is: Is that -- although it alleges that he owns the weapon, he was using it as a law enforcement officer?

Ordinarily, people don't use their personal weapon. It's a government-issued weapon. And you use your personal weapon for other -- for personal matters.

And so, in Iowa, is it different? You provide your own weapon or the sheriff's office says "Here's an option, but if you don't want what we're giving you, you can use your own personal one"? Is that how they do it?

MR. SELBY: I'm going to let Todd speak to that because he can specifically address that very issue.

THE COURT: Okay.

MR. WHEELES: Your Honor, in a lot of the smaller police departments and sheriff's departments across the country --

THE COURT REPORTER: Could you pull the microphone towards you, sir.

THE COURT: And you can have a seat.

Let me do this: Since you are so tall and the

microphone is at your waist, go ahead and have a seat, because the acoustics in this courtroom are a challenge for my court reporter and the sound system was provided by the lowest bidder and we got what we paid for.

So if, like some lawyers, you have to stand, if you'd just come to the podium. There is a button around your knees on the side that's facing you that you can press and the top will move up.

In fact, Arun, why don't you go show them. Just go press the button so that they can see the razzle and dazzle.

THE LAW CLERK: (Complies.)

MR. WHEELES: In this case, as in many small sheriff's departments and police departments across the United States, they don't have the resources to buy department-issued weapons.

Mr. Carter was carrying this Taurus, a handgun, as his duty weapon. Even though it was a personal weapon, it was his duty weapon. He had qualified with it.

The sheriff's department and the drug task force that he was working for at the time this incident occurred knew that was the weapon he was carrying and it was approved as his -- one of his duty weapons.

THE COURT: Then, let me ask you: Do you know -- have you seen his weapon?

MR. WHEELES: Yes, ma'am. We have it in our possession. And we have already provided it to Taurus and let

them look at it and photograph it.

THE COURT: Do you know where it was manufactured?

MR. WHEELES: In Brazil.

THE COURT: It was in Brazil?

MR. WHEELES: Yes, ma'am.

THE COURT: And then it was distributed through -- I sort of need -- Taurus Holdings is simply a holding company and Taurus International is the importer and the distributor?

MR. WHEELES: Yes, ma'am. We have -- when we talk about the three Defendants, I think it's very important for us to discuss the relationship between them.

Forjas Taurus in Brazil -- before a foreign arms manufacturer can import and sell arms in the US, they have to have a US company.

THE COURT: Import.

MR. WHEELES: Sure.

So what Forjas Taurus did is create Taurus Holdings, which is a holding company, and then Taurus International Manufacturing.

There's deposition testimony where Forjas Taurus, which is a publicly traded company in Brazil, is the sole owner of Taurus Holdings.

Taurus Holdings then --

THE COURT: Is the sole owner of --

MR. WHEELES: -- is the sole owner of Taurus

International Manufacturing. Yes, ma'am.

When you look at the relationship between the companies, Taurus International Manufacturing doesn't even have a contract with Forjas Taurus. They can't negotiate prices. They're just told how much the pistols -- or firearms that they're going to import -- they're sent an invoice and asked to pay for them.

So it's very vertically integrated when it comes to the importation and distribution of firearms here in the US.

THE COURT: Okay.

MR. BUMANN: Your Honor, Tim Bumann again.

That certainly has been -- was true at one point in time. But since Mr. Wheeles and I have known each other and become fast friends, the situation has changed.

And while there is still the relationship between Forjas Taurus owning Taurus Holdings, which owns Taurus International, it's important for the Court to understand that Taurus Holdings does not just deal with Forjas Taurus.

Taurus Holdings owns other companies other than Taurus International and those other companies import and/or manufacture and/or distribute for other manufacturers other than Forjas Taurus.

THE COURT: And when did that occur? When did that change occur?

MR. BUMANN: That was soon after Mr. Wheeles and I met

each other, about five, six years ago now. And since that time, Heritage Manufacturing has been purchased by Taurus Holdings.

I know the company Taurus Diamondback Distributors has been formed and they distribute for a company -- another firearms manufacturer that's called Diamondback. And there continue to be purchases --

THE COURT: And where are those manufacturing plants?

MR. BUMANN: Here in the United States.

THE COURT: The United States has 50 states. Which one?

MR. BUMANN: I'm sorry. I'm sorry.

Here in Florida.

THE COURT: Oh.

MR. BUMANN: Heritage is manufactured here in the Miami area. Diamondback is manufactured further north, up near Orlando.

THE COURT: Okay.

MR. BUMANN: And there's continuing to be additional -- purchases are going to be made in the future as well.

THE COURT: Have they shifted all of their manufacturing stateside and there's no more importation from Brazil?

MR. BUMANN: No, ma'am. There is still importation from Brazil of all of the revolvers. Some pistols are being

manufactured here in the United States under the Taurus brand pistols.

THE COURT: Okay.

MR. BAUMANN: And you can look at -- actually, under the '68 Gun Control Act, certain markings are required on the firearm.

And it's pretty easy to tell which ones were manufactured in the US and which ones were manufactured overseas because they'll have -- for example, this pistol has got "Forjas Taurus, Port Alegre, Brazil," stamped on it and it also has "Taurus International Manufacturing, Miami, Florida," stamped on it.

If it was domestically manufactured, it would just have the latter.

THE COURT: But Mr. Carter's pistol has both of those stamps?

MR. BUMANN: Yes, ma'am. It was manufactured in Port Alegre Brazil and imported by Taurus International.

THE COURT: Needless to say, on felons in possession that I see, I always have the expert testifying here from ATF, testifying where the weapon was manufactured and how you can look at it.

Help me. What's the difference between a revolver and a pistol?

MR. BUMANN: They're both handguns. A revolver has a

revolving cylinder. If you've seen an old western movie, for example, technically, anything that doesn't have a revolving cylinder and is a revolver is a pistol. They can be single-shot pistols.

But most people are familiar with a semiautomatic pistol, such as we have in this case, which is fed by a magazine that moves up into the grip and has a slide that moves along the top of the grip frame and ejects cartridges and then feeds the next cartridge.

THE COURT: This is my courtroom deputy, Linda Webb. Unfortunately, she's having the audacity of retiring on me as of June the 6th. She has been invaluable for the last going on 16 years.

I have the name of the Brazilian translator that the Court uses. I have two of them. One is Patricia M-a-r-k-o-w. Her number is (786) 202-0675.

And I think the one that I am most familiar with is the other one, Maria Carolina Paraventi, P-a-r-a-v-e-n-t-i. She is at (305) 332-9046.

I can't remember which one is which unless I actually see them in the courtroom. But I've been pleased with the translations that our interpreters have provided, particularly for, you know, Defendants.

And I'm a stickler for making sure that it's -- on pleas that the plea -- I mean, the Defendant truly understands

what his rights and alternatives are.

And so, thus far, the Defendants seem to find the ones that we use very, very helpful because, on occasion, we will take a break so that counsel and the interpreter and the Defendant can sit and chat through things.

Getting back to you, Mr. Wheeles.

MR. WHEELES: Yes, ma'am.

When I earlier made the statement about the connection -- or the relationship between Forjas Taurus and Taurus Holdings and Taurus International, I was taking that information from a deposition that Mark Kresser, who's the president and CEO -- the current president and CEO of Taurus International Manufacturing, gave in August of 2013.

In that deposition, he just confirms that Forjas Taurus owns Taurus Holdings, Taurus Holdings owns Taurus International Manufacturing.

THE COURT: Okay.

MR. BUMANN: And that's true, your Honor. I just wanted to make sure that the Court wasn't under the impression that Taurus Holdings --

THE COURT: Was the only -- was its only asset.

MR. BUMANN: Exactly.

THE COURT: Okay. The question that I have is there's also a reference in the complaint to other litigation that apparently -- I'm sorry. Now I can't find it.

MR. BUMANN: It's part of the *Maroney* case, your Honor.

THE COURT: That becomes relevant because, in the class issue, in identifying the nature of the damages that you're seeking, which is relevant to the analysis of whether or not it is an appropriate class, you've got two different groups.

You've got those that are simply looking for a failure to provide the benefit of the bargain, in other words, based on the complaint, representations that were made as to what the weapon could do that it failed to provide, and you have those that were physically injured when the weapon went off.

Those are two different types of injuries.

MR. SELBY: They are two different types of injuries, your Honor. This class does not seek to comprise of those with personal injuries.

THE COURT: So in tweaking the description of the proposed class, I think we need to make that a little bit clearer.

MR. SELBY: Yes, your Honor.

THE COURT: And I also saw that it went back to 1975.

There have been no changes in the manufacture? And don't we have a statute of repose in the state of Florida that you really can't go back?

MR. SELBY: Your Honor, the statute of repose may very well eliminate for a certain time period as far as what evidence we have currently as to how far it goes back. Based

on previous evidence we've obtained and based on just common knowledge, we're not aware of the specific design defect that we've made allegations in the class complaint that -- that has not been changed.

THE COURT: But the class is anybody who has purchased a weapon since 1975?

MR. SELBY: Yes, your Honor.

THE COURT: What I'm trying to do is -- let's be realistic as to what is the best way to focus this case. It's not going to be a small class to begin with, but let's not make it unnecessarily large.

I mean, that's a waste of time and energy if, ultimately, we are -- it's focused down more narrowly. Let me share with you my biases and prejudices here.

Ultimately, I'm the one that's going to be dealing with the papers that you file. If I can make the papers more laser-like and the critical issues fine-tuned, the easier it is for me and the faster that I can turn around a decision.

And then you don't have to address -- because they'll move for a motion to dismiss and they'll be raising all of these things and then you have to respond to them and, if you are on a contingency fee, you want to maximize your profits, not to be spending time, when you can focus the case in.

It's the old theory of go with the jugular issues that they can't wishy-washy around and obfuscate. The problem is

that I was on both the plaintiff and the defense side in my career.

Yes, sir.

MR. JOHN MARINO: Your Honor, obviously, being on the defense side my entire career, the comments I'm about to make aren't going to surprise your Honor.

But along the lines of streamlining things, our initial investigation, your Honor, indicates that the number of pistols included within their proposed class at this time, anyway, would be 24 or 25 different pistols.

We do not believe that the manufacturing of the safety pin and the other elements of the pistols are all the same. We believe that those will be significant issues on class certification.

THE COURT: Okay.

MR. JOHN MARINO: In terms of statutes of repose, your Honor, you were addressing the Florida statute of repose. But as this class is proposed right now, I think you'd be dealing with statutes of repose from several different states.

THE COURT: Well, that's the next thing that I'm getting to. Because, as I looked at the complaint, it appeared to me that -- don't you get what you need without having to deal with the idiosyncrasies of each state by simply proceeding with the --

MR. WHEELES: Unfair deceptive.

THE COURT: But if you use the Florida consumer statute -- I mean, I've had other parties brief this -- the law is a little murky in showing whether or not FDUTPA is exportable beyond the confines of the state of Florida. There needs to be some type of nexus between the particular injury.

And if this weapon was not manufactured here and simply went through here, what is the Florida Supreme Court -- the Florida Supreme Court hasn't really talked about how far FDUTPA goes.

And district courts on the federal side are interpreting Florida law, but, ultimately, the ultimate decision-maker is the Florida Supreme Court.

Now, depending on who is on the Florida Supreme Court, sort of like the Alabama Supreme Court, it can shift as to being more restrictive or narrower. And I just throw that out.

But it looked to me like the federal statutes and the express warranty, which the law is pretty clear, and the negligence -- I mean, the -- not the negligence -- the -- I don't know enough of the facts. And you know what the facts are; so, I don't want to opine.

But it just seemed to me that the strict liability and the breach of express warranty were things that -- the law is pretty uniform across the United States. The same thing with the breach of implied warranty of merchantability.

But if you've got an express warranty, doesn't that

sort of trump the need to even have -- you know, what does the breach of implied warranty of merchantability get you?

I guess that's where I am looking at. Of the counts, what -- what's your strongest counts? Which ones provide you with the -- you want the maximum recovery, but you need to have redundant claims.

Are the facts so murky that you do need the redundant claims?

MR. SELBY: Your Honor --

THE COURT: It sounds to me like they're pretty cut and dried.

MR. SELBY: They are, your Honor.

And to go back to something you initially mentioned, I mean, our goal, obviously, you know, not only on this case, but in other class cases, is always at -- you know, at the point when -- you know, especially at the class certification stage and the critical dispositive motion stage, is not to be arguing over things that we know aren't going to gain us, you know, the individual or certainly the class members, you know, anything further.

It doesn't benefit anybody. And certainly, quite frankly, you know, it puts us in a position of having the class certification challenged with more scrutiny. We don't want that either.

You know, the complaint itself, while very specific

with factual allegations -- common factual allegations and lists a lot of history, lists a lot of knowledge that we would certainly claim cannot be disputed of the Defendants, it will come down to certainly, again, a laser focus of the counts.

And implied warranty counts, express warranty counts, depending on how some of the stipulations by the Defendants with regards to control, with regards to what companies do what, with regard to who's responsible for the warranty, et cetera, that will certainly eliminate, in my opinion, some of the duplicative counts.

You know, if there is a push-back on certain things that we feel are obvious from an express warranty standpoint and it's going to be a disputed issue, then that may be a situation where fall-back is an implied warranty.

THE COURT: Okay. The Magnuson-Moss Warranty Act -- that's sort of a duplicate again. The nice thing about it is that it does -- it's a federal statute and it covers all jurisdictions.

MR. SELBY: Yes, your Honor.

THE COURT: I looked at Count 7 and Count 8, which -- one is the negligent failure to disclose. And so it's a lower standard than the -- and then the fraudulent inducement.

But it sort of seems that the fraudulent inducement and the fraudulent concealment -- all three of those were sort of duplicative.

MR. SELBY: To some extent, I would agree, your Honor, because I think the key difference would be, again, depending on what -- as we go down this road, what we're going to get a fight on with regards to who it would apply to in the sense of a suppression claim, for instance, under, I guess, Count 7 --

THE COURT: Right.

MR. SELBY: -- you know, how does that suppression claim apply to certain class members and how that's defined, you know, for people that -- and let me back up and say this --

THE COURT: Because what I'm -- I'm hearing how that applies to certain class members, then says -- what has been a concern of mine is: Why are we even trying to have a single definition of a class? Isn't it better to proceed with subclasses?

MR. SELBY: It may very well be, your Honor, depending on how discovery pans out. Our position right now, though, would be that that's not needed and that it's really pretty straightforward with regards to -- if you look at Taurus International and Forjas Taurus's warranty, that's for life. No limitation. Doesn't even matter if you're the original owner. If you currently possess that firearm.

So if -- you've got an express warranty issue and all the tenets that would fall from those warranty claims. That's a pretty broad catch for class members with regards to it's these group of people. Pretty simple, really, I mean, as far

as just a definition standpoint.

If you go --

THE COURT: Hold on.

You say no limitation. What do you mean by that?

MR. SELBY: It's a lifetime warranty.

THE COURT: Oh. The lifetime warranty. Okay.

MR. SELBY: Yes, your Honor. I'm sorry.

And so, you know, as your Honor is aware, you know, in many warranty cases, especially class actions, sometimes the thing you're dealing with, well, there's a limited period of time that the warranty even applies.

So depending on when the product was manufactured, depending on, you know, who is the current person that's entitled to benefit from that warranty is sometimes an issue that obviously has to be vetted out, you know, throughout the litigation.

In this situation, again, it's already fairly laser-focused with that regard because of what the warranty itself says.

You know, the Magnuson-Moss Warranty Act, of course, would just follow on the heels of that express warranty. You know, our position would not be that those would be necessarily duplicative.

The Magnuson-Moss Warranty Act, as your Honor is aware, would just allow, for one thing, attorneys' fees under the

federal statute.

THE COURT: But I guess what I was throwing out is: Why not just go with the Magnuson-Moss as the cause of action with the fraudulent inducement or suppression or the failure to warn, concealment or misrepresentation claim?

Because that's usually pretty generic across all common-law states. I don't know how it applies in Louisiana, which is not a common-law state. It's a code law state.

MR. SELBY: It could very well --

THE COURT: And I do remember that Louisiana is weird.

MR. SELBY: Part of the -- I guess, the maturation process with this lawsuit would be, too, the parties -- we have already talked about this -- sitting down even further and continuing along the lines of the JSR and stipulating, you know, to certain facts.

And I think a lot of this could be -- you know, our hope certainly is that a lot could be more laser-focused early on, depending on what is stipulated to with regards to, you know, how a class member is defined, whether it's going to be a fight over the warranty and how that is extended to and so forth.

So I think a lot of these answers -- our hope certainly is that we can laser-focus it even sooner than later, you know, well before any formal pleading stages, if you will, you know, through the stipulations.

THE COURT: Does the Defendant agree with that? Is that the -- are you in agreement that that is the way to proceed in this case and that what he is saying, you are of the same mind? I guess that's the better way to ask it.

MR. BUMANN: Well, I think -- go ahead, John.

MR. JOHN MARINO: Your Honor, certainly we're getting to know each other and Todd and Tim have known each other a long time. We're going to work well together and we certainly want to streamline the litigation and we'll cooperate with working with them and so forth.

But the position that the Defendants don't want to be in is kind of a moving target. I mean, the complaint needs to get set, so to speak, and we need to know what the proposed class is and then we can litigate the issue of class certification or litigate dispositive motions or what have you.

What we don't want is to be in a position, you know, five, six months down the road, we've been litigating and we've been, you know, doing class discovery and so forth and then all of a sudden the proposed class is going to change or the causes of action are going to change.

Obviously, there's a deadline to amend pleadings. But that is a concern, is that we want to, you know, kind of define the playing field and then work from that. Along those lines, we will be cooperative.

But, like your Honor, we would like to see -- whatever

the complaint is going to be and whatever the proposed class is going to be, we'd like to see that sooner rather than later.

THE COURT: You all have a joinder and amendment cutoff as 12-04-2014 and then the class certification deadline is next April.

Quite frankly, I was taken aback that it should take a year to serve up the class cert issues because, quite frankly, to me, in a class action, that's one of the key points that usually determines whether or not the case is going to go to trial or the case is going to resolve.

And given the fact that there was only one Plaintiff right now and -- I wondered why it was going to take so long as to -- one class rep. Although I have concerns whether or not he is going to be able to be the rep for all of the different potential members of the class.

I'm just sharing this with you. Having done these enough and having seen problems -- I mean, each case is different. But I'm concerned. I'm in the Eleventh Circuit. I know what the law is in the Eleventh Circuit as far as certifying a class.

But I also know, even if this case settles after -- if I decide that a class is appropriate and -- for the Plaintiff's and the Defendant's sakes, sometimes if the Plaintiff demonstrates and meets all of the requirements, I will certify it as a class. I have no problem. But I have also not

certified cases as a class.

The Eleventh Circuit, as you know, is -- you have to cross the T's and dot the I's. Judge Tjoflat is the -- how do I say this?

He is a guardian of the class action to make sure that the T's are crossed and the I's are dotted. And he's not planning on taking any senior status anytime soon, I hear. The last I saw him, he's still going quite strong.

MR. JOHN MARINO: The last I saw him, your Honor, he was playing golf at the San Jose Country Club in Jacksonville.

THE COURT: I will share with you that I was quite pleased. I had a class early when I was on the bench. He reversed it. We did what he said.

Ultimately, it was an antitrust case. I couldn't -- in light of what he said, the Plaintiff was not able to cross the T's and dot the I's to certify a direct purchasers' class.

But the Plaintiff was savvy enough after reading the opinion on the reversal, they gave me what I needed. So I certified the indirect purchasers, which, to me, was really going out on a limb, given the fact that I was very surprised that Judge Tjoflat reversed it on the direct purchasers' class.

And then he cited the opinion that we wrote on the indirect purchasers' class several times in affirming another judge on the class certification.

So I've been taken to the woodshed on that one. I got

the message of what needs to be done. I prefer not to be reversed. Not because you get reversed. Just because they have a lot of work up there and, if I do what I'm supposed to do, it makes their life easier.

And I need counsel to recognize that judges like counsel to help give them what they need so that they can make a fair and impartial and dispassionate decision.

So I'm just throwing these things out because that's, I think, valuable in this type of complex litigation, that we have some discussion so you really know what I will need and expect from the Plaintiff.

And I really will need for you to fine-tune the class so that I'm not having to redraft the class because I don't see that as my job unless it's just a minor tweak.

You're the advocate to create this as a class, and I need for you to be focused on how we define this class so that it will survive in the Eleventh Circuit --

MR. SELBY: Yes, your Honor.

THE COURT: -- and that, if it is affirmed, that the management of the class, the notice of the class -- the devil is in the details on the management side after the class certification. I'm just throwing it out.

If I certify this as a class, I don't -- and there's an award of attorneys' fees, there's a small amount up front. The rest is after the last claim is resolved because it helps keep

the lawyers interested in the case. I learned that one the hard way, too.

As you all have been working long enough in these vineyards know, judges' idiosyncrasies usually arrive from the lessons that counsel have taught them.

Let me ask if -- in the same way as I asked the Defendants if we could resolve the issue of the service of the principal Defendant. What do we need to do?

I mean, a wrongful or unjust enrichment count? Give me a break. You've got an express warranty. And the Defendant seems to think Iowa law will apply. Why do you think that? Because the class representative is from Iowa?

MR. JOHN MARINO: I think, your Honor, on different various causes of action the laws of different states may apply.

You know, to be honest with you, in terms of an unjust enrichment claim, we haven't researched exactly which law would apply. I know the main Plaintiff is from Iowa. I'm guessing he purchased his firearm in Iowa.

You know, whether or not Florida law or Iowa law would apply to that common-law count, to be honest with you, we haven't resolved that.

THE COURT: Have you done any research on the choice of law issues?

MR. JOHN MARINO: Yes. We've looked at choice of law

issues. We believe that, under the common-law counts, the laws of different states are going to apply. I would think that's an obstacle to class certification.

THE COURT: And I'm trying to figure out, based upon the -- we've got Mr. Selby from Birmingham. I just signed the *pro hac* of Ms. Kipnis. She's from New Jersey. And I have Mr. Barrett from Charleston, West Virginia.

So my question was: Who are these other Plaintiffs -- I mean, who are these other Plaintiffs' counsel? And what is their interest? Help educate me. Because I recognize that it sounds to me like I have a consortium on the Plaintiffs' side.

Mr. Marino is going like this (indicating).

MR. SELBY: All the people you mentioned, your Honor, are still within my same firm. They're just in our -- we have a New Jersey office and, actually, our main office is in Charleston, West Virginia. And myself and several other lawyers are in the Birmingham office.

Those lawyers, your Honor, that you mentioned are just part of our class-action practice group. But they were not with other firms. We all work in the same firm, the folks you just mentioned.

THE COURT: Did you handle the *Maroney* case? Is that the name of the case that's referenced in the complaint?

MR. WHEELES: No, ma'am. I did.

THE COURT: And what about the other -- Ms. Price's

case that's referenced in Paragraph 41?

MR. WHEELES: Yes, ma'am. I represented her as well. Mr. Wheeles.

THE COURT: Okay. So it's *Maroney* and Ms. Price.

Were there other ones? I can't remember if there were other ones that were referenced. I think there's just the -- did Ms. Price proceed with her action?

MR. WHEELES: Yes, ma'am, she did. But it was resolved.

THE COURT: And what about the -- I found it interesting about the São Paulo military police doing the recall. Tell me about that.

MR. SELBY: Your Honor, that's simply based on information available through their website on the Internet with the São Paulo State Police Department.

The answer -- in the answer to the complaint, Taurus International, Taurus Holdings, have stated that they have investigated those claims.

But we don't have -- you know, through no formal discovery at this point, we don't have the results of those investigations.

THE COURT: And you don't have an investigator that's down working in São Paulo collecting facts, I gather, speaking fluent Portuguese.

MR. SELBY: Not yet, your Honor.

THE COURT: Tell me whom you have as your expert for the latent defect.

MR. SELBY: Well, we currently are -- the experts we have retained would be experts that we have used on these other cases already. And we are also speaking presently with some additional experts.

THE COURT: And I presume that the Defendants already have their experts in-house. Yes? Are you going to use in-house or out-house?

MR. BUMANN: Well, it depends on how the case evolves, your Honor, because our view of the class of pistols is quite different than the Plaintiffs' view.

THE COURT: Tell me what is your view, other than what Mr. Marino said, that there are 24 to 25 different pistols involved.

Did I understand you correctly?

MR. JOHN MARINO: Yes, your Honor.

MR. BUMANN: Those different pistols have different designs. For example, the parts are not interchangeable. There is no universal defect in those pistols.

THE COURT: Mr. Carter's pistol: Which one of the group of 24 to 25 is his in? Do you know? I presume you've seen the weapon.

MR. BUMANN: We have, your Honor.

Mr. Mobley was there at the inspection, as I recall.

It was a Pro, wasn't it?

MR. MOBLEY: Yes.

MR. BUMANN: It was a PT111 Pro, which is different than a PT111. There are two different kinds of PT111s. There's a PT111 Pro. There's generations that follow on to that. I'm sorry. PT140, which means it was a .40-caliber Smith & Wesson polymer frame pistol.

But those -- these pistols are all different. You can't interchange parts. The design concepts on several of them are different for the firing pin block safety, which I understand to be the focus of the case.

THE COURT: Okay.

MR. BUMANN: I know, when Mr. Wheeles and I have looked at -- because he and I have worked together on several of these matters. The pistols are not the same when you take them apart to look at them on the inside.

So we've got an issue there as far as, you know, which -- how these defects are even supposed to exist.

THE COURT: So --

MR. BUMANN: We also have issues concerning whether or not some of these were drop cases to start with. The *Maroney* case I've never thought was a drop case.

THE COURT: I don't know anything about the *Maroney* case.

MR. BUMANN: The *Maroney* case is the Alabama case that

Mr. Wheeles and I tried and he got a verdict. And then it was -- we appealed and it was settled during the appeal process.

But the proof that we made in that case that Mr. Maroney wasn't even shot with the Taurus pistol that was the subject of the litigation.

MR. WHEELES: Your Honor, that was one of the defenses that was raised during the course of that trial. But a jury in Gaston, Alabama, determined that he was shot with that pistol when it dropped and awarded a 1.25-million-dollar verdict on the personal-injury claim.

So that was definitely the defense that Taurus International and defense counsel used during the trial. But I don't believe that the jury --

THE COURT: Bought it?

MR. WHEELES: Bought it. Yes, ma'am.

MR. BUMANN: Yeah. That jury did not.

They acknowledged in the interviews that they understood that the bullet that was removed from the Plaintiff didn't come from that gun.

But they thought that he was badly hurt and he was from the area; so, he needed an award. The fact of the matter was the bullet didn't come from that gun.

THE COURT: But, unfortunately for you, the interviews with the jurors don't count for anything.

MR. BUMANN: No.

THE COURT: And as far as the jury's concerned, you know, they made a finding that it was and you just have to work on your sympathy quotient next time.

MR. BUMANN: Even in that county, I think -- you know, I win that case six times out of ten. But this was one of the others.

And we're certainly -- you know, if we get to that point, we're going to contest whether *Maroney* was even a drop case. So, I mean, there's a lot of issues that are down in the weeds.

THE COURT: But I think, on this one, I can see why they've chosen Mr. Carter as their class rep, unless he comes across like some of our City of Miami police officers, in which -- if they're your only witnesses for the Government in a felon in possession case, I predict that there will be a defense verdict.

MR. WHEELES: Well, your Honor, we looked long and hard because this is such a unique cause of action. We recognize that.

We believe that all of these handguns that have this same or similar-design firing block -- or firing pin block or strike block -- we needed a good Plaintiff. And Mr. Carter, we believe, you'll be impressed with, your Honor.

THE COURT: But I'm looking at the class definition

that you proposed. You've got -- what is it? -- 12 -- 14 different models.

MR. BUMANN: Just for the Court, it doesn't limit to those 14 models. As I understand it, they're looking at polymer frame striker-fired pistols, period.

And if there are additional polymer frame striker-fired pistols, they would also be within the class, based on what I read in the complaint. There are some that are not listed here.

THE COURT: And my question back to the Plaintiffs' counsel is: Isn't it more advantageous to pick off what you can run home with easily and then use that for a negotiating tool when you bring a separate claim for a different cause of action -- I mean, a different class that can be more narrowly defined?

MR. SELBY: Well, your Honor, our position is it is narrowly defined in that it's the pistols that contain this firing pin block safety device, the design that is defective.

And, ironically, it's just not by happenstance. These different Plaintiffs that we've named, past occurrences, including Mr. Carter and including other cases that are personal injury cases that will be possibly even an amendment to the complaint just allege different facts that have now since arose.

We're -- the common factor is it's not limited to one

particular model, model being a --

THE COURT: So that's going to be one of the issues in the war of the experts as to whether or not -- their position is that parts are not interchangeable and they are model-specific, and your position will be that this is a -- the defect in the firing, the sliding fire -- what do you call it? --

MR. BUMANN: Firing pin block safety, your Honor.

THE COURT: -- firing pin block safety is, for all intents and purposes, the same thing. One may be silver and the other one gold, but the structure is the same.

MR. WHEELES: Yes, ma'am. We think that we'll be able to present very compelling evidence to the Court that the design and the manufacture of these -- even though the pistols may vary in size a little bit, that's why the parts aren't interchangeable.

When you deal with these smaller handguns, a .9-millimeter handgun may be a little different size than a .40-caliber or a .45. Those -- the .40 and the .45 have to be a little larger to accommodate the larger ammunition.

So the size of the parts are a little different. They're not interchangeable parts. But we would allege that they're the same parts, you know. They're -- the design is the same.

THE COURT: Okay.

MR. BUMANN: Your Honor, one point.

Mr. Wheeles is exactly correct, that for the same model, a different caliber may have different size parts. When we tell the Court that, so far, we're looking at 24 to 25 different ones, we're excluding caliber as a variable. We're talking about, no kidding, not interchangeable parts. You can't take one from the other and -- setting caliber aside.

THE COURT: They have identified 14 in their class definition. You're saying that there are subparts of those 14 that are -- bring us to a total of 24 to 25 different models?

MR. BUMANN: Yes, your Honor.

And, in addition, there are a couple of models that are not named that also fit the general description of polymer frame striker-fired pistols.

THE COURT: Is the Plaintiffs' focus on the polymer striker-fired pistols?

MR. WHEELES: Yes, ma'am. I think we've tried to do our best to identify specific models in the complaint on Page 18, under -- in Paragraph 51.

And those are the Millennium and Millennium Pro series weapons, for the most part, that we think are very similar and very common in manufacture and design.

So we did --

THE COURT: And when did the Millennium and the

Millennium Pro series come into existence?

MR. BUMANN: The first designs entered the market, I believe, in 1998. And there are two different designs, two different fire control systems, in the original PT111. And, subsequently, additional calibers were manufactured.

And then that design was changed -- fundamentally changed in the area of the firing pin block for the Millennium Pro series. And then that is -- there are several sub -- there are several changes during the -- under the Pro -- Millennium Pro market name. And now there's G2, Generation 2, as well.

And the description also includes not only the Millennium, but also the 24/7 series, which is a larger pistol, still a polymer frame striker fired-pistol with a firing pin block -- no question -- but different designs.

And there are several different designs in the 24/7 product line as well and then there's an additional product line that's not named here, but also fits the description. And we don't know whether those are going to be in or out. We were assuming they would be in.

So if they're not in, then the 24 number falls off, probably somewhere closer to 16, somewhere closer to the original number.

MR. JOHN MARINO: Your Honor, where we come up with the 24 to 25, if you look at their class definition, it says "including, but not limited to."

THE COURT: I realize that.

I just realized my court reporter has been going for two hours without a break. Let us take a ten-minute break and then what I'd like to do is wrap it up in ten more minutes.

What I'd like for you all to do after running out to the rest room, as I'm sure that some of you may need to, is let's come back and take a look at tweaking this schedule that you all have given me so that the -- we have an earlier amendment date for the pleadings.

We have an earlier -- I need to really understand how many depositions you need to take that the class certification discovery needs to go until next February.

I'm not hearing -- because it's primarily a refinement of the complaint down to what are the claims going to be, because they're going to come back and say, "We need to have -- you need to have subclasses."

These are the things we've got to think through. And that's why I'm asking the Plaintiff: How do you simplify this case so that it gets to be teed up faster than the plan here and doesn't give them any wiggle room? Because the more specific that you can be, the sooner both sides need to come to Jesus.

Let's just take a quick ten-minute break. Then we'll be five minutes. But just take a look at your schedule because I need -- I think we can move this case faster.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT: Counsel are present.

I do not like to interrupt good discussions, but I also realize I've had you here for two hours and 15 minutes and I need let you go and to eat. Food is important.

MR. BUMANN: Yes.

THE COURT: Have a seat. If you want to stand, you can stand, too. I do tell the jury that, if they want to stand, just stand in the back row of the jury box so they don't block anyone's view.

Do you think that we could have the amendment of the pleadings by July or August at the latest or any earlier time? We really need to focus this case. As beautiful as the complaint is, as wonderful as the allegations are, the more focused we can be, it will do a number of things.

It's cheaper for the translation of the complaint for the Defendant to have. That's a small, minor issue. But it keeps us focused on how we define the class so that it's one class rather than subclasses. And we do need to look at the choice of law issues.

MR. SELBY: Your Honor, to go back to your first inquiry about moving the amendment deadline, I guess the first thing I would say is, as detailed even as the complaint is and the information in it, I want to be careful that I -- we

haven't hurt ourselves by almost saying to look at all this we already know.

I think the Court -- you can be made aware as well there's been no -- you know, Mr. Wheeles had the *Maroney* case, which deposition testimony was taken.

But, really, beyond that, we have not had the benefit of getting in and finding out a lot of the information we know we're going to need to make determinations as far as amendments to complaint, narrowing the class, narrowing the claims.

THE COURT: But I guess I'm looking at Count 10, wrongful or unjust enrichment.

I can tell you -- because I've done this one a number of times -- if you've got an express warranty, you've got a cause of action.

If you've got a negligence claim or any other claim -- I mean, the unjust enrichment goes with a contractual issue and, if you've got a contract, that's out the window.

The declaratory relief -- you want a declaration that the firing pin lock is defective. I can't declare that. I can enjoin people from doing things, but I can't make those kinds of declarations.

I mean, let's look at what the complaint now has based on what you know and how do we simplify it, understanding I want to protect the fact that you've not done any discovery.

So for the class certification discovery -- why are we

breaking it up so that we're just doing class cert discovery now? Why aren't we doing merits discovery as well?

MR. SELBY: Your Honor, I think the answer to that question is we went off the case management -- we had the same -- we went off what was recommended by the case management guidelines.

THE COURT: Usually -- I usually recommend that the class cert be done within five months, max, that the motions be teed up, that if the class is so complicated that it takes a year to discover it, to serve up the motions for class cert, then we've got a problem before we ever start.

Because, remember, the mechanism is there because it is the most cost-efficient way to deal with a lot of claims that the amounts are so small that it doesn't benefit -- it's not as efficient to litigate them on an individual basis. It's better to do it as a class.

And that's why I guess I threw out -- do we want to take on the whole universe? Is -- maybe it's better for Sherman to march to the sea by going through each city and conquering --

MR. BUMANN: We didn't care for that at all, your Honor, just for the record.

THE COURT: That's why I used the --

MR. BUMANN: It was terribly destructive.

THE COURT: Yes. But it was very effective.

MR. BUMANN: It did have its merits from that perspective. Yes. I'm -- we live in Madison, Georgia, which is one of the towns that didn't get burned. So we still have a core historic district. But, other than that, it was quite a conflagration.

THE COURT: But the goal here is -- I don't think the Defendant is dumb. The Defendant is in a business. The Defendant may enjoy rattling its sabers and showing me that it has a lot of testosterone, but that is not going to get them very far in moving the case along.

Ultimately, it all boils down to a business decision for this Defendant, short-term and long-term. We need to put the Plaintiffs' case into a posture that forces them to take a look at how they want to litigate this case.

MR. SELBY: We agree, your Honor.

THE COURT: I mean, you've gotten their attention with the complaint and the fact that I've now discovered that counsel on both sides know each other. That's a factor in how this case is going to move along.

I presume that you all are as pleasant outside in dealing with each other as you are in my presence. I'm counting on that. I don't want to be reading any depositions that I'm asking myself "Which jerk school did this counsel go to?"

MR. BUMANN: We actually get along very well, your

Honor.

THE COURT: That's the impression that I have. And that's what -- that's why I look forward to working with you all on this case.

But I will be pushy unless you tell me a reason why to drag it out. I understand you don't know anything at this point and you don't want to be caught in a Catch-22.

MR. SELBY: Your Honor, for one example -- and Mr. Bumann addressed this earlier about -- you know, the Defendants don't agree about the common design applying to all -- what we would say they do.

And just from a commonality standpoint and proving commonality, if that is going to be contested, you know --

THE COURT: Then, your expert needs to be focused on that.

But other than taking the deposition of the class representative and other than doing expert discovery, what do you need to serve the case up as far as -- and help shimmy it down as far as filing the motion for class certification and having a complaint that you're happy with going all the way?

MR. SELBY: Well, I mean, to start with, on the commonality issue, is making sure that we are very comfortable when we do begin to whittle it down that we haven't left hanging out there, you know, models that would fall within this class definition, those guns remain out there with this defect

and we've left them out of the class.

THE COURT: Then, let me ask the Defendant: How quickly can you give them the information that they need so that they can have their expert evaluate the various models that you say are problematic so that they can narrow it down?

You see what -- they need some information. You've got the information. I'm going to put pressure on them to act fast, but I need for you to provide the information so that they can act fast.

MR. BUMANN: Your Honor, they're on the website. I mean, all of the firearms at taurususa.com -- all of the firearms that could fall within this class are on the website one can go to the website and identify the polymer frame striker-fired pistols within a couple hours.

We certainly -- there's some additional -- the only additional ones, if they're looking at the Millennium product line, the 24/7 product line, there's also the TCP product line and the Slim product line that are striker-fired pistols. One is the 732 and the 738.

THE COURT: How do those all relate to the models that they have identified in Paragraph 51?

MR. BUMANN: Only to the extent that they have a polymer frame and are striker-fired as opposed to hammer-fired and have a firing pin block safety.

THE COURT: What does "striker-fired" mean?

MR. BUMANN: Striker -- there's two different ways that pistols can -- that fire controls can work in a pistol. One is what the Court's probably familiar with where there's an external hammer that flies forward.

There's also another design that's actually contemporary with the hammer-fired that are called striker-fired, where there's a firing pin mounted on the front of a larger pin, if you will, and there is no external hammer.

The firing pin is retained by the sear and, when the trigger is pulled, the sear falls out of the way and, by spring pressure, the striker moves forward.

THE COURT: And the bullet is ejected.

MR. BUMANN: The primer is impacted. It explodes, burns the powder. Down the road we go.

The Court has probably heard of a Glock pistol. A Glock pistol is a striker-fired pistol.

THE COURT: Okay.

MR. BUMANN: Most of -- you've probably heard about SIG Sauer pistols. Those are -- they've just come out with their first striker-fired. Those are almost all hammer-fired guns.

Each one has their own design advantages and disadvantages, like revolvers and pistols have advantages and disadvantages.

Depending on what market you're trying to appeal to,

the designer makes certain design choices. Frame material, for example, going to a polymer frame, can reduce cost, but it can also -- it lightens the firearm and gives the designer other choices and other options that really aren't available in a metal frame handgun. So these are all design choices.

All we're pointing out is that, by including the language about not limited to the following, we looked at the other pistols in the line that we knew to be striker-fired polymer frame with a firing pin block, and that's the 709, the 740, the 732 and the 738 pistols.

THE COURT: Okay.

MR. BUMANN: But, again, there are subdesigns in the different models as they have evolved overtime. The Chevrolet Impala is not the same year after year after year.

THE COURT: What is the discovery that the Plaintiffs will need to do before the -- because what I want you to do is to be in a position that you can then tell me, "Judge, based on the discovery, we're dropping these counts and these are the counts we're going forward with."

I'd like for you to be able to do that so we don't have to brief those that are not your best and your strongest. Can you do that for me? If you've got a problem with that, I need to know.

MR. SELBY: Is your Honor asking would we at the class cert motion narrow it so that it is limited to those claims

only? In other words, we're not trying to shotgun it with all of them. We're saying these are the claims that we want only on class certification?

THE COURT: Right.

MR. SELBY: Yes, your Honor. I mean, that's fully our intention.

THE COURT: Then, can we move the class certification between now and -- can we move the class certification motion up to December?

MR. SELBY: Your Honor, I just don't see the ability for what -- I mean, from what I'm hearing about what we're going to have to battle over on commonality, for instance, alone.

And, you know, it may be that we leave here and can get our heads together on some of this more on the commonality issues and be able to answer that, you know.

But unless --

THE COURT: Can we do this? Can you all meet and confer over the next two weeks, particularly as he is talking about how -- counseling with his client as to what is the -- how they want to proceed as far as willingness to accept service?

To come up with a plan, I'm okay with trying this in November, but I would like to do the class certification and have the -- before a year from now.

It just doesn't -- based on my experience, delaying that long the class certification is not healthy for either side. The case gets mange. It becomes a dog with mange.

I recognize this is not the only case that you have and that it has significant implications for both sides because the class certification is critical here and that that will drive the structure of the amendments to the pleadings.

But if you can move that up, I would really like to have the class cert by December. If it can't be done -- and you all know much better than I do whether or not that can be done -- unless what you're telling me is that, by the time you file the class certification, all of the merits discovery will be done, all of the class -- I mean, the case will actually -- that will basically be the dispositive motions in this case.

Is that what -- is that what both sides are telling me? Or if you don't want to tell me right now, you don't have to tell me.

But can we -- based on our discussion that we've had today -- and you've seen my crazy idiosyncrasies -- I'll say that for you so that you can then have license to say that among yourselves -- it's really important for me that we move the case in the most cost-efficient manner possible.

I have very bright lawyers in front of me. The value added of bright lawyers to a judge is that you're problem-solvers, that you can see what each side needs and what

their concerns are and structure a solution so that we tee -- we narrow the issues and we tee them up.

And for the Defendant, there are advantages to having a class certified and having it certified properly because sometimes the Plaintiff doesn't win and you get the benefit of that or, if the case is resolved, an issue goes away in a manner that you can control it.

So keep that in mind as you are working with the Plaintiff as to how do you define who's in this class and whether or not the issues work -- refine them so that it works as a class.

MR. SELBY: Your Honor, in moving the class cert deadline to December, would your Honor -- I know you mentioned about you were fine with the trial. What about other deadlines? How would you like us to adjust those?

THE COURT: Well, again, my concern was it looked like, as I looked at your schedule, that the class -- the only discovery that was occurring in this case was -- up until February was the class cert.

And I kept thinking "Is that different from the merits discovery?" If that's different from the merits discovery, I can't go along with this.

MR. JOHN MARINO: I think, your Honor, in this case there will be a lot of overlap between class and merits discovery.

MR. SELBY: Agreed.

And I don't -- John, correct me if I'm wrong.

We didn't -- I mean, the deadlines -- I apologize if the appearance -- it wasn't intended -- we're not limiting to say that we can only do class discovery.

THE COURT: Okay.

MR. JOHN MARINO: Yeah. When we initially talked, we weren't going to propose to bifurcate discovery. Then we looked at the case management deadline worksheet and we interpreted it as requiring class discovery to go first.

THE COURT: I usually like to do that up front just so that you can define whether or not there's a class, given what you all have shared with me today as far as some of the issues that need to be resolved that will help define what the class is.

And based on the representation you've just told me, I understand that the merits discovery will proceed at the same time.

MR. SELBY: Yes, your Honor. That's our intention.

We would certainly -- you know, from the Plaintiffs' perspective, with a December class certification deadline, obviously, we would concentrate on making sure we've dotted our I's and crossed the T's with regards to what we need on class cert.

THE COURT: I'm willing to be flexible.

Can we have a compromise between April and December and sort of have it by mid-January?

MR. SELBY: That's fine.

THE COURT: I don't want to screw up anyone's holidays.

MR. BUMANN: Well, your Honor, that encompasses hunting season as well. That can be an issue.

MR. JOHN MARINO: Todd and Tim may not be here.

MR. BUMANN: We may have to --

THE COURT: Do it earlier.

MR. BUMANN: Well, see, that's illegal. And then we'd end up in jail and we couldn't be here and that would be --

THE COURT: That's true. That could ruin your whole day.

MR. BUMANN: I look terrible in an orange jumpsuit. I'm not a fall at all. I'm more spring.

THE COURT: Based on what I've heard about the Georgia jails, that's probably not a place that you'd like to spend time.

MR. BUMANN: It wouldn't be good.

MR. JOHN MARINO: Not anymore, anyway. Right?

MR. BUMANN: No. Not anymore.

MR. SELBY: So January is --

THE COURT: Okay. So can you meet and confer and tell me whether or not you can tweak any of those deadlines? If you can't, based on your discussion over the next two weeks, then I

will go ahead and -- you have persuaded me that you all have looked at it and I will accept the schedule and we'll go with that schedule.

If the Plaintiffs can refine their complaint any earlier than December, I think that you have my blessings. I'm sure that the other side will agree to a voluntary amendment of the complaint.

I would ask -- I understand that the Defendants -- I have all of these boilerplate defenses because right now you don't know what the facts are and you don't know which way that you're going to go as far as what are they -- the jugular defenses that you're going to assert.

When we talk about the amendment of the pleadings, I'm going to ask you to do the same thing with the affirmative defenses.

MR. BUMANN: We'll need to know what the claims are before we can do that, your Honor. We're happy to do that.

The other practical question that I have is: If the Court holds the 12(b)(5) motion in abeyance, then --

THE COURT: Just for a week.

MR. BUMANN: Well, that really goes to my question.

I mean, I can certainly get an answer within a week. But do we want to translate the existing complaint or do we want to translate and serve the final document? And if --

THE COURT: Let's translate and serve what we've got

now.

MR. BUMANN: Okay.

THE COURT: Because I think that it's important for your client to see the worst-case scenario, which -- and the only problem that I have is that I truly understand what he's dealing with -- and you do, too -- with the in-house counsel situation, particularly a foreign counsel and the lead who is out -- when will she be back from maternity leave?

MR. BUMANN: Not soon enough, your Honor. Sometime in March.

THE COURT: Of next year?

MR. BUMANN: After she delivers the baby and takes her time off, you know, for -- it's ugly. I mean, I've got a real problem.

THE COURT: She -- she --

MR. BUMANN: She hasn't delivered yet.

THE COURT: If she's going to deliver in March, then she can't even be pregnant.

MR. BUMANN: No. No. No. That's after she has the baby and has done all the mother nurturing thing. Then she would come back and -- that's what I understand, is March.

THE COURT: So Brazil has a year maternity or is that the company's plan?

MR. BUMANN: I don't know what the situation is as far as their leave policy down there. I've just been told that we

should not expect her to be back full-time until March.

I think she delivers -- she's supposed to deliver sometime soon, I think. I don't know. I wasn't there for any of it. So I don't know.

THE COURT: I just throw that into the mix. That's a --

MR. BUMANN: Her second is there, your Honor. We just don't --

THE COURT: I thought you said that the second --

MR. BUMANN: Is terrified.

THE COURT: -- is terrified.

MR. BUMANN: He is terrified.

THE COURT: So that's something that he has to deal with. So keep that in mind as to how you -- that's one of the reasons why I wanted to simplify the complaint. If it doesn't look so terrorizing, it's easier for him to understand and work with his outside counsel.

MR. BUMANN: Well, the fundamental problem that I have is that they cannot get their minds around the concept of a class action. The thing doesn't exist in their code law system, that you would do such a thing.

And I think they first thought it was some sort of a joke, a bad one. But I'm trying to explain to them that this is part of the -- of our consumer product liability relief system in the United States.

THE COURT: And that it is designed to try and reduce costs.

MR. BUMANN: Correct.

And it gives the Defendant an opportunity to resolve business issues. As the Court observes, there's -- there can be significant advantages for a defendant to have a class certified and to resolve issues. No question about it.

THE COURT: So, hopefully, with your newfound Portuguese, you are able to --

MR. BUMANN: Grovel?

THE COURT: -- give them comfort that there are some advantages in this American creature, that it has been hammered out so that it is a mechanism to try and save money for both sides to tee up things for corporations on the business side, from the business perspective, to give them -- because that's what corporations need. They need to have some sense of control, as do all lawyers. Right?

If you can report back to me, then, by -- let me cut down on the two weeks. Can we have it by May 1st?

MR. SELBY: Is that to find out -- the May 1st deadline is --

THE COURT: If there is any change to the schedule. And I'm asking if we can move the class cert deadline up to January. If it doesn't work, it doesn't work.

MR. JOHN MARINO: How should we report on that, your

Honor, by May 1st?

THE COURT: Right. And then you all are going to report as well as to the resolution of the service issue.

MR. JOHN MARINO: Should we do that as a notice to the Court or an amended --

THE COURT: Yes.

I'm inclined to deny the motion to dismiss with the instruction to the Plaintiff that, if it's not resolved this way, to proceed with the -- just in an abundance of caution because, if you get a judgment, that's the only way you'll be able to enforce it in Brazil.

MR. BUMANN: So you would deny or grant the 12(b)(5) motion?

THE COURT: No. I'm going to deny it.

MR. BUMANN: Deny it. Okay.

THE COURT: Right. Because I think, as far as the Eleventh Circuit law, they have done what they need to do.

MR. BUMANN: Okay.

THE COURT: The concern that I have is, in looking at what was actually provided to me, it looked like the question was that, for enforcement purposes -- and that was the concern that the Brazilian justices had -- that they would not give full faith and credit.

MR. BUMANN: Exactly, your Honor.

THE COURT: And that goes back to the sovereignty

issue. But, quite frankly, it looks to me more like a form over substance issue.

But I don't -- but that's the practicalities. I do not want to create any offense to the Brazilian Government, the Brazilian state or the citizens of Brazil. And I'm just looking at it practically speaking.

MR. BUMANN: Does the Court have -- assuming that I'm successful, which I believe I will be, in getting them to waive service once we get the translation done, does the Court have any deadline in mind for when we need to get with -- because we've got to get with the translators, pick a translator and get the thing done.

THE COURT: I leave that up to you. I've given you the names and the phone numbers so you -- you all are very experienced.

MR. BUMANN: I just didn't know if the Court had a particular deadline that it had in mind for that.

THE COURT: I presume that the --

MR. SELBY: The Plaintiffs will take care of getting that done immediately, translated.

THE COURT: And that should help you in your discussions so that, by May 1, I will know that it's, A, been translated -- and you need to call her today -- that that issue can be resolved.

Because I'd like to keep all of the parties on track as

we proceed with the case because I just think that that is cheaper for everyone if you don't have to duplicate things.

MR. SELBY: Your Honor, on the issue of the translation, is it the Court's -- I know these names you provided to us -- I mean, for purposes of timing --

THE COURT: You don't have to use them.

MR. SELBY: That's what I wanted to know.

THE COURT: You don't have to use them. You just asked me for who the Court uses. Those are the names of the two Brazilian Portuguese translators that the Court uses.

If you can find another one that -- I would just suggest that you both have confidence that that translator is doing a good job.

MR. BUMANN: That is a concern, your Honor, because I -- that's why I was -- wanted to use the Court-approved, if we could, because I have had situations where translations were disputed.

THE COURT: So have I.

MR. BUMANN: And that can be a real train wreck.

THE COURT: Let me tell you about it.

And then it goes to the jury as -- I had that in a libel case.

MR. BUMANN: Oh.

MR. SELBY: Your Honor, one thing that was just brought -- we were just discussing, would the translation

include the exhibits to the complaint, especially including their own documents?

THE COURT: I don't think you need to do that. I think they're primarily interested in --

MR. BUMANN: The core document will be fine.

THE COURT: Yes.

MR. BUMANN: That'll be fine. As long as they can understand what the battle space looks like, then we're fine.

THE COURT: Okay. Thank you all very much.

MR. SELBY: Thank you, your Honor.

THE COURT: Sorry to keep you here so long.

We're in recess.

It was a real pleasure meeting you all.

MR. SELBY: Likewise, Judge.

MR. JOHN MARINO: Likewise, your Honor.

(Proceedings concluded.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

____________ /s/Lisa Edwards
DATE

LISA EDWARDS, RDR, CRR
Official United States Court Reporter
400 North Miami Avenue, Twelfth Floor
Miami, Florida 33128
(305) 523-5499

**'**

**'50s** [1] - 23:14
**'60s** [1] - 23:15
**'68** [2] - 9:3, 43:5
**'72** [1] - 9:5
**'77** [1] - 16:5
**'80s** [1] - 4:24
**'83** [1] - 16:5
**'90s** [1] - 19:16

**/**

**/s/Lisa** [1] - 91:21

**1**

**1** [3] - 1:10, 23:5, 89:22
**1.25-million-dollar** [1] - 64:10
**10** [3] - 5:18, 6:2, 72:10
**10-year** [1] - 5:18
**100** [3] - 1:21, 8:3, 14:10
**10:05** [1] - 1:7
**12** [5] - 5:18, 6:2, 7:18, 7:24, 66:1
**12(b)(5** [3] - 25:17, 84:19, 88:12
**12-04-2014** [1] - 56:4
**120** [1] - 12:17
**1230** [1] - 2:5
**12:49** [1] - 1:7
**13-24583-Civil-Chris** [1] - 3:1
**13-24583-CIVIL-SEITA** [1] - 1:2
**14** [5] - 20:11, 66:2, 66:4, 68:8, 68:10
**15** [3] - 6:19, 16:10, 71:5
**150** [1] - 14:10
**16** [2] - 44:13, 69:21
**16(B** [1] - 1:12
**17** [1] - 9:1
**18** [1] - 68:20
**1972** [1] - 10:4
**1975** [2] - 46:19, 47:6
**1989** [1] - 10:24
**1990** [2] - 5:1, 12:20
**1992** [1] - 12:24
**1998** [1] - 69:3
**1st** [4] - 21:21, 87:19, 87:20, 88:1

**2**

**2** [1] - 69:10
**2006** [2] - 14:18, 14:20
**2007** [1] - 13:23
**2013** [4] - 27:23, 27:24, 27:25, 45:13
**2014** [1] - 1:6
**202-0675** [1] - 44:16
**23** [1] - 1:6
**24** [7] - 48:10, 62:14, 62:22, 68:4, 68:10, 69:20, 69:24
**24/7** [4] - 16:11, 69:12, 69:15, 76:17
**25** [9] - 11:12, 14:21, 26:19, 48:10, 62:14, 62:22, 68:5, 68:10, 69:24
**2600** [1] - 2:2

**3**

**30** [1] - 24:14
**30-plus** [1] - 9:16
**300** [1] - 1:18
**30309** [1] - 2:6
**305** [3] - 2:11, 44:19, 91:23
**3100** [1] - 2:6
**32202** [1] - 2:3
**33128** [2] - 2:10, 91:23
**332-9046** [1] - 44:19
**33301** [1] - 1:24
**35** [1] - 11:25
**3500** [1] - 1:21
**35243** [1] - 1:22
**35244** [1] - 1:19

**4**

**4(d** [1] - 29:4
**40** [1] - 67:19
**40-caliber** [2] - 63:6, 67:19
**400** [2] - 2:9, 91:22
**41** [1] - 61:1
**42** [1] - 9:7
**45** [2] - 67:19

**5**

**50** [2] - 2:2, 42:10
**51** [2] - 68:20, 76:21
**523-5499** [2] - 2:11, 91:23

**6**

**645** [1] - 1:23
**6th** [1] - 44:12

**7**

**7** [2] - 51:20, 52:5
**709** [1] - 78:9
**732** [2] - 76:19, 78:10
**738** [2] - 76:19, 78:10
**740** [1] - 78:10
**750** [1] - 13:19
**786** [1] - 44:16

**8**

**8** [1] - 51:20

**9**

**9-millimeter** [1] - 67:18
**90** [5] - 27:9, 27:21, 28:5, 28:6, 28:7
**905** [1] - 1:18
**95** [1] - 12:4

**A**

**a.m** [1] - 1:7
**Aatif** [2] - 37:3, 37:4
**aback** [1] - 56:6
**abeyance** [1] - 84:19
**ability** [1] - 79:10
**able** [12] - 20:1, 21:10, 22:19, 29:9, 37:9, 56:14, 57:15, 67:12, 78:20, 79:16, 87:9, 88:11
**above-entitled** [1] - 91:19
**absolutely** [2] - 21:12, 30:8
**abundance** [1] - 88:9
**abuse** [1] - 22:15
**abused** [1] - 18:15
**accent** [2] - 3:8, 7:15
**accept** [6] - 30:2, 30:6, 30:7, 37:7, 79:21, 84:2
**accident** [2] - 16:18, 17:12
**accommodate** [1] - 67:20
**accurate** [1] - 91:19
**achieve** [1] - 33:22
**acknowledged** [1] - 64:18
**acoustics** [1] - 39:2
**act** [3] - 6:16, 76:7, 76:9
**Act** [6] - 7:2, 7:3, 43:5, 51:15, 53:20, 53:24
**action** [25] - 5:20, 5:22, 6:6, 6:7, 7:1, 12:2, 12:5, 19:23, 21:15, 26:11, 33:5, 37:5, 37:24, 54:3, 55:20, 56:8, 57:5, 59:14, 60:19, 61:7, 65:19, 66:14, 72:14, 86:20
**actions** [4] - 6:11, 6:23, 37:17, 53:9
**active** [2] - 16:1, 16:19
**adage** [1] - 31:16
**added** [1] - 80:24
**addition** [1] - 68:13
**additional** [9] - 17:15, 26:4, 42:19, 62:6, 66:6, 69:5, 69:16, 76:15, 76:16
**address** [2] - 38:17, 47:19
**addressed** [1] - 75:9
**addressing** [1] - 48:17
**adjust** [1] - 81:15
**administrative** [1] - 27:12
**adopt** [1] - 17:25
**advantageous** [1] - 66:11
**advantages** [5] - 77:22, 77:23, 81:3, 87:6, 87:12
**adversary** [1] - 18:5
**advice** [1] - 22:11
**advocate** [1] - 58:15
**advocates** [1] - 18:4
**affected** [1] - 9:23
**affidavit** [2] - 35:5, 36:11
**affidavits** [1] - 26:6
**affirmed** [1] - 58:19
**affirming** [1] - 57:23
**age** [4] - 10:8, 16:19, 16:21, 16:23
**agent** [1] - 7:19
**aggressive** [1] - 25:10
**ago** [4] - 5:20, 11:24, 27:22, 42:1
**agree** [8] - 32:18, 34:8, 34:15, 52:1, 55:1, 74:15, 75:10, 84:6
**agreed** [1] - 82:1
**agreement** [1] - 55:2
**ahead** [3] - 39:1, 55:5, 84:1
**Alabama** [16] - 1:19, 1:22, 3:8, 4:17, 4:24, 4:25, 5:3, 7:4, 7:17, 7:19, 7:21, 7:25, 13:2, 49:14, 63:25, 64:9
**Alegre** [4] - 24:24, 27:17, 43:10, 43:18
**Alexander** [1] - 8:1
**allegations** [5] - 37:21, 47:3, 51:1, 71:15
**allege** [2] - 66:23, 67:22
**alleges** [1] - 38:6
**allow** [1] - 53:25
**almost** [7] - 13:17, 16:15, 28:16, 37:11, 72:1, 77:20
**alone** [1] - 79:13
**alternatives** [1] - 45:1
**amenable** [1] - 29:5
**amend** [1] - 55:21
**amended** [1] - 88:5
**amendment** [7] - 56:3, 66:22, 70:9, 71:12, 71:23, 84:6, 84:13
**amendments** [2] - 72:8, 80:7
**America** [2] - 15:20, 28:23
**American** [3] - 25:6, 34:12, 87:12
**ammunition** [1] - 67:20
**amount** [2] - 5:15, 58:24
**amounts** [1] - 73:14
**analysis** [1] - 46:4
**Angelo** [1] - 3:13
**ANGELO** [10] - 1:23, 3:13, 3:18, 8:24, 9:9, 9:11, 10:4, 10:6, 35:20, 35:23
**answer** [6] - 26:5, 61:16, 73:3, 79:16, 84:22
**answers** [1] - 54:22
**anti** [1] - 16:8

**anti-terrorism** [1] - 16:8
**anticipate** [2] - 30:4, 34:2
**antitrust** [2] - 13:12, 57:14
**anytime** [1] - 57:7
**anyway** [3] - 32:19, 48:9, 83:20
**apart** [1] - 63:15
**apologize** [2] - 5:8, 82:3
**appeal** [2] - 64:2, 77:25
**appealed** [1] - 64:2
**appear** [1] - 25:21
**appearance** [1] - 82:4
**APPEARANCES** [1] - 1:15
**appearances** [1] - 3:3
**appeared** [1] - 48:21
**applies** [3] - 52:11, 53:11, 54:7
**apply** [7] - 52:4, 52:8, 59:11, 59:15, 59:18, 59:21, 60:2
**applying** [2] - 17:1, 75:10
**appreciate** [1] - 17:13
**appropriate** [2] - 46:5, 56:22
**approved** [5] - 33:18, 34:17, 34:18, 39:20, 90:15
**April** [3] - 1:6, 56:5, 83:1
**area** [6] - 4:23, 15:25, 33:2, 42:16, 64:22, 69:7
**arguing** [1] - 50:17
**arm** [1] - 36:2
**arms** [2] - 40:12, 40:13
**arose** [1] - 66:24
**arrange** [1] - 21:4
**array** [1] - 21:12
**arrive** [1] - 59:4
**Arun** [3] - 22:9, 22:10, 39:9
**aside** [1] - 68:7
**assert** [1] - 84:12
**asset** [1] - 45:21
**assigned** [1] - 13:12
**assist** [1] - 19:2
**associate** [1] - 12:1
**assuming** [2] - 69:19, 89:7
**ATF** [1] - 43:20
**Atlanta** [11] - 2:6, 12:12, 12:14, 12:16, 13:12, 13:18, 14:17, 14:20, 17:6, 21:23, 24:17
**attend** [1] - 4:24
**attended** [3] - 4:25, 10:22
**attention** [1] - 74:16
**Attorney's** [3] - 5:2, 5:7, 5:12
**attorneys** [1] - 11:25
**attorneys'** [2] - 53:25, 58:24
**attractive** [1] - 15:5
**Auburn** [2] - 7:17, 12:23
**audacity** [1] - 44:11
**August** [3] - 7:24, 45:13, 71:13
**authority** [1] - 32:18
**auto** [1] - 10:1
**automatically** [1] - 25:12
**available** [2] - 61:14, 78:4
**Avenue** [2] - 2:9, 91:22
**award** [2] - 58:24, 64:22
**awarded** [1] - 64:10
**aware** [8] - 8:10, 25:14, 32:1, 36:10, 47:2, 53:8, 53:24, 72:3

## B

**B-u-m-a-n-n** [1] - 4:8
**baby** [2] - 85:12, 85:20
**background** [3] - 4:18, 13:21, 17:13
**backwards** [1] - 19:1
**bad** [1] - 86:23
**badly** [1] - 64:21
**BAILEY** [1] - 1:17
**Bailey** [1] - 5:19
**Ballantine** [1] - 11:19
**bank** [1] - 10:1
**banks** [1] - 14:10
**Bar** [5] - 5:24, 7:23, 9:20, 19:15, 19:19
**bargain** [1] - 46:7
**Barrett** [1] - 60:7
**based** [14] - 11:13, 46:7, 46:25, 47:1, 60:4, 61:13, 66:7, 72:22, 78:17, 80:1, 80:18, 82:16, 83:16, 83:25
**basis** [1] - 73:15
**battle** [2] - 79:12, 91:8
**BAUMANN** [1] - 43:4
**bear** [1] - 29:17
**beautiful** [2] - 37:15, 71:14
**become** [3] - 22:1, 28:22, 41:14
**becomes** [2] - 46:2, 80:3
**BEFORE** [1] - 1:13
**begin** [3] - 34:14, 47:10, 75:23
**behalf** [9] - 1:4, 3:4, 3:6, 3:11, 3:13, 3:21, 4:2, 4:5, 6:8
**behind** [2] - 3:16, 9:19
**ben** [1] - 33:11
**bench** [1] - 57:12
**benefit** [6] - 46:7, 50:21, 53:14, 72:6, 73:14, 81:5
**best** [3] - 47:9, 68:19, 78:21
**better** [6] - 4:13, 52:13, 55:4, 73:15, 73:18, 80:10
**between** [10] - 14:10, 40:11, 41:2, 41:15, 43:23, 45:9, 49:5, 79:8, 81:24, 83:1
**beyond** [3] - 21:9, 49:4, 72:6
**biases** [1] - 47:14
**bidder** [1] - 39:3
**bifurcate** [1] - 82:8
**big** [2] - 6:22, 11:13
**Bill** [1] - 17:1
**Billy** [1] - 9:19
**Birmingham** [8] - 1:19, 1:22, 5:13, 7:22, 8:2, 60:5, 60:17
**bit** [8] - 4:18, 11:2, 12:21, 19:16, 23:2, 46:16, 67:15
**blessings** [1] - 84:5
**block** [12] - 63:10, 65:22, 65:23, 66:18, 67:8, 67:9, 69:7, 69:14, 71:10, 76:24, 78:9
**Boggs** [1] - 11:23
**boilerplate** [1] - 84:9
**boils** [1] - 74:11
**born** [6] - 7:17, 8:25, 12:11, 15:24, 25:11
**bothered** [1] - 19:1
**bottom** [2] - 19:7, 20:3
**bottomed** [1] - 25:17
**bought** [4] - 15:8, 35:12, 64:15, 64:16
**box** [2] - 21:3, 71:10
**brain** [1] - 21:8
**brand** [1] - 43:1
**Brasilia** [2] - 27:11, 28:6
**Brazil** [20] - 23:14, 24:21, 25:2, 25:23, 26:5, 26:12, 28:19, 30:10, 31:14, 40:3, 40:4, 40:12, 40:21, 42:23, 42:25, 43:10, 43:18, 85:22, 88:11, 89:5
**Brazilian** [18] - 25:7, 25:12, 26:7, 26:14, 26:20, 27:1, 27:2, 27:10, 27:13, 29:24, 34:12, 35:2, 44:14, 88:22, 89:4, 89:5, 90:10
**breach** [3] - 49:22, 49:24, 50:2
**break** [5] - 45:4, 59:10, 70:3, 70:23
**breaking** [1] - 73:1
**BRENNAN** [1] - 3:17
**Brennan** [2] - 3:17, 9:19
**brief** [3] - 30:21, 49:2, 78:21
**bright** [2] - 80:23, 80:24
**bring** [2] - 66:13, 68:10
**brisk** [1] - 28:10
**broad** [1] - 52:24
**brought** [1] - 90:25
**built** [1] - 5:17
**bullet** [3] - 64:19, 64:23, 77:12
**BUMANN** [131] - 2:4, 4:5, 4:8, 8:21, 14:16, 14:24, 15:4, 15:7, 15:9, 15:12, 15:23, 16:4, 16:12, 16:17, 16:22, 17:5, 17:12, 23:10, 23:18, 23:23, 24:5, 24:7, 24:12, 24:15, 24:23, 25:1, 25:5, 25:8, 25:13, 25:16, 26:18, 27:6, 27:23, 27:25, 28:3, 28:7, 28:15, 29:12, 29:15, 30:8, 30:11, 30:14, 30:18, 30:20, 32:11, 32:13, 32:18, 32:23, 33:1, 33:4, 33:12, 33:20, 34:17, 34:22, 35:5, 35:7, 35:9, 35:12, 35:15, 35:25, 37:12, 41:11, 41:25, 42:9, 42:12, 42:15, 42:19, 42:24, 43:17, 43:25, 45:18, 45:22, 46:1, 55:5, 62:10, 62:18, 62:24, 63:3, 63:13, 63:20, 63:25, 64:17, 65:1, 65:5, 66:3, 67:8, 68:1, 68:12, 69:2, 71:7, 73:21, 73:24, 74:1, 74:25, 76:10, 76:22, 77:1, 77:13, 77:18, 78:12, 83:5, 83:8, 83:10, 83:14, 83:19, 83:21, 84:16, 84:21, 85:2, 85:9, 85:12, 85:16, 85:19, 85:24, 86:7, 86:10, 86:12, 86:18, 87:3, 87:10, 88:12, 88:15, 88:18, 88:24, 89:7, 89:16, 90:14, 90:19, 90:23, 91:5, 91:7
**Bumann** [9] - 4:5, 4:8, 8:13, 8:17, 13:25, 14:12, 14:15, 41:11, 75:9
**Bumann's** [1] - 36:16
**Bureau** [1] - 7:21
**burned** [1] - 74:3
**burns** [1] - 77:14
**business** [9] - 6:9, 12:25, 24:21, 29:13, 74:7, 74:11, 87:5, 87:14, 87:15
**button** [2] - 39:6, 39:10
**buy** [1] - 39:14
**BY** [1] - 2:8

## C

**cabin** [1] - 18:10
**caliber** [3] - 68:3, 68:5, 68:7
**calibers** [1] - 69:5
**California** [2] - 6:16, 7:4
**calmer** [1] - 32:16
**cam** [1] - 15:16
**cameras** [1] - 15:17

**cannot** [5] - 20:8, 22:11, 26:5, 51:3, 86:19
**car** [3] - 6:18, 6:20
**care** [3] - 31:22, 73:21, 89:19
**career** [2] - 48:2, 48:5
**careful** [1] - 71:25
**Carolina** [1] - 44:18
**carrying** [2] - 39:15, 39:20
**cars** [2] - 35:12, 35:13
**CARTER** [1] - 1:4
**Carter** [5] - 3:2, 39:15, 65:13, 65:23, 66:21
**Carter's** [2] - 43:15, 62:21
**cartridge** [1] - 44:9
**cartridges** [1] - 44:8
**case** [79] - 17:20, 17:21, 17:22, 19:11, 19:13, 20:5, 20:14, 21:7, 21:9, 21:20, 22:24, 25:19, 27:17, 27:20, 27:22, 28:1, 29:21, 29:25, 30:17, 30:18, 30:21, 31:2, 32:1, 34:2, 34:8, 37:11, 37:24, 37:25, 39:12, 44:6, 46:1, 47:9, 47:23, 50:14, 55:3, 56:9, 56:10, 56:17, 56:21, 57:14, 59:1, 60:22, 60:23, 61:1, 62:10, 63:11, 63:22, 63:24, 63:25, 64:4, 65:6, 65:10, 65:16, 70:19, 70:25, 71:14, 72:4, 73:4, 73:5, 74:10, 74:13, 74:14, 74:19, 75:4, 75:18, 80:3, 80:4, 80:13, 80:14, 80:22, 81:6, 81:18, 81:23, 82:9, 85:4, 90:1, 90:22
**CASE** [1] - 1:2
**Case** [1] - 3:1
**cases** [31] - 6:12, 6:16, 6:18, 7:2, 7:3, 7:5, 7:7, 7:8, 8:7, 8:15, 9:25, 13:22, 14:1, 14:10, 14:23, 15:15, 15:21, 20:1, 21:6, 22:2, 22:7, 36:19, 50:15, 53:9, 57:1, 62:5, 63:21, 66:21, 66:22
**catch** [1] - 52:24
**Catch-22** [1] - 75:7
**caught** [1] - 75:7
**causes** [4] - 26:10, 26:11, 55:19, 59:14
**caution** [1] - 88:9
**center** [1] - 19:3
**CEO** [2] - 45:12
**cert** [10] - 56:7, 73:1, 73:8, 73:10, 78:25, 80:9, 81:12, 81:19, 82:24, 87:23
**certain** [8] - 16:23, 43:5, 46:24, 51:11, 52:8, 52:11, 54:15, 78:1
**certainly** [16] - 23:12, 36:8, 41:12, 50:19, 50:21, 51:3, 51:4, 51:9, 54:17, 54:22, 55:6, 55:8, 65:8, 76:15, 82:20, 84:22
**certification** [19] - 48:14, 50:16, 50:23, 55:15, 56:4, 57:24, 58:22, 60:3, 70:11, 72:25, 75:19, 79:3, 79:7, 79:8, 79:24, 80:2, 80:6, 80:12, 82:21
**certified** [8] - 34:11, 36:17, 36:18, 57:1, 57:19, 81:4, 87:7
**certify** [4] - 56:24, 57:16, 58:23, 91:19
**certifying** [1] - 56:20
**cetera** [1] - 51:9
**challenge** [3] - 29:1, 36:8, 39:2
**challenged** [1] - 50:23
**challenges** [1] - 29:2
**change** [6] - 30:22, 31:7, 41:24, 55:19, 55:20, 87:22
**changed** [4] - 41:14, 47:4, 69:6, 69:7
**changes** [3] - 9:23, 46:20, 69:9
**charge** [1] - 36:1
**Charleston** [2] - 60:7, 60:16
**chat** [1] - 45:5
**cheap** [3] - 18:21, 35:9, 35:25
**cheaper** [4] - 35:12, 35:18, 71:17, 90:2
**cheaply** [2] - 15:9, 18:15
**Chevrolet** [1] - 78:13
**child** [1] - 25:11
**chocoholic** [1] - 8:11
**choice** [3] - 59:23, 59:25, 71:21
**choices** [3] - 78:1, 78:4, 78:5
**choose** [3] - 30:2, 30:6, 30:7
**chosen** [1] - 65:13
**CHRIS** [1] - 1:4
**churning** [1] - 31:18
**Circuit** [6] - 29:23, 56:18, 56:19, 57:2, 58:17, 88:17
**Circuit's** [2] - 25:20
**cited** [1] - 57:22
**citizen** [2] - 25:9, 25:12
**citizens** [1] - 89:5
**city** [1] - 73:19
**City** [2] - 8:1, 65:14
**Civil** [1] - 29:5
**civil** [1] - 11:20
**claim** [10] - 51:3, 52:5, 52:8, 54:5, 58:25, 59:17, 64:11, 66:13, 72:15
**claims** [10] - 50:6, 50:8, 52:23, 61:18, 70:14, 72:9, 73:13, 78:25, 79:2, 84:16
**class** [114] - 5:20, 5:22, 6:6, 6:7, 6:11, 6:22, 7:1, 12:2, 12:5, 33:5, 37:16, 37:24, 38:2, 38:5, 46:2, 46:5, 46:13, 46:16, 47:3, 47:5, 47:10, 48:9, 48:13, 48:18, 50:15, 50:16, 50:19, 50:22, 52:8, 52:11, 52:13, 52:24, 53:9, 54:19, 55:14, 55:18, 55:19, 56:1, 56:4, 56:7, 56:8, 56:13, 56:15, 56:20, 56:22, 56:25, 57:1, 57:5, 57:12, 57:16, 57:21, 57:23, 57:24, 58:12, 58:13, 58:15, 58:16, 58:20, 58:21, 58:23, 59:12, 60:3, 60:19, 62:11, 65:13, 65:25, 66:7, 66:14, 68:8, 69:24, 70:11, 71:19, 71:20, 72:9, 72:25, 73:1, 73:8, 73:9, 73:10, 73:16, 75:16, 75:19, 75:25, 76:1, 76:12, 78:24, 79:3, 79:7, 79:8, 79:24, 80:2, 80:6, 80:9, 80:12, 80:13, 81:4, 81:9, 81:11, 81:12, 81:17, 81:19, 81:24, 82:5, 82:10, 82:12, 82:14, 82:21, 82:23, 86:20, 87:6, 87:23
**class-action** [6] - 5:20, 5:22, 7:1, 12:2, 12:5, 60:19
**classes** [1] - 17:6
**classmates** [1] - 13:7
**clear** [2] - 27:3, 49:17
**clearer** [1] - 46:17
**CLERK** [1] - 39:11
**clerk** [5] - 3:18, 9:19, 21:19, 22:23, 37:3
**clerks** [1] - 22:22
**client** [17] - 18:11, 18:13, 24:23, 30:6, 30:7, 30:15, 30:20, 31:1, 31:23, 32:3, 32:15, 32:16, 33:22, 37:6, 79:20, 85:4
**clients** [7] - 6:9, 15:19, 18:18, 18:24, 23:11, 25:1, 25:2
**clones** [1] - 16:10
**close** [1] - 9:1
**closer** [2] - 69:21
**Club** [1] - 57:10
**Coast** [1] - 16:5
**code** [4] - 26:13, 27:12, 54:8, 86:20
**cognizable** [1] - 26:11
**COLA** [1] - 36:4
**colleagues** [1] - 22:7
**collectible** [1] - 31:17
**collecting** [1] - 61:23
**college** [2] - 16:19, 16:24
**colonel** [1] - 16:7
**Colonnade** [1] - 1:21
**comfort** [3] - 34:9, 34:15, 87:11
**comfortable** [3] - 4:19, 33:23, 75:22
**comments** [1] - 48:5
**commercial** [4] - 6:8, 8:7, 14:6, 14:11
**common** [12] - 6:21, 26:12, 47:1, 51:1, 54:7, 54:8, 59:21, 60:1, 66:25, 68:23, 75:10
**common-law** [4] - 54:7, 54:8, 59:21, 60:1
**commonality** [5] - 75:12, 75:13, 75:22, 79:12, 79:15
**companies** [4] - 41:3, 41:19, 41:20, 51:7
**company** [8] - 15:16, 27:18, 40:7, 40:14, 40:18, 40:21, 42:4, 42:5
**company's** [1] - 85:23
**compelling** [1] - 67:13
**complaint** [37] - 23:9, 26:9, 26:21, 32:3, 32:5, 32:7, 32:20, 33:16, 33:18, 37:8, 37:15, 37:23, 45:24, 46:8, 47:3, 48:21, 50:25, 55:12, 56:1, 60:23, 61:16, 66:8, 66:23, 68:19, 70:14, 71:15, 71:17, 71:24, 72:9, 72:22, 74:17, 75:20, 84:4, 84:7, 84:23, 86:15, 91:1
**complex** [3] - 13:22, 21:7, 58:9
**complicated** [1] - 73:9
**complies** [1] - 39:11
**component** [1] - 6:14
**comprise** [1] - 46:13
**compromise** [1] - 83:1
**concealment** [2] - 51:24, 54:5
**concentrate** [1] - 82:22
**concentrates** [1] - 5:21
**concept** [1] - 86:19
**concepts** [1] - 63:9
**concern** [7] - 25:21, 52:12, 55:22, 81:16, 88:19, 88:22, 90:14
**concerned** [5] - 31:12, 33:15, 37:21, 56:18, 65:2
**concerning** [3] - 30:20, 31:4, 63:20
**concerns** [3] - 31:22, 56:13, 81:1

**concluded** [1] - 91:16
**concrete** [1] - 17:25
**confer** [2] - 79:19, 83:23
**conference** [2] - 20:23, 21:1
**CONFERENCE** [1] - 1:12
**conferred** [1] - 20:8
**confidence** [2] - 18:7, 90:12
**confines** [1] - 49:4
**confirms** [1] - 45:14
**conflagration** [1] - 74:5
**conflicted** [1] - 11:7
**connection** [1] - 45:9
**conquering** [1] - 73:20
**considerable** [1] - 5:15
**considerations** [1] - 29:23
**consistent** [1] - 19:9
**consortium** [1] - 60:11
**constantly** [1] - 15:21
**constitutional** [1] - 35:21
**construction** [6] - 12:24, 13:20, 13:21, 13:22, 13:24, 14:3
**constructively** [1] - 37:23
**consumer** [4] - 9:25, 12:3, 49:1, 86:24
**Consumer** [1] - 7:2
**contain** [1] - 66:17
**contemporary** [1] - 77:6
**contest** [1] - 65:9
**contested** [1] - 75:13
**contingency** [2] - 18:22, 47:22
**continue** [1] - 42:7
**continued** [1] - 5:20
**continuing** [2] - 42:19, 54:14
**contract** [2] - 41:4, 72:17
**contractual** [1] - 72:16
**control** [4] - 51:7, 69:4, 81:7, 87:17
**Control** [1] - 43:5
**controls** [1] - 77:2
**convicted** [1] - 11:3
**cooperate** [1] - 55:9
**cooperative** [1] - 55:24
**copy** [1] - 29:8
**core** [2] - 74:4, 91:5
**corporate** [1] - 31:6
**corporation** [4] - 19:3, 29:5, 29:9, 29:10
**corporations** [2] - 87:14, 87:16
**Corps** [1] - 21:25
**correct** [7] - 15:7, 24:4, 32:13, 32:22, 68:2, 82:2, 87:3
**correctly** [1] - 62:16
**cost** [16] - 19:9, 20:19, 23:7, 23:8, 23:19, 24:1, 27:5, 33:25, 34:16, 35:10, 35:13, 36:6, 73:13, 78:2, 80:22
**cost-effective** [2] - 20:19, 36:6
**cost-efficient** [2] - 73:13, 80:22
**costs** [9] - 20:6, 23:25, 29:11, 29:14, 29:17, 29:25, 30:3, 31:6, 87:2
**counsel** [30] - 3:3, 8:19, 10:13, 18:3, 18:17, 19:5, 19:6, 21:1, 21:17, 22:14, 29:9, 31:6, 31:21, 32:4, 32:6, 32:8, 32:9, 45:4, 58:5, 58:6, 59:5, 60:9, 64:13, 66:11, 71:3, 74:18, 74:23, 85:6, 85:7, 86:17
**counseling** [1] - 79:20
**Count** [4] - 51:20, 52:5, 72:10
**count** [3] - 59:9, 59:21, 64:25
**counting** [1] - 74:22
**country** [5] - 13:22, 26:13, 27:12, 28:17, 38:21
**Country** [1] - 57:10
**counts** [10] - 38:1, 50:3, 50:4, 51:4, 51:5, 51:10, 60:1, 78:18, 78:19
**county** [1] - 65:5
**couple** [4] - 23:7, 24:15, 68:13, 76:14
**course** [5] - 18:12, 20:11, 22:15, 53:20, 64:8
**Court** [37] - 2:8, 2:9, 18:3, 18:9, 25:14, 26:20, 27:11, 27:13, 28:17, 29:20, 30:24, 33:18, 35:2, 36:17, 41:17, 44:15, 45:19, 49:7, 49:8, 49:12, 49:13, 49:14, 66:3, 67:13, 68:4, 72:3, 77:15, 84:19, 87:5, 88:5, 89:7, 89:9, 89:16, 90:9, 90:10, 90:15, 91:22
**court** [4] - 16:9, 28:9, 39:2, 70:2
**COURT** [239] - 1:1, 3:5, 3:7, 3:10, 3:12, 3:15, 3:19, 3:23, 4:1, 4:4, 4:7, 4:9, 4:21, 5:6, 5:9, 5:11, 5:23, 6:6, 6:10, 6:22, 7:9, 7:13, 7:15, 8:9, 8:16, 8:18, 8:20, 8:22, 9:8, 9:10, 10:3, 10:5, 10:12, 10:17, 10:25, 11:14, 11:17, 12:6, 12:10, 12:14, 12:18, 13:4, 13:9, 13:15, 14:2, 14:15, 14:22, 15:3, 15:5, 15:8, 15:10, 15:22, 16:3, 16:10, 16:16, 16:21, 17:4, 17:10, 17:13, 23:5, 23:11, 23:21, 24:2, 24:6, 24:10, 24:14, 24:20, 24:25, 25:3, 25:6, 25:10, 25:15, 25:18, 26:23, 27:22, 28:1, 28:5, 28:13, 29:4, 29:13, 29:19, 30:9, 30:12, 30:17, 30:19, 31:8, 32:12, 32:14, 32:25, 33:3, 33:11, 33:19, 34:4, 34:7, 34:20, 34:23, 35:6, 35:8, 35:10, 35:14, 35:17, 35:22, 35:24, 36:1, 36:16, 37:13, 37:20, 38:18, 38:22, 38:24, 39:22, 40:2, 40:4, 40:6, 40:15, 40:24, 41:10, 41:23, 42:8, 42:10, 42:14, 42:18, 42:21, 43:3, 43:15, 43:19, 44:10, 45:17, 45:21, 45:23, 46:2, 46:15, 46:19, 47:5, 47:8, 48:15, 48:20, 49:1, 50:10, 51:15, 51:20, 52:6, 52:10, 53:3, 53:6, 54:2, 54:10, 55:1, 56:3, 57:11, 58:19, 59:23, 60:4, 60:22, 60:25, 61:4, 61:10, 61:22, 62:1, 62:7, 62:13, 62:21, 63:12, 63:19, 63:23, 64:15, 64:24, 65:2, 65:12, 65:25, 66:10, 67:2, 67:9, 67:25, 68:8, 68:16, 68:25, 70:1, 71:3, 71:8, 72:10, 73:7, 73:23, 73:25, 74:6, 74:16, 75:2, 75:14, 76:2, 76:20, 76:25, 77:12, 77:17, 78:11, 78:15, 79:4, 79:7, 79:18, 81:16, 82:6, 82:11, 82:25, 83:4, 83:9, 83:12, 83:16, 83:23, 84:20, 84:25, 85:3, 85:11, 85:15, 85:17, 85:22, 86:5, 86:9, 86:11, 86:13, 87:1, 87:8, 87:11, 87:22, 88:2, 88:6, 88:14, 88:16, 88:19, 88:25, 89:13, 89:18, 89:21, 90:6, 90:8, 90:18, 90:20, 91:3, 91:6, 91:9, 91:11
**Court's** [2] - 77:3, 90:4
**Court-approved** [2] - 33:18, 90:15
**COURTROOM** [1] - 3:1
**courtroom** [3] - 39:2, 44:10, 44:21
**courts** [2] - 34:19, 49:10
**covers** [1] - 51:17
**craft** [1] - 20:2
**crazy** [1] - 80:19
**create** [3] - 40:17, 58:15, 89:4
**creature** [1] - 87:12
**Credit** [1] - 7:3
**credit** [1] - 88:23
**creditors'** [1] - 14:8
**crime** [1] - 5:4
**criminal** [5] - 9:12, 13:13, 22:1, 36:19, 36:21
**criteria** [1] - 26:8
**critical** [4] - 20:18, 47:17, 50:17, 80:6
**cross** [3] - 37:20, 57:3, 57:15
**crossed** [2] - 57:6, 82:23
**CRR** [2] - 2:8, 91:21
**Cumberland** [2] - 4:25, 5:1
**cumbersome** [1] - 38:2
**current** [2] - 45:12, 53:13
**cut** [2] - 50:10, 87:18
**cutoff** [1] - 56:3
**cylinder** [2] - 44:1, 44:3

## D

**DA's** [1] - 13:6
**damages** [1] - 46:3
**data** [1] - 23:21
**date** [3] - 20:15, 32:20, 70:9
**DATE** [1] - 91:21
**dates** [1] - 17:25
**DAVID** [2] - 1:17, 2:4
**David** [4] - 3:4, 3:6, 4:2, 12:8
**days** [6] - 20:11, 27:9, 27:21, 28:5, 28:6, 28:7
**dazzle** [1] - 39:10
**dazzling** [1] - 21:12
**DC** [3] - 15:24, 24:17, 24:18
**deadline** [10] - 55:21, 56:4, 71:23, 81:13, 82:9, 82:21, 87:20, 87:23, 89:10, 89:17
**deadlines** [3] - 81:15, 82:3, 83:24
**deal** [7] - 20:25, 37:25, 41:18, 48:23, 67:17, 73:13, 86:13
**dealers** [1] - 6:20
**dealing** [8] - 6:14, 6:17, 7:2, 47:15, 48:18, 53:10, 74:21, 85:6
**death** [2] - 8:4, 11:17
**December** [6] - 79:9, 80:9, 81:13, 82:21, 83:1, 84:5
**deceptive** [2] - 6:15, 48:25
**decide** [4] - 10:5, 14:2, 21:3, 56:22
**decided** [1] - 5:24
**decision** [6] - 25:20, 47:18, 49:12, 58:7, 74:11

**decision-maker** [1] - 49:12
**declaration** [1] - 72:18
**declarations** [1] - 72:21
**declaratory** [1] - 72:18
**declare** [1] - 72:19
**defect** [6] - 6:21, 47:2, 62:2, 62:20, 67:6, 75:25
**defective** [3] - 6:14, 66:18, 72:19
**defects** [1] - 63:18
**Defendant** [17] - 26:16, 29:14, 29:15, 29:22, 44:25, 45:5, 55:1, 59:8, 59:10, 71:18, 74:7, 74:8, 74:12, 76:2, 81:3, 87:4
**defendant** [1] - 87:6
**Defendant's** [1] - 56:23
**Defendants** [15] - 3:22, 4:2, 4:5, 26:5, 34:1, 40:10, 44:23, 45:2, 51:3, 51:6, 55:11, 59:7, 62:7, 75:10, 84:8
**defendants** [1] - 1:10
**DEFENDANTS** [1] - 2:1
**Defendants'** [1] - 18:24
**defense** [13] - 5:13, 5:23, 6:1, 6:3, 8:19, 10:12, 12:2, 12:5, 48:1, 48:5, 64:12, 64:13, 65:17
**defenses** [4] - 64:7, 84:9, 84:12, 84:15
**define** [6] - 55:22, 58:16, 71:19, 81:9, 82:12, 82:14
**defined** [4] - 52:8, 54:19, 66:15, 66:17
**definitely** [1] - 64:12
**definition** [6] - 52:13, 53:1, 65:25, 68:9, 69:24, 75:25
**degree** [3] - 12:23, 16:16, 17:10
**delaying** [1] - 80:1
**deliver** [2] - 85:17, 86:2
**delivered** [1] - 85:16
**delivers** [2] - 85:12, 86:2
**demand** [1] - 30:25
**demanded** [1] - 30:15
**demonstrate** [1] - 20:2
**demonstrates** [1] - 56:24
**dentist** [1] - 18:25
**deny** [6] - 25:22, 25:25, 88:7, 88:12, 88:14, 88:15
**department** [3] - 19:3, 39:14, 39:18
**Department** [2] - 13:11, 61:15
**department-issued** [1] - 39:14
**departments** [4] - 38:20, 39:13
**deposition** [6] - 36:15, 40:20, 45:11, 45:14, 72:5, 75:16
**depositions** [2] - 70:11, 74:22
**deputy** [1] - 44:10
**DEPUTY** [1] - 3:1
**description** [5] - 38:3, 46:15, 68:14, 69:11, 69:17
**design** [13] - 47:2, 63:9, 65:22, 66:18, 67:14, 67:23, 68:23, 69:6, 75:10, 77:5, 77:22, 78:1, 78:5
**designed** [1] - 87:1
**designer** [2] - 78:1, 78:3
**designs** [5] - 62:19, 69:2, 69:3, 69:14, 69:15
**desire** [1] - 19:14
**destructive** [1] - 73:24
**detailed** [1] - 71:24
**details** [1] - 58:21
**determinations** [1] - 72:8
**determine** [1] - 31:2
**determined** [1] - 64:9
**determines** [1] - 56:9
**device** [2] - 15:15, 66:18
**devil** [1] - 58:20
**Dewey** [2] - 11:18, 11:20
**Diamondback** [3] - 42:4, 42:6, 42:16
**die** [4] - 11:3, 11:8, 11:14, 11:18
**die-hard** [2] - 11:3, 11:8
**diet** [1] - 22:7
**difference** [2] - 43:23, 52:2
**different** [39] - 14:4, 38:12, 46:5, 46:11, 46:12, 48:10, 48:19, 56:14, 56:18, 59:13, 59:14, 60:2, 62:12, 62:14, 62:18, 63:3, 63:4, 63:8, 63:10, 66:2, 66:13, 66:14, 66:20, 66:23, 67:18, 67:21, 68:3, 68:5, 68:10, 69:3, 69:4, 69:14, 69:15, 77:1, 78:13, 81:20, 81:21
**difficult** [1] - 28:20
**digest** [1] - 21:10
**diplomatic** [1] - 27:15
**direct** [2] - 57:16, 57:21
**disadvantages** [2] - 77:23, 77:24
**disclose** [2] - 8:11, 51:21
**discover** [1] - 73:10
**discovered** [1] - 74:17
**discovery** [23] - 20:7, 21:2, 29:1, 52:16, 55:18, 61:20, 70:12, 72:24, 72:25, 73:1, 73:2, 75:17, 78:15, 78:18, 80:12, 81:18, 81:21, 81:25, 82:5, 82:8, 82:10, 82:17
**discuss** [1] - 40:11
**discussed** [2] - 26:6, 30:16
**discussing** [2] - 25:20, 90:25
**discussion** [4] - 30:20, 58:10, 80:18, 83:25
**discussions** [2] - 71:4, 89:22
**disloyal** [1] - 11:1
**dismiss** [8] - 17:16, 17:18, 25:22, 26:10, 36:12, 37:10, 47:20, 88:7
**dispassionate** [2] - 19:10, 58:7
**dispassionately** [1] - 18:20
**dispositive** [3] - 50:17, 55:15, 80:14
**disputed** [3] - 51:3, 51:13, 90:17
**distribute** [2] - 41:21, 42:5
**distributed** [1] - 40:6
**distribution** [1] - 41:9
**distributor** [1] - 40:8
**Distributors** [1] - 42:4
**District** [5] - 2:9, 5:2, 5:6, 5:12, 22:8
**district** [4] - 22:18, 34:19, 49:10, 74:4
**DISTRICT** [3] - 1:1, 1:1, 1:13
**division** [2] - 5:4, 13:13
**DIVISION** [1] - 1:2
**document** [3] - 23:24, 84:24, 91:5
**documents** [2] - 19:1, 91:2
**dog** [1] - 80:3
**DOJ** [1] - 13:15
**dollars** [1] - 15:6
**domestically** [1] - 43:13
**done** [24] - 6:18, 7:1, 8:13, 9:24, 9:25, 12:2, 15:14, 27:9, 30:12, 56:16, 58:1, 59:23, 72:12, 72:24, 73:8, 80:9, 80:11, 80:13, 85:20, 88:17, 89:9, 89:12, 89:20
**dot** [3] - 37:20, 57:3, 57:16
**dotted** [2] - 57:6, 82:22
**double** [1] - 21:23
**down** [35] - 3:25, 17:3, 20:7, 21:25, 23:15, 24:24, 27:17, 27:18, 29:14, 29:25, 31:6, 31:25, 32:24, 34:18, 34:24, 35:1, 36:6, 36:15, 36:24, 37:1, 47:13, 51:4, 52:3, 54:13, 55:17, 61:23, 65:10, 70:14, 74:11, 75:19, 75:23, 76:5, 77:14, 85:25, 87:19
**downturn** [1] - 14:6
**drafter** [1] - 37:22
**drag** [1] - 75:6
**dress** [1] - 20:23
**dressed** [1] - 15:6
**dried** [1] - 50:11
**drive** [1] - 80:6
**drop** [3] - 63:21, 63:22, 65:9
**dropped** [1] - 64:10
**dropping** [1] - 78:18
**drug** [1] - 39:18
**due** [2] - 9:3, 29:23
**dumb** [1] - 74:7
**duplicate** [2] - 51:16, 90:2
**duplicative** [3] - 51:10, 51:25, 53:23
**during** [4] - 64:2, 64:8, 64:13, 69:9
**duty** [7] - 16:1, 16:19, 21:20, 22:21, 39:16, 39:17, 39:21

## E

**early** [5] - 4:24, 10:8, 19:16, 54:17, 57:12
**easier** [3] - 47:17, 58:4, 86:16
**easily** [1] - 66:12
**easy** [1] - 43:7
**eat** [1] - 71:6
**economy** [1] - 14:5
**educate** [2] - 31:4, 60:10
**education** [1] - 35:11
**Edwards** [1] - 91:21
**EDWARDS** [2] - 2:8, 91:21
**effective** [3] - 20:19, 36:6, 73:25
**efficient** [5] - 18:23, 19:9, 73:13, 73:15, 80:22
**effort** [1] - 32:2
**either** [5] - 8:9, 23:20, 26:11, 50:24, 80:2
**ejected** [1] - 77:12
**ejects** [1] - 44:8
**elements** [1] - 48:12
**elevator** [2] - 4:12, 4:17
**Eleventh** [7] - 25:19, 29:23, 56:18, 56:19, 57:2, 58:17, 88:17
**eliminate** [2] - 46:24, 51:9
**Emory** [1] - 21:23
**encompasses** [1] - 83:5
**end** [1] - 83:11
**ended** [1] - 17:1
**ends** [1] - 21:20

**energy** [1] - 47:12
**enforce** [2] - 31:14, 88:11
**enforceable** [1] - 26:1
**enforcement** [2] - 38:7, 88:21
**enforcing** [1] - 25:23
**engineering** [1] - 12:23
**English** [4] - 24:3, 24:4, 33:1, 33:8
**enjoin** [1] - 72:20
**enjoy** [4] - 14:13, 16:15, 19:25, 74:8
**enjoys** [1] - 22:3
**enrichment** [4] - 59:9, 59:17, 72:11, 72:16
**entered** [1] - 69:2
**entire** [2] - 33:23, 48:5
**entities** [1] - 8:20
**entitled** [2] - 53:14, 91:19
**equity** [1] - 5:16
**especially** [4] - 21:7, 50:16, 53:9, 91:1
**ESQ** [6] - 1:17, 1:20, 1:23, 2:1, 2:4, 2:4
**essential** [1] - 20:18
**essentially** [1] - 23:25
**establish** [1] - 5:17
**et** [1] - 51:9
**Europe** [2] - 24:8, 24:16
**European** [1] - 24:8
**evaluate** [1] - 76:4
**evaluates** [1] - 26:9
**evaluation** [1] - 26:14
**evidence** [3] - 46:25, 47:1, 67:13
**evolved** [1] - 78:13
**evolves** [1] - 62:10
**exactly** [6] - 15:7, 15:12, 45:22, 59:17, 68:2, 88:24
**examines** [1] - 27:2
**example** [7] - 28:25, 36:8, 43:9, 44:2, 62:19, 75:8, 78:2
**excellent** [1] - 23:18
**exception** [2] - 9:18, 9:22
**excluding** [1] - 68:5
**exhibits** [1] - 91:1
**exist** [2] - 63:18, 86:20
**existence** [1] - 69:1
**existing** [1] - 84:23
**expect** [2] - 58:11, 86:1
**expensive** [3] - 27:8, 35:8, 35:23
**experience** [3] - 26:19, 27:7, 80:1
**experienced** [1] - 89:15
**expert** [5] - 43:20, 62:1, 75:14, 75:17, 76:4
**experts** [5] - 62:3, 62:4, 62:6, 62:8, 67:3
**explain** [2] - 33:25, 86:23
**explodes** [1] - 77:13
**exportable** [1] - 49:4
**express** [9] - 49:17, 49:22, 49:25, 51:5, 51:12, 52:22, 53:21, 59:10, 72:13
**extended** [1] - 54:20
**extent** [2] - 52:1, 76:22
**external** [2] - 77:4, 77:8

## F

**face** [1] - 22:25
**facilitate** [1] - 31:10
**facing** [1] - 39:7
**fact** [7] - 22:17, 39:9, 56:11, 57:20, 64:22, 72:24, 74:17
**factor** [2] - 66:25, 74:18
**facts** [9] - 23:7, 23:22, 49:19, 50:7, 54:15, 61:23, 66:23, 84:10
**factual** [2] - 51:1
**failed** [1] - 46:9
**failure** [3] - 46:6, 51:21, 54:4
**fair** [2] - 19:10, 58:7
**Fair** [1] - 7:3
**fairly** [4] - 18:19, 19:13, 30:21, 53:17
**faith** [2] - 20:8, 88:23
**fall** [5] - 51:14, 52:23, 75:24, 76:12, 83:15
**fall-back** [1] - 51:14
**falls** [2] - 69:20, 77:10
**familiar** [6] - 23:13, 23:16, 24:24, 44:5, 44:17, 77:3
**family** [2] - 10:20, 23:15
**family's** [1] - 15:24
**fans** [1] - 11:8
**far** [23] - 10:17, 19:16, 36:21, 37:21, 38:4, 45:2, 46:24, 46:25, 49:8, 52:25, 56:19, 63:17, 65:2, 68:4, 72:8, 74:10, 75:18, 75:19, 79:21, 82:13, 84:11, 85:24, 88:16
**fashion** [3] - 19:12, 21:12, 37:10
**fast** [3] - 41:14, 76:8, 76:9
**faster** [3] - 47:18, 70:19, 70:25
**father** [1] - 10:10
**favor** [1] - 34:24
**FDUTPA** [2] - 49:3, 49:8
**February** [2] - 70:12, 81:19
**fed** [1] - 44:6
**federal** [9] - 26:12, 36:3, 36:21, 49:10, 49:16, 51:17, 54:1
**Federal** [1] - 29:4
**fee** [1] - 47:22
**feeds** [1] - 44:9
**fees** [2] - 53:25, 58:24
**felon** [1] - 65:16
**felons** [1] - 43:19
**fester** [1] - 20:12
**few** [1] - 16:6
**field** [1] - 55:23
**Fifth** [1] - 1:23
**fight** [2] - 52:4, 54:20
**figure** [3] - 19:25, 31:11, 60:4
**figured** [1] - 3:24
**file** [2] - 47:16, 80:12
**filing** [2] - 20:10, 75:19
**fill** [1] - 21:13
**final** [1] - 84:24
**fine** [8] - 35:7, 47:17, 58:12, 81:14, 83:3, 91:5, 91:7, 91:8
**fine-tune** [1] - 58:12
**fine-tuned** [1] - 47:17
**fire** [3] - 67:6, 69:4, 77:2
**firearm** [5] - 8:13, 43:6, 52:21, 59:19, 78:3
**firearms** [9] - 8:5, 14:13, 15:1, 15:13, 41:5, 41:9, 42:6, 76:11, 76:12
**fired** [16] - 66:5, 66:6, 68:15, 68:17, 69:13, 76:14, 76:18, 76:23, 76:25, 77:6, 77:7, 77:16, 77:20, 78:8
**fired-pistol** [1] - 69:13
**firing** [14] - 63:10, 65:22, 66:18, 67:6, 67:8, 67:9, 69:7, 69:13, 72:19, 76:24, 77:7, 77:9, 78:9
**firm** [24] - 5:13, 5:14, 5:17, 5:19, 5:21, 7:7, 7:25, 9:11, 9:14, 9:15, 11:12, 11:13, 12:17, 12:18, 12:21, 13:18, 14:7, 14:16, 14:19, 23:24, 33:16, 60:14, 60:20
**firms** [3] - 12:22, 14:22, 60:20
**first** [12] - 9:11, 17:6, 18:3, 19:22, 28:22, 38:6, 69:2, 71:22, 71:23, 77:20, 82:10, 86:22
**fit** [1] - 68:14
**fits** [1] - 69:17
**five** [8] - 6:4, 6:23, 8:15, 9:15, 42:1, 55:17, 70:24, 73:8
**flew** [1] - 16:4
**flexible** [1] - 82:25
**flies** [1] - 77:4
**floodgates** [1] - 31:25
**Floor** [2] - 2:10, 91:22
**FLORIDA** [1] - 1:1
**Florida** [33] - 1:4, 1:24, 2:3, 2:10, 4:23, 6:17, 9:6, 9:7, 10:3, 10:5, 10:7, 10:21, 10:22, 10:23, 11:5, 11:9, 12:18, 12:20, 12:25, 19:15, 42:13, 43:11, 46:21, 48:17, 49:1, 49:4, 49:7, 49:8, 49:11, 49:12, 49:13, 59:20, 91:23
**Floridian** [1] - 12:12
**fluent** [3] - 24:9, 33:1, 61:24
**flying** [1] - 16:23
**focus** [8] - 8:3, 47:9, 47:23, 51:4, 54:23, 63:11, 68:16, 71:14
**focused** [8] - 17:21, 47:13, 53:18, 54:17, 58:16, 71:16, 71:19, 75:14
**folks** [3] - 16:13, 27:12, 60:20
**follow** [2] - 53:21, 63:5
**following** [2] - 71:2, 78:7
**food** [1] - 71:6
**FOR** [2] - 1:17, 2:1
**force** [1] - 39:18
**forces** [1] - 74:13
**foregoing** [1] - 91:19
**foreign** [2] - 40:12, 85:7
**foremost** [1] - 18:3
**Forjas** [14] - 3:2, 24:23, 26:18, 40:12, 40:17, 40:20, 41:4, 41:16, 41:18, 41:22, 43:10, 45:9, 45:14, 52:19
**FORJAS** [1] - 1:8
**form** [4] - 21:13, 26:15, 31:9, 89:1
**formal** [3] - 30:2, 54:24, 61:19
**formality** [1] - 33:22
**formally** [1] - 30:13
**formed** [1] - 42:5
**Fort** [1] - 1:24
**forth** [3] - 54:21, 55:10, 55:18
**forward** [5] - 34:2, 75:3, 77:4, 77:11, 78:19
**four** [2] - 21:24, 38:4
**fourth** [1] - 12:11
**fourth-generation-born-and-raised** [1] - 12:11
**Fowler** [1] - 11:22
**frame** [12] - 44:8, 63:7, 66:5, 66:6, 68:15, 69:13, 76:13, 76:23, 78:1, 78:2, 78:5, 78:9
**frankly** [4] - 50:22, 56:6, 56:7, 89:1
**fraud** [4] - 6:21, 10:1
**fraudulent** [4] - 51:22, 51:23, 51:24, 54:4
**frequently** [1] -

36:18
**friends** [1] - 41:14
**front** [5] - 37:25, 58:24, 77:7, 80:23, 82:11
**full** [3] - 24:2, 86:1, 88:23
**full-time** [2] - 24:2, 86:1
**fully** [2] - 19:13, 79:5
**fun** [3] - 21:14, 22:4, 32:10
**fundamental** [1] - 86:18
**fundamentally** [1] - 69:6
**future** [1] - 42:20

## G

**G2** [1] - 69:10
**gain** [1] - 50:18
**Galleria** [1] - 1:18
**GAMBRELL** [2] - 2:1, 2:5
**Gambrell** [7] - 11:24, 12:14, 12:16, 13:23, 14:17, 24:10, 24:11
**Gaston** [1] - 64:9
**gate** [2] - 16:20, 16:21
**gather** [1] - 61:23
**gathered** [1] - 4:17
**GC** [1] - 32:23
**gems** [1] - 21:11
**general** [1] - 68:14
**generation** [1] - 12:11
**Generation** [1] - 69:10
**generations** [1] - 63:5
**generic** [1] - 54:6
**Geneva** [1] - 10:20
**Georgia** [5] - 2:6, 16:8, 17:5, 74:2, 83:16
**GI** [1] - 17:1
**giant** [2] - 25:3, 28:23
**given** [7] - 31:21, 37:9, 56:11, 57:20, 70:8, 82:12, 89:13
**GLASSER** [1] - 1:17
**Glasser** [1] - 5:19
**Glock** [2] - 77:15, 77:16
**goal** [2] - 50:14, 74:6
**gold** [1] - 67:11
**golf** [1] - 57:10
**government** [1] - 38:10
**Government** [2] - 65:15, 89:4
**government-issued** [1] - 38:10
**graduated** [6] - 5:1, 9:3, 9:5, 10:24, 12:23, 13:10
**grant** [1] - 88:12
**great** [6] - 16:13, 18:7, 19:14, 21:14, 21:15, 22:3
**greatly** [1] - 9:23
**grew** [3] - 4:17, 4:23, 12:12
**grip** [2] - 44:7, 44:8
**group** [6] - 6:12, 13:20, 13:24, 52:25, 60:19, 62:22
**groups** [1] - 46:5
**grovel** [1] - 87:10
**grow** [2] - 5:21, 15:22
**Guard** [2] - 16:5, 16:8
**guardian** [1] - 57:5
**guess** [9] - 9:16, 50:3, 52:5, 54:2, 54:11, 55:4, 71:23, 72:10, 73:17
**guessing** [1] - 59:18
**guidelines** [1] - 73:6
**gun** [2] - 64:20, 64:23
**Gun** [1] - 43:5
**guns** [2] - 75:25, 77:21

## H

**hac** [2] - 4:21, 60:6
**Hague** [1] - 28:25
**half** [3] - 5:10, 5:20, 16:24
**hammer** [5] - 76:23, 77:4, 77:6, 77:8, 77:20
**hammer-fired** [3] - 76:23, 77:6, 77:20
**hammered** [1] - 87:12
**handgun** [3] - 39:15, 67:18, 78:5
**handguns** [3] - 43:25, 65:21, 67:17
**handle** [1] - 60:22
**handled** [4] - 6:11, 6:13, 8:14, 14:7
**handling** [2] - 14:9, 22:18
**hanging** [1] - 75:24
**happenstance** [1] - 66:19
**happy** [5] - 19:6, 31:3, 36:4, 75:20, 84:17
**hard** [5] - 11:3, 11:8, 19:18, 59:2, 65:18
**hat** [2] - 19:18, 33:21
**HAYNES** [1] - 1:20
**headquarters** [1] - 24:22
**heads** [2] - 20:16, 79:15
**heads-up** [1] - 20:16
**healthy** [1] - 80:2
**hear** [3] - 10:12, 20:10, 57:7
**heard** [3] - 77:15, 77:18, 83:16
**hearing** [3] - 52:10, 70:13, 79:11
**heels** [1] - 53:21
**height** [1] - 14:9
**helicopters** [1] - 16:4
**help** [7] - 16:13, 43:23, 58:6, 60:10, 75:18, 82:14, 89:21
**help...** [1] - 36:24
**helpful** [2] - 21:17, 45:3
**helps** [1] - 58:25
**hereby** [1] - 91:19
**Heritage** [1] - 42:2
**heritage** [1] - 42:15
**high** [3] - 10:22, 14:7, 16:2
**high-volume** [1] - 14:7
**hip** [1] - 7:5
**hire** [1] - 24:2
**historic** [1] - 74:4
**historically** [1] - 30:15
**history** [1] - 51:2
**hit** [1] - 28:6
**hobby** [1] - 16:15
**hold** [1] - 53:3
**holding** [2] - 40:7, 40:18
**HOLDINGS** [1] - 1:9
**Holdings** [13] - 40:7, 40:17, 40:22, 40:23, 41:16, 41:18, 41:19, 42:3, 45:10, 45:15, 45:20, 61:17
**holds** [1] - 84:19
**holidays** [1] - 83:4
**home** [3] - 10:8, 16:9, 66:12
**homes** [2] - 6:15, 6:17
**honest** [2] - 59:16, 59:21
**Hong** [1] - 24:19
**Honor** [98] - 3:9, 3:18, 3:22, 4:3, 4:6, 4:20, 4:22, 6:1, 6:24, 8:21, 8:24, 10:16, 11:3, 12:8, 14:16, 17:12, 23:4, 23:19, 24:5, 25:9, 27:7, 27:25, 28:7, 29:12, 29:16, 29:18, 30:8, 30:14, 32:11, 34:6, 34:22, 37:12, 37:19, 38:19, 41:11, 45:18, 46:1, 46:13, 46:18, 46:23, 47:7, 48:4, 48:6, 48:8, 48:17, 50:9, 50:12, 51:19, 52:1, 52:15, 53:7, 53:8, 53:24, 55:6, 55:25, 57:9, 58:18, 59:13, 60:13, 60:18, 61:13, 61:25, 62:11, 62:17, 62:24, 64:7, 65:18, 65:24, 66:16, 67:8, 68:1, 68:12, 69:23, 71:22, 73:3, 73:22, 74:15, 75:1, 75:8, 76:10, 78:24, 79:5, 79:10, 81:12, 81:13, 81:23, 82:19, 83:5, 84:17, 85:9, 86:7, 88:1, 88:24, 90:3, 90:14, 90:24, 91:10, 91:15
**HONORABLE** [1] - 1:13
**honored** [1] - 26:22
**honors** [1] - 13:12
**hope** [3] - 24:12, 54:17, 54:22
**hopefully** [3] - 9:20, 34:12, 87:8
**HORNSBY** [1] - 1:20
**hours** [3] - 70:3, 71:5, 76:14
**house** [12] - 19:6, 22:1, 24:3, 32:8, 32:9, 32:15, 32:16, 62:8, 62:9, 85:6
**housing** [1] - 6:13
**human** [1] - 4:7
**humanly** [2] - 18:23, 19:9
**hundred** [1] - 24:15
**hunting** [1] - 83:5
**hurt** [2] - 64:21, 72:1

## I

**I's** [5] - 37:21, 57:3, 57:6, 57:16, 82:23
**ideas** [1] - 28:18
**identified** [2] - 68:8, 76:21
**identify** [2] - 68:19, 76:13
**identifying** [1] - 46:3
**idiosyncrasies** [5] - 8:9, 36:21, 48:23, 59:4, 80:19
**II** [1] - 1:17
**illegal** [1] - 83:10
**immediately** [1] - 89:20
**impacted** [1] - 77:13
**Impala** [1] - 78:14
**impartial** [2] - 19:10, 58:7
**impartially** [1] - 18:19
**implications** [1] - 80:5
**implied** [4] - 49:24, 50:2, 51:5, 51:14
**import** [4] - 40:13, 40:15, 41:6, 41:20
**importance** [1] - 33:25
**important** [6] - 15:10, 40:10, 41:17, 71:6, 80:21, 85:3
**importation** [3] - 41:9, 42:22, 42:24
**imported** [1] - 43:18
**importer** [1] - 40:8
**impressed** [2] - 18:6, 65:24
**impression** [2] - 45:19, 75:2
**improper** [1] - 6:17
**in-house** [11] - 19:6, 22:1, 24:3, 32:8, 32:9, 32:15, 32:16, 62:8, 62:9, 85:6
**INC** [2] - 1:9, 1:9
**incident** [1] - 39:19
**inclined** [1] - 88:7
**include** [1] - 91:1
**included** [1] - 48:9
**includes** [3] - 8:4, 10:1, 69:11
**including** [5] - 66:21,

69:25, 78:6, 91:1
**inconsistent** [1] - 36:10
**incurred** [1] - 29:11
**indicated** [1] - 30:21
**indicates** [1] - 48:8
**indicating)** [1] - 60:12
**indirect** [2] - 57:19, 57:23
**individual** [2] - 50:19, 73:15
**Individually** [1] - 1:4
**inducement** [3] - 51:22, 51:23, 54:4
**industrial** [2] - 15:14, 28:23
**industry** [1] - 14:4
**infamous** [1] - 28:14
**information** [10] - 17:15, 21:8, 45:11, 61:14, 71:25, 72:7, 76:3, 76:6, 76:7, 76:8
**inglorious** [1] - 11:17
**initial** [1] - 48:7
**injured** [1] - 46:10
**injuries** [3] - 46:11, 46:12, 46:14
**injury** [8] - 7:25, 8:4, 8:15, 9:12, 9:25, 49:5, 64:11, 66:22
**inquiry** [1] - 71:23
**inside** [1] - 63:16
**insist** [1] - 29:10
**inspection** [1] - 62:25
**instance** [2] - 52:5, 79:12
**instruction** [1] - 88:8
**insulation** [1] - 6:17
**insurance** [1] - 12:3
**integrated** [1] - 41:8
**intended** [3] - 10:7, 18:14, 82:4
**intention** [2] - 79:6, 82:19
**intents** [1] - 67:10
**interchange** [1] - 63:9
**interchangeable** [5] - 62:19, 67:4, 67:16, 67:22, 68:6
**interest** [1] - 60:10
**interested** [3] - 31:18, 59:1, 91:4
**interesting** [1] - 61:11
**INTERNATIONAL** [1] - 1:8
**International** [14] - 40:8, 40:18, 41:1, 41:3, 41:17, 41:20, 43:11, 43:18, 45:10, 45:13, 45:15, 52:19, 61:17, 64:13
**Internet** [1] - 61:14
**interpreted** [1] - 82:10
**interpreter** [1] - 45:4
**interpreters** [1] - 44:22
**interpreting** [1] - 49:11
**interrupt** [1] - 71:4
**interviews** [2] - 64:18, 64:24
**introduce** [1] - 21:19
**invaluable** [1] - 44:12
**investigated** [1] - 61:18
**investigation** [2] - 13:13, 48:8
**Investigation** [1] - 7:21
**investigations** [1] - 61:21
**investigator** [1] - 61:22
**invite** [1] - 17:18
**invoice** [1] - 41:6
**involved** [5] - 7:7, 26:16, 26:25, 33:24, 62:15
**Iowa** [6] - 38:12, 59:11, 59:12, 59:18, 59:19, 59:20
**Iqbal** [1] - 37:3
**ironically** [1] - 66:19
**Israel** [1] - 24:19
**issue** [23] - 20:7, 22:12, 26:15, 31:6, 36:5, 38:17, 46:3, 51:13, 52:22, 53:14, 55:14, 59:7, 63:17, 71:18, 72:16, 75:22, 81:6, 83:6, 88:3, 89:1, 89:2, 89:23, 90:3
**issued** [2] - 38:10, 39:14
**issues** [20] - 8:8, 20:18, 23:12, 38:4, 47:17, 47:24, 48:13, 56:7, 59:24, 60:1, 63:20, 65:10, 67:2, 71:21, 79:16, 81:2, 81:10, 82:13, 87:5, 87:7
**issuing** [1] - 26:25
**it'll** [1] - 18:15
**Item** [1] - 23:5
**itself** [2] - 50:25, 53:19

## J

**Jacksonville** [8] - 2:3, 11:11, 11:12, 11:23, 11:25, 24:14, 24:17, 57:10
**JAG** [1] - 21:25
**jail** [1] - 83:11
**jails** [1] - 83:17
**January** [3] - 83:2, 83:22, 87:24
**Jean** [1] - 37:1
**jerk** [1] - 74:23
**Jersey** [5] - 8:25, 9:1, 10:7, 60:6, 60:15
**Jesus** [1] - 70:22
**job** [4] - 21:11, 32:10, 58:14, 90:13
**John** [3] - 3:21, 55:5, 82:2
**JOHN** [24] - 2:1, 3:21, 3:24, 10:15, 10:19, 11:2, 11:15, 11:18, 12:20, 48:4, 48:16, 55:6, 57:9, 59:13, 59:25, 62:17, 69:23, 81:23, 82:7, 83:7, 83:20, 87:25, 88:4, 91:15
**join** [1] - 28:22
**joinder** [1] - 56:3
**joined** [5] - 5:19, 5:21, 11:12, 11:22, 11:24
**joining** [2] - 9:20, 28:24
**joke** [1] - 86:23
**Jose** [1] - 57:10
**JR** [1] - 1:23
**JSR** [1] - 54:14
**judge** [14] - 16:9, 20:9, 22:16, 22:21, 26:7, 26:9, 26:14, 27:1, 27:2, 28:9, 36:5, 57:24, 80:24
**Judge** [6] - 20:9, 22:17, 57:3, 57:21, 78:17, 91:14
**JUDGE** [1] - 1:13
**judges** [4] - 22:6, 36:3, 58:5
**judges'** [1] - 59:4
**judgment** [7] - 20:21, 25:23, 26:2, 26:21, 31:13, 31:16, 88:10
**judicial** [1] - 16:14
**jugular** [2] - 47:24, 84:11
**July** [1] - 71:13
**jumpsuit** [1] - 83:14
**June** [1] - 44:12
**jurisdiction** [1] - 16:9
**jurisdictions** [2] - 15:21, 51:18
**jurors** [1] - 64:25
**jury** [13] - 19:11, 19:21, 19:22, 21:4, 21:9, 37:24, 37:25, 64:8, 64:14, 64:17, 71:9, 71:10, 90:21
**jury's** [1] - 65:2
**Justice** [1] - 13:11
**justices** [1] - 88:22

## K

**keep** [14] - 19:5, 20:4, 20:6, 29:14, 29:21, 29:25, 33:14, 37:10, 58:25, 81:8, 86:14, 89:25, 91:11
**keeps** [1] - 71:19
**kept** [1] - 81:20
**key** [2] - 52:2, 56:8
**kid** [2] - 9:8, 9:10
**kidding** [2] - 35:22, 68:6
**Kilpatrick** [1] - 13:19
**kind** [4] - 7:6, 14:24, 55:12, 55:22
**kinds** [2] - 63:4, 72:20
**kipnis** [1] - 60:6
**knees** [1] - 39:6
**knowing** [1] - 4:19
**knowledge** [2] - 47:2, 51:2
**knowledgeable** [2] - 36:21, 36:22
**known** [3] - 8:20, 41:13, 55:7
**knows** [2] - 34:9, 35:15
**Kong** [1] - 24:19
**Kresser** [1] - 45:11

## L

**Lakeland** [2] - 10:21, 10:22
**Lamb** [1] - 11:13
**language** [1] - 78:7
**languages** [1] - 24:9
**large** [6] - 6:12, 13:18, 14:10, 15:19, 24:18, 47:11
**larger** [6] - 5:14, 22:6, 67:20, 69:12, 77:8
**laser** [5] - 47:17, 51:4, 53:18, 54:17, 54:23
**laser-focus** [1] - 54:23
**laser-focused** [2] - 53:18, 54:17
**laser-like** [1] - 47:17
**last** [13] - 6:4, 6:23, 7:15, 7:20, 8:15, 9:22, 10:9, 17:22, 34:21, 44:12, 57:8, 57:9, 58:25
**late** [1] - 23:15
**latent** [1] - 62:2
**latest** [1] - 71:13
**latter** [1] - 43:14
**Lauderdale** [1] - 1:24
**Laura** [1] - 2:2
**law** [59] - 3:18, 4:24, 4:25, 7:18, 7:22, 7:23, 9:4, 9:11, 9:13, 9:14, 9:15, 9:19, 9:23, 11:11, 11:21, 13:1, 13:10, 13:18, 16:18, 17:1, 17:2, 17:3, 17:4, 19:23, 21:19, 21:24, 22:22, 22:23, 25:19, 26:12, 27:3, 27:12, 33:2, 35:4, 35:21, 36:1, 37:3, 38:7, 49:2, 49:11, 49:17, 49:22, 54:7, 54:8, 56:19, 59:11, 59:17, 59:20, 59:21, 59:24, 59:25, 60:1, 71:21, 86:20, 88:17
**Law** [5] - 4:25, 5:1, 7:22, 10:23, 13:2
**LAW** [1] - 39:11
**laws** [2] - 59:14, 60:1
**lawsuit** [3] - 29:8, 29:9, 54:12
**lawyer** [1] - 33:8
**lawyers** [18] - 5:18, 9:12, 13:19, 18:7, 18:25, 19:20, 19:21, 19:24, 21:15, 24:16, 39:5, 59:1, 60:17, 60:18, 80:23, 80:24, 87:17
**lead** [2] - 7:6, 85:7

**learned** [1] - 59:1
**least** [2] - 22:24, 34:21
**leave** [5] - 32:24, 79:14, 85:8, 85:25, 89:13
**leaving** [1] - 5:12
**LeBoeuf** [4] - 11:13, 11:20, 11:22, 12:2
**left** [9] - 5:5, 5:17, 9:1, 10:8, 11:22, 13:10, 17:1, 75:23, 76:1
**leg** [1] - 36:2
**legal** [7] - 19:2, 22:11, 23:17, 28:19, 34:12, 34:13, 35:10
**less** [1] - 27:20
**lessons** [2] - 33:9, 59:5
**letter** [2] - 27:15
**letters** [9] - 23:20, 25:25, 26:20, 26:25, 27:10, 28:6, 28:8, 30:16, 33:23
**level** [1] - 33:22
**liability** [11] - 6:7, 6:10, 6:25, 8:5, 8:6, 9:24, 14:21, 14:23, 33:2, 49:21, 86:24
**liable** [1] - 29:10
**libel** [1] - 90:22
**license** [1] - 80:20
**licensed** [1] - 9:6
**lieutenant** [1] - 16:7
**life** [3] - 10:10, 52:19, 58:4
**lifetime** [2] - 53:5, 53:6
**light** [1] - 57:15
**lightens** [1] - 78:3
**likewise** [2] - 91:14, 91:15
**limb** [1] - 57:20
**limine** [1] - 20:25
**limit** [1] - 66:3
**limitation** [2] - 52:20, 53:4
**limited** [5] - 53:10, 66:25, 69:25, 78:7, 78:25
**limiting** [1] - 82:4
**Linda** [5] - 34:24, 35:1, 36:25, 44:10
**line** [9] - 19:7, 20:3, 69:16, 69:17, 76:17, 76:18, 78:8
**lines** [4] - 10:2, 48:7, 54:14, 55:23
**LISA** [2] - 2:8, 91:21
**listed** [1] - 66:8
**listening** [1] - 35:1
**lists** [2] - 51:2
**litigate** [4] - 55:14, 55:15, 73:15, 74:14
**litigating** [1] - 55:17
**litigation** [11] - 8:8, 9:25, 12:2, 14:7, 14:11, 18:21, 45:24, 53:16, 55:9, 58:9, 64:6
**live** [1] - 74:2
**lived** [2] - 10:6, 23:14
**living** [1] - 12:12
**LLP** [1] - 1:17
**located** [1] - 24:21
**lock** [1] - 72:19
**lockstep** [1] - 34:1
**long-term** [1] - 74:12
**look** [24] - 18:2, 19:1, 19:2, 19:19, 26:10, 26:21, 33:5, 34:14, 40:1, 41:2, 43:4, 43:22, 52:18, 63:16, 69:24, 70:7, 70:24, 71:20, 72:1, 72:22, 74:14, 75:3, 83:14, 86:16
**looked** [13] - 14:14, 48:21, 49:16, 51:20, 59:25, 63:13, 65:18, 78:7, 81:16, 81:17, 82:9, 84:2, 88:20
**looking** [12] - 17:20, 18:7, 25:19, 46:6, 50:3, 65:25, 66:4, 68:4, 72:10, 76:16, 88:19, 89:6
**looks** [5] - 27:13, 32:14, 32:15, 89:1, 91:8
**Louisiana** [2] - 54:7, 54:10
**loved** [1] - 10:7
**lower** [1] - 51:21
**lowest** [1] - 39:3

## M

**M-a-r-k-o-w** [1] - 44:15
**ma'am** [22] - 7:11, 7:14, 7:16, 8:12, 8:19, 16:4, 24:12, 24:15, 28:3, 39:24, 40:5, 40:9, 41:1, 42:24, 43:17, 45:7, 60:24, 61:2, 61:8, 64:16, 67:12, 68:18
**machinery** [1] - 15:15
**Madison** [1] - 74:2
**magazine** [1] - 44:7
**magistrate** [3] - 20:9, 22:16, 27:16
**Magnuson** [4] - 51:15, 53:20, 53:24, 54:3
**Magnuson-Moss** [4] - 51:15, 53:20, 53:24, 54:3
**main** [2] - 59:18, 60:15
**majority** [1] - 8:7
**maker** [1] - 49:12
**management** [7] - 17:23, 20:15, 58:20, 58:21, 73:4, 73:5, 82:9
**managing** [2] - 11:23, 14:19
**mange** [2] - 80:3
**manner** [2] - 80:22, 81:7
**manufacture** [4] - 41:21, 46:20, 67:14, 68:23
**manufactured** [14] - 6:13, 6:15, 40:2, 42:15, 42:16, 43:1, 43:8, 43:13, 43:17, 43:21, 49:6, 53:12, 69:5
**manufacturer** [2] - 40:13, 42:6
**manufacturers** [4] - 6:13, 6:14, 6:20, 41:21
**Manufacturing** [7] - 40:19, 41:1, 41:3, 42:2, 43:11, 45:13, 45:16
**MANUFACTURING** [1] - 1:9
**manufacturing** [3] - 42:8, 42:22, 48:11
**March** [4] - 85:10, 85:17, 85:21, 86:1
**march** [1] - 73:19
**Maria** [1] - 44:18
**Marine** [1] - 21:25
**Marino** [10] - 3:13, 3:15, 3:21, 3:23, 8:23, 10:14, 19:16, 35:14, 60:12, 62:14
**MARINO** [34] - 1:23, 2:1, 3:13, 3:18, 3:21, 3:24, 8:24, 9:9, 9:11, 10:4, 10:6, 10:15, 10:19, 11:2, 11:15, 11:18, 12:20, 35:20, 35:23, 48:4, 48:16, 55:6, 57:9, 59:13, 59:25, 62:17, 69:23, 81:23, 82:7, 83:7, 83:20, 87:25, 88:4, 91:15
**Mark** [1] - 45:11
**market** [3] - 69:2, 69:10, 77:25
**marketable** [2] - 17:9, 33:13
**markings** [1] - 43:5
**Maroney** [9] - 46:1, 60:22, 61:4, 63:21, 63:23, 63:25, 64:5, 65:9, 72:4
**mass** [1] - 6:19
**masters** [1] - 20:2
**material** [1] - 78:1
**maternity** [3] - 32:24, 85:8, 85:22
**matter** [4] - 14:3, 52:20, 64:22, 91:19
**matters** [2] - 38:11, 63:15
**maturation** [1] - 54:11
**max** [1] - 73:8
**maximize** [1] - 47:22
**maximum** [1] - 50:5
**MDL** [2] - 7:5, 7:8
**mean** [28] - 26:10, 36:2, 44:25, 47:12, 49:2, 49:18, 50:14, 52:25, 53:4, 55:12, 56:17, 59:9, 60:9, 65:10, 66:14, 72:16, 72:22, 74:16, 75:21, 76:11, 76:25, 79:5, 79:11, 80:13, 82:3, 84:22, 85:13, 90:5
**means** [1] - 63:6
**meantime** [1] - 33:20
**mechanism** [2] - 73:12, 87:13
**mediator** [1] - 22:19
**medical** [2] - 9:21, 15:15
**meet** [3] - 14:15, 79:18, 83:23
**meeting** [1] - 91:13
**meets** [1] - 56:24
**member** [1] - 54:19
**members** [6] - 5:24, 50:19, 52:8, 52:11, 52:24, 56:15
**mentioned** [5] - 50:13, 60:13, 60:18, 60:21, 81:13
**merchantability** [2] - 49:24, 50:2
**merged** [2] - 11:15, 11:18
**merits** [7] - 73:2, 74:1, 80:12, 81:20, 81:21, 81:24, 82:17
**mesmerizing** [1] - 21:13
**message** [1] - 58:1
**met** [3] - 14:12, 20:8, 41:25
**metal** [1] - 78:5
**meth** [1] - 33:6
**MIAMI** [1] - 1:2
**Miami** [10] - 1:4, 2:9, 2:10, 24:22, 35:4, 42:15, 43:11, 65:14, 91:22, 91:23
**microphone** [2] - 38:22, 39:1
**mid** [1] - 83:2
**mid-January** [1] - 83:2
**might** [1] - 37:9
**military** [2] - 16:14, 61:11
**Millennium** [8] - 68:21, 68:25, 69:1, 69:7, 69:9, 69:12, 76:16
**mind** [7] - 20:4, 31:7, 55:4, 81:8, 86:14, 89:10, 89:17
**minds** [1] - 86:19
**mindset** [2] - 21:2, 21:16
**mine** [2] - 26:24, 52:12
**minimum** [1] - 33:15
**Minnesota** [1] - 7:8
**minor** [2] - 58:14, 71:18
**minute** [2] - 70:3, 70:23
**minutes** [5] - 4:14, 4:15, 70:4, 70:24, 71:5
**misrepresentation** [1] - 54:5
**miss** [1] - 21:22
**mix** [2] - 6:8, 86:5
**mobile** [1] - 6:17
**MOBLEY** [12] - 2:4, 4:2, 12:8, 12:11, 12:16, 12:21, 13:5, 13:10, 13:17, 14:5, 27:24, 63:2
**Mobley** [5] - 4:2,

12:7, 12:8, 12:10, 62:25
**model** [4] - 67:1, 67:5, 68:3
**model-specific** [1] - 67:5
**models** [9] - 66:2, 66:4, 68:11, 68:13, 68:19, 75:24, 76:4, 76:20, 78:13
**Molto** [1] - 33:11
**money** [2] - 17:1, 87:13
**months** [2] - 55:17, 73:8
**moot** [1] - 37:11
**morning** [2] - 8:24, 12:8
**morphed** [1] - 6:15
**MORRIS** [1] - 1:20
**mortgage** [1] - 10:1
**Moss** [4] - 51:15, 53:20, 53:24, 54:3
**most** [11] - 15:2, 15:13, 15:19, 20:18, 36:18, 44:5, 44:17, 68:22, 73:13, 77:18, 80:22
**mother** [2] - 10:10, 85:20
**motion** [17] - 17:15, 17:18, 23:6, 25:22, 25:25, 26:10, 28:8, 36:12, 37:10, 47:20, 50:17, 75:19, 78:25, 79:8, 84:19, 88:7, 88:13
**motions** [8] - 20:10, 20:20, 20:25, 21:18, 55:15, 73:8, 73:10, 80:14
**mounted** [1] - 77:7
**move** [13] - 10:3, 14:6, 31:10, 34:2, 39:8, 47:20, 70:25, 74:19, 79:7, 79:8, 80:8, 80:21, 87:23
**moved** [4] - 4:24, 10:21, 11:11, 23:15
**moves** [3] - 44:7, 77:11
**movie** [1] - 44:1
**moving** [7] - 29:21, 29:25, 37:11, 55:12, 71:23, 74:10, 81:12
**MR** [257] - 3:4, 3:6, 3:9, 3:11, 3:13, 3:17, 3:18, 3:21, 3:24, 4:2, 4:5, 4:8, 4:20, 4:22, 5:8, 5:10, 5:12, 6:1, 6:7, 6:12, 6:24, 7:11, 7:14, 7:16, 8:12, 8:17, 8:19, 8:21, 8:24, 9:9, 9:11, 10:4, 10:6, 10:15, 10:19, 11:2, 11:15, 11:18, 12:8, 12:11, 12:16, 12:20, 12:21, 13:5, 13:10, 13:17, 14:5, 14:16, 14:24, 15:4, 15:7, 15:9, 15:12, 15:23, 16:4, 16:12, 16:17, 16:22, 17:5, 17:12, 23:4, 23:10, 23:18, 23:23, 24:5, 24:7, 24:12, 24:15, 24:23, 25:1, 25:5, 25:8, 25:13, 25:16, 26:18, 27:6, 27:23, 27:24, 27:25, 28:3, 28:7, 28:15, 29:12, 29:15, 30:8, 30:11, 30:14, 30:18, 30:20, 32:11, 32:13, 32:18, 32:22, 32:23, 33:1, 33:4, 33:12, 33:20, 34:6, 34:17, 34:22, 35:5, 35:7, 35:9, 35:12, 35:15, 35:20, 35:23, 35:25, 36:5, 37:12, 37:19, 38:16, 38:19, 39:12, 39:24, 40:3, 40:5, 40:9, 40:16, 40:25, 41:11, 41:25, 42:9, 42:12, 42:15, 42:19, 42:24, 43:4, 43:17, 43:25, 45:7, 45:18, 45:22, 46:1, 46:12, 46:18, 46:23, 47:7, 48:4, 48:16, 48:25, 50:9, 50:12, 51:19, 52:1, 52:7, 52:15, 53:5, 53:7, 54:9, 54:11, 55:5, 55:6, 57:9, 58:18, 59:13, 59:25, 60:13, 60:24, 61:2, 61:8, 61:13, 61:25, 62:3, 62:10, 62:17, 62:18, 62:24, 63:2, 63:3, 63:13, 63:20, 63:25, 64:7, 64:16, 64:17, 65:1, 65:5, 65:18, 66:3, 66:16, 67:12, 68:1, 68:12, 68:18, 69:2, 69:23, 71:7, 71:22, 73:3, 73:21, 73:24, 74:1, 74:15, 74:25, 75:8, 75:21, 76:10, 76:22, 77:1, 77:13, 77:18, 78:12, 78:24, 79:5, 79:10, 81:12, 81:23, 82:1, 82:7, 82:19, 83:3, 83:5, 83:7, 83:8, 83:10, 83:14, 83:19, 83:20, 83:21, 83:22, 84:16, 84:21, 85:2, 85:9, 85:12, 85:16, 85:19, 85:24, 86:7, 86:10, 86:12, 86:18, 87:3, 87:10, 87:20, 87:25, 88:4, 88:12, 88:15, 88:18, 88:24, 89:7, 89:16, 89:19, 90:3, 90:7, 90:14, 90:19, 90:23, 90:24, 91:5, 91:7, 91:10, 91:14, 91:15
**municipal** [1] - 16:9
**murky** [2] - 49:3, 50:7
**must** [1] - 25:14

## N

**name** [5] - 7:12, 22:10, 44:14, 60:23, 69:10
**named** [3] - 66:20, 68:14, 69:17
**names** [3] - 89:14, 90:4, 90:9
**narrow** [3] - 76:5, 78:25, 81:2
**narrower** [1] - 49:15
**narrowing** [2] - 72:9
**narrowly** [3] - 47:13, 66:14, 66:17
**national** [1] - 22:5
**National** [1] - 16:8
**nationally** [1] - 19:20
**nature** [1] - 46:3
**Navy** [2] - 15:23, 16:3
**near** [1] - 42:16
**necessarily** [1] - 53:22
**need** [51] - 17:15, 18:13, 18:23, 19:8, 20:22, 26:4, 31:1, 31:20, 32:1, 34:7, 35:17, 40:7, 46:16, 48:22, 50:1, 50:5, 50:7, 55:13, 58:5, 58:6, 58:10, 58:12, 58:16, 59:8, 70:6, 70:10, 70:11, 70:15, 70:16, 70:21, 70:25, 71:6, 71:14, 71:20, 72:8, 74:12, 75:18, 76:3, 76:6, 76:8, 78:16, 78:22, 82:14, 82:23, 84:16, 87:16, 88:17, 89:10, 89:23, 91:3
**needed** [5] - 16:19, 52:17, 57:18, 64:22, 65:23
**needless** [1] - 43:19
**needs** [8] - 18:9, 20:21, 49:5, 55:12, 58:1, 70:12, 75:14, 80:25
**negligence** [4] - 9:22, 49:18, 72:15
**negligent** [1] - 51:21
**negotiate** [1] - 41:4
**negotiating** [1] - 66:12
**negotiation** [1] - 15:11
**nervous** [2] - 33:3, 33:4
**never** [5] - 10:8, 10:10, 11:20, 22:2, 63:22
**new** [1] - 31:5
**New** [15] - 8:25, 9:1, 10:7, 10:15, 10:16, 10:18, 10:19, 11:13, 14:19, 14:22, 21:24, 24:17, 60:6, 60:15
**newfound** [1] - 87:8
**next** [11] - 3:19, 20:10, 37:5, 44:9, 48:20, 56:4, 65:4, 70:12, 79:19, 83:25, 85:11
**nexus** [1] - 49:5
**nice** [5] - 17:10, 34:20, 34:21, 34:22, 51:16
**nilly** [1] - 31:25
**Ninth** [1] - 25:20
**NO** [1] - 1:2
**nobody** [1] - 24:20
**none** [1] - 26:6
**nonpermanent** [1] - 24:19
**north** [1] - 42:16
**North** [4] - 2:2, 2:9, 15:20, 91:22
**Northeast** [1] - 2:5
**note** [1] - 27:11
**nothing** [1] - 23:25
**notice** [6] - 24:20, 26:16, 29:8, 29:22, 58:20, 88:4
**November** [1] - 79:24
**nowadays** [1] - 35:11
**number** [9] - 6:4, 13:21, 38:1, 44:16, 48:8, 69:20, 69:22, 71:16, 72:12
**numbers** [1] - 89:14
**nurturing** [1] - 85:20

## O

**obfuscate** [1] - 47:25
**obligated** [1] - 30:3
**obligation** [1] - 18:13
**observed** [1] - 28:17
**observes** [1] - 87:5
**obstacle** [1] - 60:3
**obtained** [1] - 47:1
**obvious** [1] - 51:12
**obviously** [6] - 11:9, 48:4, 50:14, 53:15, 55:21, 82:22
**occasion** [1] - 45:3
**occur** [2] - 41:23, 41:24
**occurred** [1] - 39:19
**occurrences** [1] - 66:20
**occurring** [1] - 81:18
**OF** [1] - 1:1
**offense** [1] - 89:4
**Office** [4] - 5:3, 5:7, 5:13, 13:6
**office** [15] - 5:4, 11:25, 12:15, 13:7, 14:17, 14:20, 24:8, 24:16, 24:17, 38:13, 60:15, 60:17
**officer** [5] - 16:8, 18:3, 18:9, 29:20, 38:8
**officers** [1] - 65:14
**offices** [1] - 8:1
**Official** [1] - 91:22
**official** [1] - 2:8
**Ohio** [3] - 9:5, 9:6, 35:20
**old** [4] - 19:18, 31:16, 44:1, 47:24
**older** [1] - 35:14
**once** [2] - 17:24, 89:9
**one** [55] - 4:13, 5:16, 8:1, 8:9, 13:19, 14:12, 17:6, 17:18, 18:11, 20:6, 22:5, 22:17, 24:7, 27:12, 27:21, 33:17, 38:15, 39:21,

41:12, 42:11, 44:15, 44:17, 44:18, 44:20, 47:15, 51:21, 53:25, 56:8, 56:11, 56:13, 57:25, 59:1, 62:21, 64:7, 65:6, 65:12, 66:25, 67:2, 67:10, 67:11, 68:1, 68:7, 71:19, 72:12, 74:3, 75:8, 76:13, 76:18, 77:2, 77:22, 86:14, 86:23, 90:11, 90:24
**one's** [2] - 8:1, 18:11
**ones** [8] - 43:7, 43:8, 45:2, 50:4, 61:5, 61:6, 68:5, 76:16
**open** [3] - 12:14, 20:17, 31:24
**opened** [2] - 9:15, 12:20
**opine** [1] - 49:20
**opinion** [3] - 51:9, 57:18, 57:22
**opportunity** [8] - 4:11, 13:25, 19:13, 19:19, 19:23, 20:2, 22:23, 87:4
**opposed** [1] - 76:23
**option** [1] - 38:13
**options** [1] - 78:4
**orange** [1] - 83:14
**order** [3] - 20:13, 28:8, 28:21
**orders** [1] - 17:2
**ordinarily** [2] - 37:16, 38:9
**original** [3] - 52:20, 69:4, 69:22
**originally** [2] - 10:15, 11:12
**originated** [1] - 28:2
**Orlando** [1] - 42:17
**otherwise** [2] - 4:19, 22:22
**ourselves** [2] - 23:3, 72:1
**out-house** [1] - 62:9
**outline** [1] - 38:4
**outrageous** [1] - 35:11
**outside** [5] - 6:25, 15:24, 19:5, 74:20, 86:17
**overlap** [1] - 81:24
**overseas** [1] - 43:9
**overtime** [1] - 78:13
**owe** [1] - 18:18
**own** [7] - 5:17, 9:15, 35:13, 38:12, 38:14, 77:22, 91:2
**owner** [4] - 40:21, 40:24, 40:25, 52:21
**owning** [1] - 41:16
**owns** [5] - 38:7, 41:16, 41:19, 45:15

## P

**P-a-r-a-v-e-n-t-i** [1] - 44:18
**p.m** [1] - 1:7
**pace** [2] - 28:10, 28:21
**Page** [1] - 68:20
**Pages** [1] - 1:10
**paid** [1] - 39:4
**paired** [1] - 22:16
**panel** [3] - 33:17, 34:17, 34:18
**Panhandle** [1] - 4:23
**pans** [1] - 52:16
**paper** [1] - 31:17
**papers** [4] - 18:6, 27:13, 47:16
**Paragraph** [3] - 61:1, 68:20, 76:21
**Paraventi** [1] - 44:18
**parents** [2] - 10:6, 15:23
**Parkway** [1] - 1:21
**part** [6] - 22:6, 46:1, 54:11, 60:19, 68:22, 86:24
**particular** [7] - 6:21, 30:17, 30:18, 30:21, 49:5, 67:1, 89:17
**particularly** [4] - 29:7, 44:22, 79:19, 85:7
**parties** [4] - 34:7, 49:2, 54:12, 89:25
**parties'** [2] - 17:22, 18:6
**partner** [9] - 5:16, 5:17, 7:25, 9:14, 11:20, 11:23, 14:17, 14:19, 32:7
**partners** [2] - 9:17, 24:7
**parts** [9] - 62:19, 63:9, 67:4, 67:15, 67:21, 67:22, 67:23, 68:3, 68:6
**party** [1] - 18:2
**passed** [3] - 7:23, 9:20, 17:19
**passing** [1] - 7:23
**passions** [1] - 8:10
**past** [5] - 19:14, 28:10, 28:14, 33:4, 66:20
**patent** [4] - 22:1, 22:5, 22:7, 24:18
**Paterson** [1] - 8:25
**PATRICIA** [1] - 1:13
**Patricia** [1] - 44:15
**PATRICK** [1] - 2:1
**Paulo** [3] - 61:11, 61:15, 61:23
**pay** [3] - 24:6, 30:3, 41:7
**Peachtree** [1] - 2:5
**pending** [1] - 7:3
**Pensacola** [1] - 16:22
**people** [11] - 11:4, 11:19, 16:13, 19:2, 28:19, 38:9, 44:5, 52:9, 52:25, 60:13, 72:20
**percent** [2] - 8:3, 12:4
**period** [8] - 5:2, 5:14, 5:18, 6:2, 6:3, 46:24, 53:10, 66:5
**periods** [1] - 28:11
**perpetuity** [1] - 28:16
**person** [4] - 18:2, 23:8, 34:9, 53:13
**personal** [14] - 7:25, 8:4, 8:14, 9:12, 9:25, 27:7, 38:9, 38:10, 38:11, 38:15, 39:16, 46:14, 64:11, 66:22
**personal-injury** [1] - 64:11
**personally** [1] - 4:10
**perspective** [5] - 9:10, 29:13, 74:2, 82:21, 87:15
**persuade** [1] - 21:4
**persuaded** [1] - 84:1
**pharmaceutical** [1] - 14:23
**phone** [3] - 22:13, 22:25, 89:14
**photograph** [1] - 40:1
**physically** [1] - 46:10
**pick** [3] - 21:11, 66:11, 89:11
**picking** [1] - 28:21
**pill** [1] - 15:16
**pin** [14] - 48:12, 63:10, 65:22, 66:18, 67:8, 67:9, 69:7, 69:13, 72:19, 76:24, 77:7, 77:8, 77:9, 78:9
**pistol** [15] - 43:9, 43:15, 43:24, 44:3, 44:6, 62:21, 63:7, 64:5, 64:9, 69:12, 69:13, 77:2, 77:15, 77:16
**pistols** [26] - 41:5, 42:25, 43:2, 44:4, 48:8, 48:10, 48:12, 62:11, 62:14, 62:18, 62:20, 63:8, 63:15, 66:5, 66:7, 66:17, 67:14, 68:15, 68:17, 76:14, 76:18, 77:2, 77:19, 77:23, 78:8, 78:10
**place** [1] - 83:17
**Plaintiff** [28] - 1:6, 3:4, 3:6, 3:11, 3:14, 24:1, 25:19, 25:22, 27:3, 29:6, 30:1, 31:9, 31:12, 32:2, 37:6, 37:14, 56:11, 56:23, 57:15, 57:17, 58:11, 59:18, 64:19, 65:23, 70:18, 81:5, 81:9, 88:8
**plaintiff** [5] - 5:25, 6:3, 6:5, 6:8, 48:1
**PLAINTIFF** [1] - 1:17
**Plaintiff's** [3] - 32:4, 32:6, 56:22
**Plaintiffs** [7] - 17:19, 18:22, 60:8, 66:20, 78:15, 84:4, 89:19
**Plaintiffs'** [7] - 60:9, 60:11, 62:12, 66:10, 68:16, 74:13, 82:20
**plan** [8] - 17:23, 20:15, 34:5, 37:5, 37:7, 70:19, 79:23, 85:23
**planning** [1] - 57:7
**plants** [1] - 42:8
**playing** [2] - 55:23, 57:10
**plea** [1] - 44:25
**pleading** [2] - 26:15, 54:24
**pleadings** [5] - 55:21, 70:9, 71:13, 80:7, 84:13
**pleas** [1] - 44:25
**pleasant** [1] - 74:20
**pleased** [3] - 25:8, 44:21, 57:12
**pleasure** [2] - 37:17, 91:13
**podium** [1] - 39:6
**point** [7] - 27:11, 41:12, 50:15, 61:20, 65:9, 68:1, 75:7
**pointing** [1] - 78:6
**points** [1] - 56:8
**poli** [1] - 17:10
**police** [5] - 7:20, 38:20, 39:13, 61:11, 65:14
**Police** [1] - 61:15
**policy** [2] - 30:23, 85:25
**political** [1] - 16:17
**polymer** [10] - 63:7, 66:5, 66:6, 68:14, 68:16, 69:13, 76:13, 76:23, 78:2, 78:9
**Port** [4] - 24:24, 27:17, 43:10, 43:17
**Portuguese** [18] - 23:9, 23:13, 23:16, 23:24, 24:3, 24:9, 27:14, 32:7, 32:21, 33:9, 34:11, 34:18, 35:3, 61:24, 87:9, 90:10
**position** [11] - 7:6, 21:5, 50:22, 52:16, 53:22, 55:11, 55:16, 66:16, 67:3, 67:5, 78:17
**positions** [1] - 36:11
**possess** [1] - 52:21
**possession** [3] - 39:25, 43:19, 65:16
**possible** [3] - 18:23, 19:9, 80:22
**possibly** [1] - 66:22
**posture** [1] - 74:13
**potential** [1] - 56:15
**powder** [1] - 77:14
**practical** [8] - 18:2, 19:8, 23:8, 25:18, 26:24, 30:25, 32:23, 84:18
**practicalities** [1] - 89:3
**practically** [1] - 89:6
**practice** [12] - 5:20, 8:3, 9:18, 9:21, 9:22, 12:5, 14:8, 14:24, 15:2, 15:13, 24:18, 60:19
**practiced** [2] - 5:2, 21:23
**practices** [1] - 6:16
**practicing** [5] - 7:18, 7:23, 9:7, 9:16, 14:20
**predecessor** [1] - 12:22
**predict** [1] - 65:16

**preface** [1] - 37:15
**prefer** [1] - 58:1
**pregnant** [1] - 85:18
**prejudices** [1] - 47:14
**prepared** [1] - 20:21
**presence** [2] - 24:19, 74:21
**present** [3] - 19:13, 67:13, 71:3
**presently** [2] - 5:19, 62:5
**president** [4] - 19:15, 19:19, 45:12
**press** [2] - 39:7, 39:10
**pressure** [2] - 76:7, 77:11
**presume** [4] - 62:7, 62:22, 74:20, 89:18
**pretrial** [4] - 20:21, 20:22, 20:23, 21:1
**pretty** [8] - 43:7, 49:17, 49:23, 50:10, 52:17, 52:24, 52:25, 54:6
**prevents** [1] - 25:24
**previous** [1] - 47:1
**price** [2] - 61:4, 61:7
**price's** [1] - 60:25
**prices** [1] - 41:4
**primarily** [10] - 6:5, 6:6, 6:7, 6:18, 6:22, 6:24, 8:3, 12:3, 70:13, 91:4
**primer** [1] - 77:13
**priming** [1] - 22:18
**principal** [1] - 59:8
**principles** [1] - 20:4
**printed** [1] - 31:17
**privilege** [1] - 37:17
**Pro** [8] - 63:1, 63:3, 63:5, 68:21, 69:1, 69:8, 69:9, 69:10
**pro** [2] - 4:21, 60:6
**problem** [15] - 20:12, 25:23, 26:3, 32:17, 32:23, 36:17, 47:25, 56:25, 73:11, 78:22, 80:25, 85:5, 85:14, 86:18
**problem-solvers** [1] - 80:25
**problematic** [1] - 76:5
**problems** [2] - 31:14, 56:17
**procedural** [1] - 36:7
**procedurally** [1] - 34:1
**Procedure** [1] - 29:5
**procedure** [1] - 36:22
**procedures** [1] - 20:6
**proceed** [8] - 25:25, 52:13, 55:3, 61:7, 79:21, 82:17, 88:9, 90:1
**proceeding** [1] - 48:23
**proceedings** [2] - 71:2, 91:19
**Proceedings** [1] - 91:16
**process** [13] - 15:11, 18:5, 23:20, 26:8, 26:25, 27:9, 29:11, 29:23, 31:10, 31:20, 33:23, 54:12, 64:3
**product** [15] - 6:7, 6:10, 6:25, 8:4, 8:6, 14:21, 33:2, 53:12, 69:16, 76:16, 76:17, 76:18, 86:24
**productive** [1] - 37:10
**products** [5] - 9:24, 12:3, 14:1, 14:3, 14:23
**professor** [2] - 35:4, 35:20
**profit** [1] - 19:3
**profits** [1] - 47:22
**program** [2] - 13:12, 29:3
**project** [1] - 22:6
**promise** [1] - 20:20
**proof** [1] - 64:4
**properly** [1] - 81:4
**proposal** [1] - 29:16
**propose** [5] - 29:14, 29:15, 30:5, 33:16, 82:8
**proposed** [8] - 38:2, 46:16, 48:9, 48:18, 55:13, 55:19, 56:1, 66:1
**prosecution** [1] - 13:14
**prospects** [1] - 17:11
**protect** [1] - 72:24
**Protection** [1] - 7:2
**protective** [2] - 25:13, 29:18
**proud** [1] - 11:9
**provide** [7] - 19:2, 19:24, 38:12, 46:7, 46:9, 50:4, 76:8
**provided** [5] - 39:3, 39:25, 44:22, 88:20, 90:5
**proving** [1] - 75:12
**PT111** [4] - 63:3, 63:4, 63:5, 69:4
**PT111s** [1] - 63:4
**PT140** [1] - 63:6
**publicly** [1] - 40:21
**pull** [2] - 33:21, 38:22
**pulled** [1] - 77:10
**purchased** [3] - 42:2, 47:5, 59:19
**purchasers** [1] - 57:19
**purchasers'** [3] - 57:16, 57:21, 57:23
**purchases** [2] - 42:7, 42:20
**purpose** [2] - 30:17, 31:19
**purposes** [6] - 22:13, 26:3, 30:25, 67:10, 88:21, 90:5
**push** [1] - 51:11
**push-back** [1] - 51:11
**pushy** [1] - 75:5
**put** [5] - 15:1, 17:25, 26:16, 74:12, 76:7
**puts** [1] - 50:22

### Q

**qualified** [1] - 39:17
**questionable** [1] - 18:10
**questions** [4] - 21:16, 22:9, 23:1, 38:5
**quick** [3] - 27:21, 36:23, 70:23
**quickly** [1] - 76:3
**quite** [11] - 12:21, 27:21, 28:10, 50:21, 56:6, 56:7, 57:8, 57:11, 62:11, 74:4, 89:1
**quotient** [1] - 65:4

### R

**rabbit** [1] - 33:21
**raised** [4] - 7:17, 8:25, 12:11, 64:8
**raising** [1] - 47:20
**range** [1] - 17:20
**rather** [2] - 56:2, 71:20
**rattling** [1] - 74:8
**Ravindran** [2] - 22:9, 22:10
**razzle** [1] - 39:10
**RDR** [2] - 2:8, 91:21
**read** [1] - 66:8
**reading** [3] - 37:18, 57:17, 74:22
**reads** [1] - 37:18
**ready** [1] - 22:19
**real** [3] - 85:13, 90:19, 91:13
**realistic** [1] - 47:9
**realities** [1] - 31:12
**realize** [4] - 14:22, 29:2, 70:1, 71:5
**realized** [2] - 14:12, 70:2
**really** [22] - 5:25, 14:14, 17:8, 20:23, 25:16, 29:16, 32:2, 34:1, 46:22, 49:8, 52:17, 52:25, 57:19, 58:10, 58:12, 70:10, 71:14, 72:6, 78:4, 80:8, 80:21, 84:21
**reason** [5] - 18:12, 24:2, 30:22, 36:7, 75:5
**reasons** [1] - 86:15
**recently** [5] - 9:19, 11:14, 11:15, 27:9, 27:20
**recess** [2] - 71:1, 91:12
**recognize** [6] - 18:4, 19:5, 58:5, 60:10, 65:19, 80:4
**recommend** [1] - 73:7
**recommendation** [1] - 36:16
**recommended** [1] - 73:5
**record** [1] - 73:22
**recovery** [1] - 50:5
**recruited** [1] - 17:6
**redraft** [1] - 58:13
**reduce** [2] - 78:2, 87:1
**redundant** [2] - 50:6, 50:7
**reference** [1] - 45:24
**referenced** [3] - 60:23, 61:1, 61:6
**refine** [2] - 81:10, 84:4
**refinement** [1] - 70:13
**refuse** [1] - 29:7
**regard** [2] - 51:8, 53:18
**regards** [7] - 51:7, 52:4, 52:18, 52:24, 54:18, 82:23
**rehearsal** [1] - 20:23
**relate** [1] - 76:20
**relation** [1] - 3:23
**relationship** [4] - 40:11, 41:2, 41:15, 45:9
**relevant** [2] - 46:2, 46:4
**relief** [2] - 72:18, 86:24
**remain** [1] - 75:25
**remember** [6] - 18:8, 18:18, 44:20, 54:10, 61:5, 73:12
**remind** [1] - 31:5
**removed** [1] - 64:19
**renowned** [1] - 22:18
**rep** [3] - 56:13, 56:14, 65:13
**report** [3] - 87:18, 87:25, 88:3
**REPORTED** [1] - 2:8
**REPORTER** [1] - 38:22
**Reporter** [2] - 2:8, 91:22
**reporter** [2] - 39:3, 70:2
**Reporting** [1] - 7:3
**repose** [5] - 46:21, 46:23, 48:16, 48:17, 48:19
**repository** [1] - 21:8
**represent** [2] - 15:16, 23:11
**representation** [1] - 82:16
**representations** [1] - 46:8
**representative** [4] - 22:12, 38:5, 59:12, 75:17
**represented** [2] - 26:18, 61:2
**represents** [1] - 18:11
**request** [1] - 30:2
**require** [1] - 32:6
**required** [1] - 43:5
**requirements** [1] - 56:24
**requiring** [1] - 82:10
**rescue** [1] - 16:4
**research** [1] - 59:23

**researched** [1] - 59:17
**resident** [1] - 22:1
**resolution** [1] - 88:3
**resolve** [7] - 19:11, 20:8, 37:10, 56:10, 59:7, 87:4, 87:7
**resolved** [7] - 58:25, 59:22, 61:9, 81:6, 82:14, 88:8, 89:24
**resources** [1] - 39:14
**respect** [3] - 17:23, 29:24, 30:9
**respected** [1] - 31:21
**respective** [1] - 18:4
**respond** [1] - 47:21
**responsibility** [1] - 18:9
**responsible** [2] - 22:24, 51:8
**responsive** [2] - 35:18, 35:19
**rest** [2] - 58:25, 70:6
**restrictive** [1] - 49:15
**results** [1] - 61:20
**retained** [3] - 15:19, 62:4, 77:9
**retire** [1] - 10:7
**retiring** [1] - 44:11
**returned** [1] - 10:8
**revenue** [1] - 14:25
**reversal** [1] - 57:18
**reversed** [4] - 57:13, 57:21, 58:2
**revolver** [3] - 43:23, 43:25, 44:3
**revolvers** [2] - 42:25, 77:23
**revolving** [2] - 44:1, 44:2
**righteousness** [1] - 21:4
**rights** [2] - 14:8, 45:1
**risks** [1] - 15:19
**Riverchase** [1] - 1:18
**road** [4] - 36:6, 52:3, 55:17, 77:14
**rock** [1] - 21:2
**rocks** [2] - 21:3, 21:12
**rogatory** [11] - 23:20, 26:1, 26:20, 26:25, 27:10, 27:15, 27:16, 28:6, 28:9, 30:16, 33:23
**role** [1] - 36:14
**room** [2] - 70:6, 70:20
**roots** [1] - 10:14
**Rosen** [1] - 35:20
**row** [1] - 71:10
**ruin** [1] - 83:12
**Rule** [1] - 6:19
**RULE** [1] - 1:12
**rule** [2] - 20:20, 28:15
**ruled** [1] - 21:18
**Rules** [1] - 29:4
**run** [2] - 23:12, 66:12
**running** [1] - 70:5
**RUSSELL** [2] - 2:1, 2:5
**Russell** [1] - 11:24
**rusty** [1] - 23:16


## S


**S.A** [1] - 1:8
**sabers** [1] - 74:8
**safety** [6] - 48:11, 63:10, 66:18, 67:8, 67:9, 76:24
**sakes** [1] - 56:23
**San** [1] - 57:10
**sat** [1] - 9:4
**satisfied** [1] - 25:21
**satisfies** [1] - 29:22
**Sauer** [1] - 77:19
**Savannah** [2] - 15:25, 16:1
**save** [1] - 87:13
**savvy** [1] - 57:17
**saw** [4] - 17:22, 46:19, 57:8, 57:9
**scenario** [2] - 6:20, 85:4
**schedule** [6] - 70:7, 70:24, 81:17, 84:2, 84:3, 87:22
**SCHEDULING** [1] - 1:12
**scheduling** [2] - 20:14, 22:13
**school** [16] - 4:24, 4:25, 7:22, 9:2, 9:4, 10:22, 11:11, 13:1, 13:11, 16:2, 16:18, 17:1, 17:2, 17:3, 17:4, 74:23
**School** [5] - 4:25, 5:1, 7:22, 10:24, 13:2
**schools** [1] - 36:2
**sci** [1] - 17:10
**science** [1] - 16:17
**screw** [1] - 83:4
**scrutiny** [1] - 50:23
**sea** [1] - 73:19
**sear** [2] - 77:9, 77:10
**season** [1] - 83:6
**seat** [4] - 4:9, 38:24, 39:1, 71:8
**second** [5] - 12:1, 17:17, 33:1, 86:7, 86:9
**section** [1] - 34:25
**see** [20] - 18:2, 19:23, 20:22, 33:20, 34:24, 35:2, 36:16, 37:16, 39:10, 43:20, 44:21, 55:25, 56:2, 58:13, 65:12, 76:6, 79:10, 80:25, 83:10, 85:4
**seeing** [1] - 21:14
**seek** [1] - 46:13
**seeking** [1] - 46:4
**seem** [1] - 45:2
**SEITZ** [1] - 1:13
**Selby** [8] - 3:4, 3:6, 3:7, 4:16, 13:4, 13:5, 34:4, 60:5
**SELBY** [59] - 1:17, 3:4, 3:6, 3:9, 4:20, 4:22, 5:8, 5:10, 5:12, 6:1, 6:7, 6:12, 6:24, 23:4, 32:22, 34:6, 36:5, 37:19, 38:16, 46:12, 46:18, 46:23, 47:7, 50:9, 50:12, 51:19, 52:1, 52:7, 52:15, 53:5, 53:7, 54:9, 54:11, 58:18, 60:13, 61:13, 61:25, 62:3, 66:16, 71:22, 73:3, 74:15, 75:8, 75:21, 78:24, 79:5, 79:10, 81:12, 82:1, 82:19, 83:3, 83:22, 87:20, 89:19, 90:3, 90:7, 90:24, 91:10, 91:14
**sell** [1] - 40:13
**semiautomatic** [1] - 44:5
**Seminole** [3] - 11:4, 11:8
**sending** [1] - 31:25
**senior** [1] - 57:7
**sense** [3] - 33:7, 52:4, 87:16
**sensitive** [1] - 25:15
**sent** [1] - 41:6
**separate** [1] - 66:13
**separation** [1] - 8:6
**September** [1] - 21:21
**sequence** [1] - 27:4
**series** [4] - 68:21, 69:1, 69:8, 69:12
**serve** [5] - 56:7, 73:10, 75:18, 84:24, 84:25
**served** [2] - 21:24, 27:17
**service** [17] - 26:4, 26:19, 29:5, 29:7, 29:10, 30:2, 30:6, 30:7, 30:15, 31:3, 31:6, 37:7, 59:7, 79:22, 88:3, 89:9
**serving** [1] - 16:7
**set** [1] - 55:13
**setting** [3] - 20:14, 28:8, 68:7
**settled** [1] - 64:2
**settles** [1] - 56:21
**seven** [2] - 7:20, 9:12
**several** [13] - 7:7, 8:14, 12:25, 14:1, 16:12, 48:19, 57:23, 60:16, 63:9, 63:14, 69:8, 69:9, 69:15
**share** [4] - 4:18, 23:14, 47:14, 57:11
**shared** [1] - 82:13
**sharing** [1] - 56:16
**sheriff's** [4] - 38:13, 38:20, 39:12, 39:18
**Sherman** [1] - 73:19
**shift** [1] - 49:14
**shifted** [1] - 42:21
**shimmy** [1] - 75:18
**short** [2] - 33:23, 74:12
**short-term** [1] - 74:12
**shorter** [2] - 28:11
**shortly** [1] - 9:20
**shot** [3] - 44:4, 64:5, 64:9
**shotgun** [1] - 79:1
**show** [3] - 19:20, 20:3, 39:9
**showing** [2] - 49:3, 74:8
**side** [18] - 5:23, 5:25, 6:25, 12:3, 18:5, 22:1, 22:12, 25:18, 39:7, 48:1, 48:5, 49:10, 58:21, 60:11, 80:3, 80:25, 84:6, 87:14
**sides** [11] - 19:7, 19:8, 19:12, 20:7, 31:22, 36:23, 70:21, 74:18, 80:5, 80:15, 87:14
**SIG** [1] - 77:19
**signed** [3] - 28:8, 28:25, 60:5
**significant** [3] - 48:13, 80:5, 87:6
**silver** [1] - 67:10
**similar** [3] - 26:13, 65:22, 68:22
**similar-design** [1] - 65:22
**similarly** [1] - 1:5
**simple** [1] - 52:25
**simplest** [1] - 37:25
**simplify** [5] - 17:20, 32:5, 70:18, 72:23, 86:15
**simply** [7] - 20:9, 26:15, 40:7, 46:6, 48:23, 49:6, 61:13
**single** [2] - 44:4, 52:12
**single-shot** [1] - 44:4
**sit** [4] - 3:19, 36:14, 36:24, 45:5
**sitting** [2] - 3:16, 54:13
**situated** [1] - 1:5
**situation** [5] - 41:14, 51:14, 53:17, 85:7, 85:24
**situations** [1] - 90:16
**six** [5] - 4:13, 8:15, 42:1, 55:17, 65:6
**size** [5] - 14:25, 67:15, 67:18, 67:21, 68:3
**skills** [2] - 17:9, 33:13
**sleeping** [3] - 25:3, 28:17, 28:18
**slide** [1] - 44:7
**sliding** [1] - 67:6
**Slim** [1] - 76:18
**small** [5] - 39:12, 47:10, 58:24, 71:18, 73:14
**smaller** [2] - 38:19, 67:17
**SMITH** [2] - 2:1, 2:5
**Smith** [8] - 11:24, 12:14, 12:16, 13:23, 14:17, 24:10, 63:7
**society** [1] - 19:24
**sole** [3] - 40:21, 40:24, 40:25
**solo** [1] - 9:18
**solution** [1] - 81:1
**solve** [1] - 32:17
**solvers** [1] - 80:25
**someone** [2] - 3:16, 25:11
**sometime** [2] - 85:9, 86:3

**sometimes** [4] - 53:9, 53:14, 56:23, 81:5
**somewhat** [2] - 6:15, 23:16
**somewhere** [4] - 13:24, 14:9, 69:21
**soon** [4] - 41:25, 57:7, 85:9, 86:3
**sooner** [3] - 54:23, 56:2, 70:21
**sophisticated** [1] - 17:11
**sorry** [7] - 15:4, 42:12, 45:25, 53:7, 63:6, 91:11
**sort** [19] - 4:12, 4:16, 4:18, 21:16, 22:14, 26:15, 28:21, 28:22, 28:24, 29:3, 36:24, 40:7, 49:14, 50:1, 51:16, 51:23, 51:24, 83:2, 86:22
**sound** [3] - 34:4, 34:5, 39:3
**sounds** [2] - 50:10, 60:11
**South** [2] - 12:25, 28:23
**south** [2] - 24:24, 31:6
**Southeast** [2] - 1:23, 14:10
**Southern** [1] - 22:8
**SOUTHERN** [1] - 1:1
**sovereignty** [5] - 25:14, 29:18, 29:25, 30:10, 88:25
**space** [1] - 91:8
**speaking** [3] - 61:23, 62:5, 89:6
**speaks** [1] - 34:11
**special** [1] - 8:10
**specific** [5] - 47:2, 50:25, 67:5, 68:19, 70:21
**specifically** [4] - 5:3, 5:21, 6:12, 38:17
**speech** [2] - 4:12, 4:17
**speedy** [1] - 20:19
**spend** [3] - 10:9, 21:7, 83:17
**spending** [1] - 47:23
**split** [1] - 34:16
**spring** [2] - 77:10, 83:15
**stage** [3] - 28:23, 50:16, 50:17
**stages** [1] - 54:24
**stamped** [2] - 43:10, 43:12
**stamps** [1] - 43:16
**stand** [5] - 39:5, 71:8, 71:9, 71:10
**standard** [4] - 26:16, 27:2, 27:4, 51:22
**standpoint** [4] - 36:7, 51:12, 53:1, 75:12
**start** [5] - 4:16, 31:20, 63:21, 73:11, 75:21
**started** [2] - 9:11, 16:19
**State** [7] - 6:19, 7:19, 9:5, 10:23, 17:5, 35:21, 61:15
**state** [12] - 3:3, 7:19, 7:20, 27:16, 28:9, 30:10, 46:21, 48:23, 49:4, 54:8, 89:5
**statement** [1] - 45:8
**states** [5] - 42:10, 48:19, 54:7, 59:14, 60:2
**States** [9] - 2:9, 28:2, 39:13, 42:9, 42:10, 43:1, 49:23, 86:25, 91:22
**STATES** [2] - 1:1, 1:13
**stateside** [1] - 42:22
**status** [1] - 57:7
**statute** [6] - 46:21, 46:23, 48:17, 49:2, 51:17, 54:1
**statutes** [3] - 48:16, 48:19, 49:16
**stayed** [1] - 17:3
**stickler** [1] - 44:24
**still** [13] - 10:20, 11:3, 11:7, 16:25, 24:12, 29:1, 30:9, 41:15, 42:24, 57:8, 60:14, 69:13, 74:3
**stip** [2] - 20:21, 20:22
**stipulated** [1] - 54:18
**stipulating** [1] - 54:14
**stipulations** [2] - 51:6, 54:25
**Stockton** [1] - 13:19
**stop** [1] - 28:17
**straightforward** [1] - 52:18
**streamline** [1] - 55:9
**streamlining** [1] - 48:7
**Street** [2] - 2:2, 2:5
**stretches** [1] - 12:21
**strict** [1] - 49:21
**strike** [1] - 65:23
**striker** [15] - 66:5, 66:6, 68:15, 68:17, 69:13, 76:14, 76:18, 76:23, 76:25, 77:1, 77:7, 77:11, 77:16, 77:20, 78:8
**striker-fired** [12] - 66:5, 66:6, 68:15, 68:17, 76:14, 76:18, 76:23, 76:25, 77:7, 77:16, 77:20, 78:8
**strong** [1] - 57:8
**strongest** [2] - 50:4, 78:21
**struck** [1] - 36:23
**structure** [3] - 67:11, 80:7, 81:1
**Stryker** [1] - 7:5
**study** [1] - 36:23
**stuff** [5] - 12:3, 12:4, 16:14, 31:25
**sub** [1] - 69:8
**subclasses** [3] - 52:14, 70:16, 71:20
**subdesigns** [1] - 78:12
**subject** [1] - 64:6
**subparts** [1] - 68:9
**subsections** [1] - 29:6
**subsequently** [1] - 69:5
**substance** [2] - 14:3, 89:2
**successful** [1] - 89:8
**sudden** [1] - 55:19
**sufficiency** [1] - 26:9
**suggest** [2] - 34:14, 90:12
**suggestions** [1] - 20:17
**suing** [1] - 6:20
**Suite** [4] - 1:18, 1:21, 2:2, 2:6
**summary** [1] - 20:21
**support** [1] - 36:12
**suppose** [1] - 35:13
**supposed** [3] - 58:3, 63:18, 86:2
**suppression** [3] - 52:5, 52:7, 54:4
**Supreme** [8] - 26:20, 27:11, 27:13, 49:7, 49:8, 49:12, 49:13, 49:14
**surprise** [1] - 48:6
**surprised** [1] - 57:20
**survive** [2] - 14:6, 58:17
**suspect** [1] - 3:8
**swallow** [1] - 15:17
**switch** [1] - 14:2
**syllable** [1] - 7:15
**sympathy** [1] - 65:4
**system** [9] - 18:14, 18:19, 23:17, 28:19, 34:12, 34:13, 39:3, 86:21, 86:25
**systems** [1] - 69:4
**São** [3] - 61:11, 61:15, 61:23

**T**

**T's** [5] - 37:20, 57:3, 57:6, 57:16, 82:23
**table** [1] - 36:14
**tall** [1] - 38:25
**tandem** [1] - 31:9
**target** [1] - 55:12
**task** [1] - 39:18
**taught** [1] - 59:5
**TAURUS** [3] - 1:8, 1:8, 1:9
**Taurus** [46] - 3:2, 8:14, 24:23, 26:18, 39:15, 39:25, 40:7, 40:8, 40:12, 40:17, 40:18, 40:20, 40:22, 40:23, 40:25, 41:3, 41:4, 41:16, 41:18, 41:19, 41:22, 42:2, 42:4, 43:1, 43:10, 43:11, 43:18, 45:9, 45:10, 45:12, 45:14, 45:15, 45:20, 52:18, 61:16, 61:17, 64:5, 64:12
**Taurus's** [1] - 52:19
**taurususa.com** [1] - 76:11
**TCP** [1] - 76:17
**TCPA** [1] - 7:2
**teachers** [1] - 21:11
**team** [4] - 16:13, 18:2, 18:7, 22:20
**technically** [1] - 44:2
**technology** [1] - 28:16
**tee** [4] - 20:18, 81:1, 81:2, 87:14
**teed** [2] - 70:19, 73:9
**teenager** [1] - 10:21
**Telephone** [1] - 7:2
**ten** [9] - 4:14, 4:15, 9:22, 11:22, 11:24, 65:6, 70:3, 70:4, 70:23
**ten-minute** [2] - 70:3, 70:23
**tenets** [1] - 52:23
**term** [2] - 74:12
**terms** [2] - 48:16, 59:16
**Terrace** [1] - 1:23
**terrible** [1] - 83:14
**terribly** [1] - 73:24
**terrified** [4] - 33:4, 86:10, 86:11, 86:12
**terrorism** [1] - 16:8
**terrorizing** [1] - 86:16
**testifying** [2] - 43:20, 43:21
**testimony** [2] - 40:20, 72:5
**testosterone** [1] - 74:9
**that'll** [1] - 91:7
**THE** [243] - 1:13, 1:17, 2:1, 3:1, 3:5, 3:7, 3:10, 3:12, 3:15, 3:19, 3:23, 4:1, 4:4, 4:7, 4:9, 4:21, 5:6, 5:9, 5:11, 5:23, 6:6, 6:10, 6:22, 7:9, 7:13, 7:15, 8:9, 8:16, 8:18, 8:20, 8:22, 9:8, 9:10, 10:3, 10:5, 10:12, 10:17, 10:25, 11:14, 11:17, 12:6, 12:10, 12:14, 12:18, 13:4, 13:9, 13:15, 14:2, 14:15, 14:22, 15:3, 15:5, 15:8, 15:10, 15:22, 16:3, 16:10, 16:16, 16:21, 17:4, 17:10, 17:13, 23:5, 23:11, 23:21, 24:2, 24:6, 24:10, 24:14, 24:20, 24:25, 25:3, 25:6, 25:10, 25:15, 25:18, 26:23, 27:22, 28:1, 28:5, 28:13, 29:4, 29:13, 29:19, 30:9, 30:12, 30:17, 30:19, 31:8, 32:12, 32:14, 32:25, 33:3, 33:11, 33:19, 34:4, 34:7, 34:20, 34:23, 35:6, 35:8, 35:10, 35:14, 35:17, 35:22, 35:24, 36:1, 36:16, 37:13, 37:20, 38:18, 38:22, 38:24, 39:11,

39:22, 40:2, 40:4, 40:6, 40:15, 40:24, 41:10, 41:23, 42:8, 42:10, 42:14, 42:18, 42:21, 43:3, 43:15, 43:19, 44:10, 45:17, 45:21, 45:23, 46:2, 46:15, 46:19, 47:5, 47:8, 48:15, 48:20, 49:1, 50:10, 51:15, 51:20, 52:6, 52:10, 53:3, 53:6, 54:2, 54:10, 55:1, 56:3, 57:11, 58:19, 59:23, 60:4, 60:22, 60:25, 61:4, 61:10, 61:22, 62:1, 62:7, 62:13, 62:21, 63:12, 63:19, 63:23, 64:15, 64:24, 65:2, 65:12, 65:25, 66:10, 67:2, 67:9, 67:25, 68:8, 68:16, 68:25, 70:1, 71:3, 71:8, 72:10, 73:7, 73:23, 73:25, 74:6, 74:16, 75:2, 75:14, 76:2, 76:20, 76:25, 77:12, 77:17, 78:11, 78:15, 79:4, 79:7, 79:18, 81:16, 82:6, 82:11, 82:25, 83:4, 83:9, 83:12, 83:16, 83:23, 84:20, 84:25, 85:3, 85:11, 85:15, 85:17, 85:22, 86:5, 86:9, 86:11, 86:13, 87:1, 87:8, 87:11, 87:22, 88:2, 88:6, 88:14, 88:16, 88:19, 88:25, 89:13, 89:18, 89:21, 90:6, 90:8, 90:18, 90:20, 91:3, 91:6, 91:9, 91:11

**theory** [1] - 47:24
**therefore** [1] - 19:4
**Thereupon** [1] - 71:1
**they've** [2] - 65:13, 77:19
**thinking** [1] - 81:20
**third** [1] - 12:1
**three** [6] - 9:14, 13:16, 17:14, 18:2, 40:10, 51:24
**three-party** [1] - 18:2
**threw** [1] - 73:17
**throughout** [1] - 53:15
**throw** [3] - 32:19, 49:15, 86:5
**throwing** [3] - 54:2, 58:8, 58:22
**Tim** [4] - 4:5, 41:11, 55:7, 83:7
**timing** [1] - 90:5
**TIMOTHY** [1] - 2:4
**Tjoflat** [2] - 57:3, 57:21
**today** [8] - 9:18, 17:14, 22:21, 32:4, 36:9, 80:19, 82:13, 89:23
**Todd** [5] - 3:11, 7:12, 38:16, 55:7, 83:7
**TODD** [1] - 1:20
**together** [3] - 55:8, 63:14, 79:15
**tolerated** [1] - 19:4
**took** [2] - 14:5, 14:14
**tool** [1] - 66:13
**top** [2] - 39:7, 44:8
**tort** [1] - 6:19
**total** [1] - 68:10
**totally** [1] - 17:12
**tour** [1] - 21:20
**towards** [1] - 38:23
**town** [1] - 10:19
**towns** [1] - 74:3
**track** [1] - 89:25
**tracked** [1] - 3:25
**trade** [1] - 6:16
**traded** [1] - 40:21
**train** [1] - 90:19
**transcription** [1] - 91:19
**transition** [1] - 21:1
**translate** [7] - 23:23, 32:7, 33:16, 33:18, 84:23, 84:24, 84:25
**translated** [6] - 24:1, 27:14, 32:20, 37:8, 89:20, 89:23
**translating** [2] - 23:8, 34:25
**translation** [6] - 35:2, 35:3, 71:17, 89:9, 90:4, 90:25
**translations** [2] - 44:22, 90:16
**translator** [7] - 24:3, 34:8, 36:17, 36:18, 44:14, 89:11, 90:12
**translators** [3] - 33:18, 89:11, 90:10
**transmitted** [2] - 27:10, 27:16
**travel** [1] - 15:20
**tread** [1] - 8:6
**treat** [1] - 18:24
**tremendous** [2] - 23:19, 23:20
**tremendously** [1] - 27:8
**trenches** [1] - 19:17
**trial** [7] - 20:15, 20:24, 21:15, 56:10, 64:8, 64:13, 81:14
**tried** [3] - 32:2, 64:1, 68:18
**trigger** [1] - 77:10
**troop** [1] - 16:10
**trooper** [1] - 7:19
**trucking** [1] - 8:8
**true** [4] - 34:23, 41:12, 45:18, 83:12
**truly** [3] - 22:20, 44:25, 85:5
**trump** [2] - 18:9, 50:1
**try** [9] - 15:21, 19:11, 20:25, 21:17, 22:14, 31:13, 87:1, 87:13
**trying** [10] - 20:1, 21:6, 31:11, 47:8, 52:12, 60:4, 77:25, 79:1, 79:23, 86:23
**tune** [1] - 58:12
**tuned** [1] - 47:17
**turn** [4] - 21:2, 23:5, 37:14, 47:18
**turned** [1] - 17:2
**Turnoff** [2] - 20:9, 22:17
**Tuscaloosa** [1] - 5:3
**tweak** [2] - 58:14, 83:24
**tweaking** [2] - 46:15, 70:7
**Twelfth** [2] - 2:10, 91:22
**two** [26] - 5:10, 5:20, 6:22, 8:1, 13:16, 13:17, 16:24, 21:7, 21:9, 22:12, 22:17, 44:15, 46:5, 46:11, 46:12, 63:4, 69:3, 70:3, 71:5, 77:1, 79:19, 83:25, 87:19, 90:9
**type** [2] - 49:5, 58:9
**types** [4] - 6:10, 9:24, 46:11, 46:12

## U

**ugly** [1] - 85:13
**ultimate** [1] - 49:11
**ultimately** [8] - 18:8, 18:18, 19:10, 47:13, 47:15, 49:11, 57:14, 74:11
**uncovering** [1] - 21:7
**under** [13] - 6:19, 16:23, 29:4, 29:6, 43:1, 43:4, 45:19, 52:5, 53:25, 60:1, 68:20, 69:9
**undergraduate** [2] - 7:17, 16:16
**understood** [1] - 64:19
**unfair** [1] - 48:25
**unfortunately** [5] - 10:10, 21:20, 22:21, 44:11, 64:24
**uniform** [1] - 49:23
**unique** [1] - 65:19
**UNITED** [2] - 1:1, 1:13
**United** [8] - 28:2, 39:13, 42:9, 42:10, 43:1, 49:23, 86:25, 91:22
**united** [1] - 2:9
**universal** [1] - 62:20
**universe** [1] - 73:18
**University** [10] - 9:5, 10:23, 11:5, 11:9, 12:24, 13:2, 17:5, 35:4, 35:21
**unjust** [4] - 59:9, 59:16, 72:11, 72:16
**unless** [6] - 44:20, 58:14, 65:13, 75:5, 79:17, 80:11
**unnecessarily** [1] - 47:11
**up** [42] - 3:19, 4:17, 4:23, 5:18, 9:15, 10:20, 12:13, 12:14, 15:1, 15:22, 16:18, 17:1, 20:16, 20:18, 28:2, 28:21, 37:7, 39:8, 42:16, 44:7, 52:9, 56:7, 58:3, 58:24, 69:23, 70:4, 70:19, 73:1, 73:9, 73:10, 75:18, 79:9, 79:23, 80:8, 81:2, 81:18, 82:11, 83:4, 83:11, 87:14, 87:23, 89:13
**Upstate** [3] - 10:16, 10:17, 10:19
**US** [7] - 13:11, 26:12, 40:13, 40:14, 41:9, 43:8
**uses** [6] - 27:2, 35:2, 36:17, 44:15, 90:9, 90:10
**Utah** [2] - 28:3, 28:9

## V

**valid** [1] - 27:15
**valuable** [1] - 58:9
**value** [2] - 19:24, 80:23
**variable** [1] - 68:5
**variety** [1] - 15:14
**various** [3] - 9:17, 59:14, 76:4
**vary** [1] - 67:15
**vast** [1] - 8:7
**Vera** [1] - 37:1
**verdict** [4] - 21:13, 64:1, 64:10, 65:17
**versus** [1] - 3:2
**vertically** [1] - 41:8
**vetted** [1] - 53:15
**vices** [1] - 8:10
**Vietnam** [1] - 9:4
**view** [4] - 62:11, 62:12, 62:13, 71:11
**viewed** [1] - 19:4
**vineyards** [1] - 59:4
**violates** [1] - 28:15
**violent** [1] - 5:4
**Virginia** [4] - 9:2, 9:3, 60:7, 60:16
**visit** [1] - 10:11
**voice** [1] - 22:25
**volume** [2] - 14:7, 14:25
**voluntary** [1] - 84:6
**vs** [1] - 1:7

## W

**waist** [1] - 39:1
**wait** [1] - 16:25
**waive** [4] - 29:7, 31:2, 89:8
**wants** [2] - 24:20, 30:7
**War** [1] - 9:4
**war** [1] - 67:3
**warn** [1] - 54:5
**Warranty** [3] - 51:15, 53:20, 53:24
**warranty** [23] - 49:17, 49:22, 49:24, 49:25, 50:2, 51:5, 51:8, 51:12, 51:14, 52:19, 52:22, 52:23, 53:5, 53:6, 53:9, 53:11, 53:14, 53:18, 53:21, 54:20, 59:10,

72:13
**Washington** [1] - 15:24
**washy** [1] - 47:25
**waste** [2] - 31:15, 47:12
**ways** [2] - 38:1, 77:1
**weapon** [16] - 38:7, 38:9, 38:10, 38:11, 38:13, 39:16, 39:17, 39:20, 39:23, 43:21, 46:9, 46:10, 47:6, 49:6, 62:23
**weapons** [3] - 39:14, 39:21, 68:22
**Webb** [1] - 44:10
**website** [4] - 61:14, 76:10, 76:12, 76:13
**weeds** [1] - 65:11
**week** [5] - 20:10, 34:3, 37:5, 84:20, 84:22
**weeks** [4] - 21:9, 79:19, 83:25, 87:19
**weird** [1] - 54:10
**Wesson** [1] - 63:7
**West** [4] - 9:2, 9:3, 60:7, 60:16
**western** [1] - 44:1
**WHEELES** [27] - 1:20, 1:20, 3:11, 7:11, 7:14, 7:16, 8:12, 8:17, 8:19, 38:19, 39:12, 39:24, 40:3, 40:5, 40:9, 40:16, 40:25, 45:7, 48:25, 60:24, 61:2, 61:8, 64:7, 64:16, 65:18, 67:12, 68:18
**Wheeles** [13] - 3:11, 7:10, 7:12, 7:13, 7:14, 41:13, 41:25, 45:6, 61:3, 63:13, 64:1, 68:2, 72:4
**wheels** [1] - 31:19
**whereby** [1] - 26:8
**White** [1] - 11:22
**whittle** [1] - 75:23
**whole** [2] - 73:18, 83:12
**wife** [1] - 11:8
**wiggle** [1] - 70:20
**William** [2] - 3:17, 22:17
**willing** [3] - 22:19, 31:2, 82:25
**willingness** [1] - 79:21
**willy** [1] - 31:25
**willy-nilly** [1] - 31:25
**win** [2] - 65:6, 81:5
**window** [1] - 72:17
**wishy** [1] - 47:25
**wishy-washy** [1] - 47:25
**witnesses** [1] - 65:15
**wondered** [1] - 56:12
**wonderful** [1] - 71:15
**woodshed** [1] - 57:25
**word** [1] - 34:3
**words** [4] - 22:14, 34:10, 46:7, 79:1
**workable** [1] - 34:5
**works** [4] - 18:14, 18:19, 81:10
**worksheet** [1] - 82:9
**world** [2] - 28:22, 28:23
**worst** [1] - 85:4
**worst-case** [1] - 85:4
**worth** [1] - 31:17
**wrap** [1] - 70:4
**wreck** [1] - 90:19
**wrongful** [3] - 8:4, 59:9, 72:11
**wrote** [1] - 57:22

## Y

**year** [13] - 9:4, 11:24, 12:1, 16:25, 24:6, 56:7, 73:10, 78:14, 79:25, 85:11, 85:22
**years** [34] - 5:10, 5:20, 6:2, 6:4, 6:5, 6:23, 7:18, 7:24, 8:15, 9:7, 9:14, 9:15, 9:16, 9:23, 10:9, 11:12, 11:22, 11:24, 12:17, 12:22, 12:25, 13:16, 13:17, 14:1, 14:21, 16:6, 16:24, 21:7, 21:24, 26:19, 42:1, 44:13
**York** [10] - 9:1, 10:15, 10:16, 10:18, 10:19, 11:13, 14:19, 14:22, 21:24, 24:17
**York-based** [1] - 11:13
**young** [2] - 9:8, 9:10
**yourself** [1] - 23:2
**yourselves** [1] - 80:21

## Z

**zeal** [1] - 18:10