IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| CHRIS P. CARTER,<br>Individually and on behalf of all<br>others similarly situated,<br><br>  *Plaintiffs,*<br><br>v.<br><br>FORJAS TAURUS S.A.,<br>TAURUS INTERNATIONAL<br>MANUFACTURING, INC., and<br>TAURUS HOLDINGS, INC.,<br><br>  *Defendants.* | | Case No. 1:13-cv-24583-PAS<br><br>**CLASS ACTION** |

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
<u>CLASS ACTION SETTLEMENT AND INCORPORATED MEMORANDUM OF LAW</u>**

**TABLE OF CONTENTS**

Argument Summary ............................................................................................................... 1

Background ............................................................................................................................ 2

A.  The Underlying Lawsuit. ............................................................................................... 2

B.  The Settlement Negotiations. ........................................................................................ 3

C.  The Proposed Settlement. .............................................................................................. 4

   1.  Settlement Benefits. ................................................................................................ 4

   2.  The Settlement Class and the Release ..................................................................... 6

   3.  Attorneys' Fees, Expenses, Incentive Award, and Costs of Notice and Administration.... 6

D.  Preliminary Approval .................................................................................................... 6

E.  Class Members' Response to the Proposed Settlement. ................................................ 7

Argument .............................................................................................................................. 7

A.  The Parties Provided the Best Practicable Notice. ........................................................ 7

B.  The Settlement is Fair, Adequate, and Reasonable. ...................................................... 9

   1.  The *Bennett* Factors Weigh in Favor of the Settlement. ........................................ 11

      a.  *Bennett* Factor One: Likelihood of Success at Trial. ....................................... 11

      b.  *Bennett* Factors Two and Three: Range of Recovery and the Point at Which a
         Settlement is Fair. .......................................................................................... 13

      c.  *Bennett* Factor Four: Complexity, Expense, and Duration of the Litigation. ............ 15

      d.  *Bennett* Factor Five: Substance and Amount of Opposition to the Settlement. .......... 16

      e.  *Bennett* Factor Six: The Stage of the Proceedings. ......................................... 16

   2.  The Judgment of Experienced Counsel and the Absence of Collusion Further Support
      the Settlement. ...................................................................................................... 17

Conclusion ........................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assoc. for Disabled Ams. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002) ....................................................................................11, 17

*Behrens v. Wometco Enterprises, Inc.*,
  118 F.R.D. 534, 538 (S.D. Fla. 1988) ................................................................10, 13, 15, 16

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) ................................................................................... *passim*

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ......................................................................................10

*Carnival Corp. v. Rolls-Royce PLC*,
  No. 08-23318, 2009 WL 3861450 (S.D. Fla. 2009) .................................................11

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ......................................................................................11

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir.1977) .........................................................................................15

*Dorestin v. Hollywood Imports, Inc.*,
  45 So.3d 819 (Fla. 4th DCA 2010) .................................................................................14

*Florida Power & Lights Co. v. Westinghouse Elec. Corp.*,
  510 So.2d 899 (Fla. 1987) ...............................................................................................11

*Fresco v. Auto Data Direct, Inc.*,
  No. 03-61063, 2007 WL 2330895 (S.D. Fla. May 14, 2007) .....................................8

*Gen. Matters, Inc. v. Paramount Canning Co.*,
  382 So.2d 1262 (Fla. 2nd DCA 1980) ...........................................................................12

*Greco v. Ginn Dev. Co., LLC*,
  No. 14-11443, --- F. App'x ---, 2015 WL 7755673 (11th Cir. Dec. 2, 2015) ..........17

*Heffner v. Blue Cross and Blue Shield of Ala., Inc.*,
  443 F.3d 1330 (11th Cir. 2006) ......................................................................................14

*Lipuma v. Am. Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) ..........................................................................16

*Mangone v. First USA Bank*,
    206 F.R.D. 222 (S.D. Ill. 2001) ................................................................3

*Martin v. Brown*,
    566 So.2d 890 (Fla 4th DCA 1990) ........................................................11

*Mazza v. American Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ..................................................................12

*In re Mercedes-Benz Tele Aid Contract Litig.*,
    257 F.R.D. 46 (D.N.J. 2009) ..................................................................12

*Mesa v. BMW of N. Am., LLC*,
    904 So.2d 450 (Fla. 3rd DCA 2005) .......................................................12

*Perez v. Asurion Corp.*,
    501 F. Supp. 2d 1360 (S.D. Fla. 2007) (Seitz, J.) .................................7, 10, 16, 17

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ...............................................................................8

*Poertner v. Gillette Co.*,
    618 F. App'x 624 (11th Cir. July 16, 2015) (unpublished) ......................8

*Renaissance Cruises, Inc. v. Glassman*,
    738 So.2d 436 (Fla. Dist. Ct. App. 1999) ...............................................12

*Rollins, Inc. v. Butland*,
    951 So. 2d 860 (Fla. Dist. Ct. App. 2006) ...........................................13, 14

*Rollins, Inc. v. Heller*,
    454 So.2d 580 (Fla Dist. Ct. App. 1984) ................................................14

*In re Sunbeam Sec. Litig.*,
    176 F. Supp. 2d 1323 (S.D. Fla. 2001) ...............................................11, 17

**Statutes**

18 U.S.C. § 926 ...........................................................................................8

Fla. Stat. § 501.211(2) ................................................................................13

**Other Authorities**

Fed. R. Civ. P. 23(c)(2)(B) ..........................................................................7

ARGUMENT SUMMARY

Plaintiff Chris P. Carter alleges that the Taurus Defendants manufactured and distributed nearly one million pistols with safety defects. After investing thousands of hours of attorney time and spending hundreds of thousands of dollars on forensic testing, Officer Carter and his team of lawyers negotiated a settlement that will provide relief that befits the serious nature of the claims. In what may be unprecedented relief in a product-liability class action settlement, class members who own certain Taurus pistols can return their pistols to Taurus and have them repaired or replaced under the Enhanced Warranty. Because there is no repair currently available for the alleged safety defects, class members who submit their pistols under the Enhanced Warranty will receive a comparable new model pistol, all without cost.

Critically, in order to receive this benefit, pistol owners will not have to undertake the rigorous scientific testing Officer Carter's counsel has undertaken. And even more critically, pistol owners will not need to show that their pistols have manifested the alleged defects through an unintended discharge incident. Class Members can receive this benefit without having to complete a claim form, and at any time, without regard to a claims period. The settlement allows class members who prefer cash to return their pistol, again free of charge, and receive up to a $200 cash payment. Finally, the settlement provides safety training to all class members.

Under the Eleventh Circuit's mandated consideration of the factors governing the fairness, adequacy, and reasonableness of a proposed class action settlement, the settlement, with a value ranging from $40.4 million to $84.1 million, warrants final approval. Judging by the infinitesimal number of objections (four) and the fact that no class member opted out after a notice campaign described as "among the most robust in the last few years" and "of the highest

modern communication standards," owners of affected pistols apparently share in Plaintiff's belief that the proposed settlement should be finally approved.

**BACKGROUND**

### A.  The Underlying Lawsuit.

On July 29, 2013, Officer Carter was carrying his Taurus PT-140 Millennium PRO striker-fired pistol while working a narcotics detail as a sheriff's deputy in Scott County, Iowa. (First Am. Compl., ECF No. 73, ¶ 52.) While attempting to apprehend a fleeing suspect on foot, Officer Carter's pistol dislodged from his holster. The pistol fired when it hit the ground, discharging a single round that struck a nearby vehicle. (*Id.*) The safety was on when the pistol dropped. (*Id.* ¶ 53.)

After the incident, Officer Carter contacted attorney Todd Wheeles, an experienced product liability lawyer who had tried and settled several unintended discharge cases against Taurus. Mr. Wheeles' firm, together with Bailey & Glasser LLP, filed a class action complaint on December 20, 2013. The complaint alleges statutory, tort, and warranty-based claims arising from safety defects in certain striker-fired Taurus pistols – referred to here as the Class Pistols.[1] Taurus stopped manufacturing and selling these pistols in the United States in 2013.

Backed by over 500 hours of "drop-fire" and other related safety device testing funded by Plaintiff's counsel, Plaintiff alleges that the Class Pistols contain two Safety Defects. The first is a "drop-fire defect" that Plaintiff alleges may cause the pistols to fire when dropped from a normal height. Plaintiff contends that the drop-fire defect is a common design defect attributable

---

[1] The Class Pistols include the Taurus Millennium models PT-111, PT-132, PT-140, PT-145, PT-745, as well as the PT-609, PT-640, and PT-24/7. Capitalized terms used in this brief have the same meaning assigned in the Settlement Agreement attached as Exhibit A to the Parties' Joint Motion for Preliminary Approval, ECF No. 123.

2

to the fact that the Class Pistols lack a "trigger blade safety." The second is a "false safety defect" that Plaintiff alleges may allow a pistol to unintentionally fire even when the manual safety lever is in the "on" or "safe" position and the trigger moves rearward.[2]

In addition to the testing, Plaintiff deposed three corporate representatives concerning key issues relevant to both merits and class certification issues. Plaintiff also pursued a motion to compel discovery (ECF No. 101), which was set for hearing but postponed after the parties reached this proposed settlement. Taurus twice moved to dismiss the case – first on grounds of ineffective service on a foreign-based corporation (ECF No. 30; the motion was fully briefed and was denied as moot when the foreign defendant agreed to accept service, ECF No. 49), and second on Rule 12(b)(6) grounds challenging all claims alleged in the First Amended Complaint (ECF No. 79; Taurus withdrew that motion, ECF No. 88, after receiving the Plaintiff's opposition brief).

**B.   The Settlement Negotiations.**

In the later phases of the litigation, the parties conducted numerous mediation sessions – six, in fact, in Miami, Fort Lauderdale, Birmingham, Atlanta, and Washington, D.C. – with Rodney Max, a certified class action mediator for this District.

At these sessions, Plaintiff disclosed his experts' findings regarding the Safety Defects, and the parties shared their widely-divergent, strongly-held views on the merits and the prospects for class certification. At one point, the parties reached a proposed settlement, only to have the

---

[2] Taurus denies these allegations and the Plaintiff's claims, as is customary in class action settlements. *See, e.g., Mangone v. First USA Bank*, 206 F.R.D. 222, 224 (S.D. Ill. 2001) ("It would defeat an important purpose of [a class action] settlement, and therefore render settlements less attractive to the parties, if the settlement agreement were required to include admissions of wrongdoing by defendants or if the court itself made such findings in connection with a proposed [class action] settlement.") (quoting *Alliance to End Repression v. City of Chicago*, 561 F. Supp. 537, 554 (N.D. Ill. 1982)).

Defendants' boards of directors reject it, as Taurus had reserved the right to do. (ECF No. 112.) This prompted another active and hotly-contested phase of litigation, which ended only when the parties met for their final mediation session in Washington, D.C. to further negotiate the proposed settlement. In addition to several lawyers for both sides as well as Mediator Max, that mediation was attended by Plaintiff's forensic accountant, Forjas Taurus's CFO from Brazil, Taurus International Manufacturing, Inc.'s CEO, and even a Portuguese translator with Brazilian business experience and a law degree retained by Plaintiff's counsel specifically for the mediation.

### C.  The Proposed Settlement.

### 1.  Settlement Benefits.

The proposed settlement provides three main benefits. The first is an Enhanced Warranty, unlimited in time, and transferable to anyone at any time who owns a Class Pistol. (Sett. Agt. & Release ("SA") §§ II.A.37, ECF No. 123 at 29, and III.E.2, ECF No. 123 at 36.) Under this benefit, an owner of a Class Pistol can send the pistol back to Taurus, at Taurus's expense, and have it repaired or replaced as necessary with a comparable, new pistol,[3] again with shipping paid by Taurus.[4]

---

[3] The replacement pistols ("G2") are equipped with a newly designed trigger blade safety which, according to Taurus, is "designed to preclude the backward movement of the trigger bar to prevent an accidental discharge in the case the firearm is dropped." (Exhibit A, Taurus PT 111/140 Millennium G2 and PT 24/7 G2 Instruction Manuals). Also, Plaintiff's experts performed "drop-fire" and other related safety related testing on the G2 designed pistols.  The safety design on the G2 pistols tested performed as intended on each of the tests conducted by Plaintiff's experts.

[4] Although the Settlement provides that Taurus will inspect and "address" the alleged Safety Defects, there is no repair available at this time; as a result, Class Members who submit their pistols under the Enhanced Warranty will receive a comparable Taurus "G2" pistol.

This may be unprecedented relief in a consumer-product class action settlement, and bears re-emphasis: because of this proposed settlement, any person who owns at Class Pistol *at any time* can ship their Class Pistol to Taurus and have it repaired or replaced as necessary with a new, comparable pistol. Pistol owners will not have to prove that their pistol is defective, and, most importantly, will not have to have experienced a potentially deadly unintended discharge incident. Taurus will repair or replace the new pistol with no requirement that the owner prove that it is defective, and without any owner having to prepare and file a claim form or pay shipping costs. This is a major departure in policy for Taurus; during the litigation, Taurus's corporate representative in charge of warranty repairs testified that, previously, if a Class Pistol owner shipped a pistol back to Taurus because of drop-fire concerns, Taurus would not have replaced the pistol. (Exhibit B, K. Intagliata Dep., April 7, 2015, at 255:21-256:14.)

The Parties' economic expert calculated the current value of the Enhanced Warranty by comparing the price of the replacement pistols to the current estimated values of the Class Pistols, and including the value of shipping costs. (Exhibit C, Safir Decl. ¶¶ 22-29). Using this method, Dr. Safir estimates the current value of the Enhanced Warranty to be worth between $20.9 and $52.3 million to the members of the class. (*Id.* ¶ 29).[5]

Second, class members who do not want to return their pistol under the Enhanced Warranty can submit a claim for up to $200 per pistol. (SA § III.E.1, ECF No. 123 at 35-36.) Dr. Safir places the value of this benefit at between $8.9 and $21.3 million. (Ex. C ¶ 34).

Third, all class members will receive the benefit of Taurus-produced safety training videos that address the Safety Defects.

---

[5] Based on various characteristics of the Settlement and the settlement class, Dr. Safir estimates that 10-25% of class members will make a claim, 60% of whom will opt for the Enhanced Warranty benefit. (Ex. C ¶¶ 15-21).

### 2.   The Settlement Class and the Release

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rules of Civil

procedure. The Settlement Class includes:

> All Persons or entities of the United States, Commonwealth of Puerto Rico, U.S.
> Virgin Islands, and Guam who own one or more of the following Taurus-branded
> firearms on the date of preliminary approval: PT-111 Millennium; PT-132
> Millennium; PT-138 Millennium; PT-140 Millennium; PT-145 Millennium; PT-
> 745 Millennium; PT-609; PT-640; and PT-24/7.

The class excludes all state, local or federal governments, bodies or agencies, the District Court

Judge and Magistrate Judge to whom the lawsuit is assigned and any member of their staffs and

immediate families, as well as all persons who validly request exclusion from the Settlement

Class. (SA § II.A.32, ECF No. 123 at 28.)

Class members who do not exclude themselves will release the claims raised in this case.

The release expressly excludes claims for death, personal injury, or damage to property other

than the Class Pistols themselves. (*Id.* § III.M., ECF No. 123 at 43-44.)

### 3.   Attorneys' Fees, Expenses, Incentive Award, and Costs of Notice and Administration.

As more fully outlined in Class Counsel's Application for an Award of Attorney Fees,

Expenses, and Incentive Award, the settlement proposes to pay attorneys' fees and costs of not

more than $9 million and a $15,000 incentive award to Officer Carter, all subject to this Court's

approval. (*Id.* §§ III.F-G, ECF No. 123 at 37-38.) The Settlement also requires Taurus to pay

costs of notice and settlement administration. (*Id.* § II.C., ECF No. 123 at 32-34.)

### D.  Preliminary Approval.

On May 15, 2015, the Parties submitted a Joint Motion for Preliminary Approval. (ECF

No. 123.) On June 16, 2015, upon review of the Joint Motion, the Court entered an Order

Identifying Issues for Preliminary Approval Hearing. (ECF No. 125.) The Parties appeared for

the Preliminary Approval Hearing on June 23, 2015, where they responded to the Court's inquiries concerning the factual basis for the Plaintiff's claims, the Parties' legal arguments, and the terms of the Settlement. The Parties also introduced the Court to a representative of the proposed Settlement Administrator, Heffler Claims Group ("Heffler"), who responded to the Court's inquiries and suggestions concerning Notice. On July 30, 2015, the Court entered an order granting preliminary approval of the Settlement. (ECF No. 133.)

**E.  Class Members' Response to the Proposed Settlement.**

The response to the Settlement has been overwhelmingly positive. No class members opted out, and only four (less than .0005% of the total estimated class size) objected.

**ARGUMENT**

Because the Parties provided the class members with the best practicable notice, and the Settlement is fair, adequate, and reasonable, the Court should grant Officer Carter's motion for final approval.

**A.  The Parties Provided the Best Practicable Notice.**

Before a court can exercise jurisdiction over the claims of absent class members, certain minimal due process requirements must be satisfied. *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1378 (S.D. Fla. 2007) (Seitz, J.). Absent class members must receive notice and an opportunity to be heard and to participate in the litigation, whether in person or through counsel. Fed. R. Civ. P. 23(c)(2)(B). The notice must be the "best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12, (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, (1950)).

Here, it was not possible to identify and generate a list of current owners of Class Pistols. *See* 18 U.S.C. § 926 (prohibiting the federal government from maintaining a registry of firearms, firearms owners, or firearms transactions). Under such circumstances, the Eleventh Circuit and courts in this district have approved notice by publication through national periodicals and popular internet outlets. *Poertner v. Gillette Co.*, 618 F. App'x 624, 626 (11th Cir. July 16, 2015) (unpublished); *Fresco v. Auto Data Direct, Inc.*, No. 03-61063, 2007 WL 2330895, at *7 (S.D. Fla. May 14, 2007) (approving "a combination of publication and Internet notice designed to reach a significant number of settlement class members").

The notice program was developed by Jeanne C. Finegan of Heffler Claims Group, the Court-appointed Settlement Administrator. Heffler and Ms. Finegan are at the forefront of modern notice, integrating new media and social media into court-approved notice programs, and have won acclaim from courts for their work designing hundreds of class action notice programs, including some of the largest and most complex programs administered in the United States and Canada. (Exhibit D, Finegan Decl. ¶¶ 9-13).

Heffler employed those skills here, using peer-accepted research methodologies to identify the target class-member demographic and the most appropriate digital and social media platforms, as well as traditional newspaper and magazine publication outlets. (*Id.* ¶¶ 15-20, 24-30.)

The Court-approved notice ran as directed in four daily newspapers and seven national magazines with combined circulation of over 22.5 million households and 134.5 million readers. (*Id.* ¶¶ 26-27, 28-29.) Heffler's internet strategy was critical, as approximately 88% of handgun owners are online. (*Id.* ¶ 31.) To reach these persons, Heffler used algorithmic technology to place online ads in three main forms: "banners" on websites most likely to be visited by

members of the class; on search engines linked to associated keywords; and on Facebook. (*Id.* ¶¶ 31-35). This advertising alone generated over 213 million "impressions," *i.e.*, opportunities to see a message or advertisement. (*Id.* ¶ 31.)  Heffler supplemented these efforts through media outreach that included a multi-media news release, and it monitored earned media mentions and articles (314 through December 9) and social media shares (more than 6,000 through December 9). (*Id.* ¶ 37.)

Finally, Heffler developed and operated a toll-free telephone hotline that has generated nearly 2,100 calls to date, and maintained the official settlement website, which has been visited by more than 234,000 unique users (people) in more than 301,700 sessions, including a sizable number of users from Puerto Rico, Guam, and the U.S. Virgin Islands. (*Id.* ¶ 38-40.)

In the end, the combination of traditional, online, mobile, social and reached approximately 86% of the targeted audience, with an average frequency of five times, while the hundreds of news mentions and thousands of social media shares achieved an even greater reach. (*Id*. ¶ 42.) As Ms. Finegan concluded, the notice campaign "rank[s] among the most robust in the last few years[,]" was "of the highest modern communication standards," and was "consistent with the best practicable court approved notice programs in similar matters and the Federal Judicial Center's guidelines concerning appropriate reach." (*Id*.)

### B.  The Settlement is Fair, Adequate, and Reasonable.

The law has long been settled in the Eleventh Circuit: "In determining whether to approve a proposed [class action] settlement, the cardinal rule is that the district court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Perez*, 501 F. Supp. 2d at 1379 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th

Cir.1977)).[6] "Determining the fairness of the settlement is left to the sound discretion of the trial court." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The Court's exercise of discretion should be "informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.* As then-Chief Judge King stated in *Behrens v. Wometco Enterprises, Inc.*:

> Litigants should be encouraged to determine their respective rights between themselves. This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice, for a just result is often no more than an arbitrary point between competing notions of reasonableness.

118 F.R.D. 534, 538 (S.D. Fla. 1988) (internal citations omitted). To aid in this determination, the Eleventh Circuit has identified six factors that a district court should examine when assessing whether a proposed settlement is fair, adequate and reasonable. These factors include:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. "In evaluating these considerations, the district court should not try the case on the merits." *Behrens*, 118 F.R.D. at 539 (*citing Cotton*, 559 F.2d at 1330). Rather, the court "must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Assoc. for Disabled Ams. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) (*quoting Cotton*, 559 F.2d at 1330).

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

### 1.  The Bennett Factors Weigh in Favor of the Settlement.

As applied to this case, the factors outlined in *Bennett* support a finding that the Settlement is fair, adequate, reasonable, and worthy of final approval.

#### a.  *Bennett* Factor One: Likelihood of Success at Trial.

Where a substantial question exists regarding the likelihood of success at trial, this factor weighs in favor of approving a proposed class action settlement. *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1330-31 (S.D. Fla. 2001). Here, Plaintiff faced significant hurdles both on the merits and in obtaining contested class certification.

In their motion to dismiss the First Amended Complaint (ECF No. 79), the Taurus Defendants challenged every claim alleged. Among other things, the Taurus Defendants argued that:

- Plaintiff's injuries were speculative, and he therefore lacked standing. *See, e.g., Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009);

- Plaintiff's fraud claims were barred by the economic loss rule, *see, e.g., Florida Power & Lights Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899 (Fla. 1987), and Plaintiff could not establish reliance, *see, e.g., Martin v. Brown*, 566 So.2d 890 (Fla 4th DCA 1990);

- Plaintiff's statutory claims could not succeed because he failed to plead that the allegedly deceptive acts occurred in Florida, and otherwise failed to plead the elements of an FDUTPA claim. *See, e.g., Carnival Corp. v. Rolls-Royce PLC*, No. 08-23318, 2009 WL 3861450, *6 (S.D. Fla. 2009);

- Plaintiff's negligence claims were barred by the economic loss rule. *See Florida Power & Lights Co.*, 510 So.2d at 899; and that

- Plaintiff failed to state a claim for breach of warranty because he failed to provide notice, did not comply with the terms of the warranty, and lacked privity with the Taurus Companies. *See Gen. Matters, Inc. v. Paramount Canning Co.*, 382 So.2d 1262, 1263 (Fla. 2nd DCA 1980); *Mesa v. BMW of N. Am., LLC,* 904 So.2d 450, 458 (Fla. 3rd DCA 2005).

Although Plaintiff vigorously opposed Taurus's contentions, the Court never ruled on Taurus's motion, and the same issues could have been raised again in summary judgment motions at the individual and class stages. Thus, the Settlement provides the class a sure result in the face of substantial legal uncertainty.

In addition, Plaintiff's ability to obtain contested class certification was far from certain. Choice-of-law determinations impacting the superiority and manageability requirements of Rule 23(b)(3) would have presented close questions for the Court. Plaintiff would have argued that Florida law applied to the claims of each class member, based on the allegations that all of Taurus's U.S. operations (which include the alleged concealment, misrepresentations, and omissions alleged in the First Amended Complaint) were planned, implemented, and carried out from its Miami, Florida headquarters. *See, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 66-67 (D.N.J. 2009) (applying Restatement's "most significant relationship" test to conclude that New Jersey law applied to all class members primarily because defendants "planned and implemented" their relevant actions in New Jersey); *Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436, 437-38 (Fla. Dist. Ct. App. 1999) (applying "most significant relationship" test to conclude that Florida Deceptive and Unfair Trade Practices Act applied to all class members because all defendant's U.S. operations were "controlled, directed, and for the most part carried out" in Florida). Taurus, on the other hand, would have argued that the laws of the separate states would have applied to the various claims. *See, e.g., Mazza v. American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) (applying consumer laws of 43 different jurisdictions and denying class certification because common issues of law did not predominate).

Had Taurus's choice-of-law arguments (or other arguments against class certification) prevailed, nationwide class certification would have been difficult, as some courts view the need

to apply different states' laws as the death knell of multistate class actions. *See, e.g., Johnson v. Nextel Comm.'s, Inc.*, 780 F.3d 128, 146 (2d Cir. 2015) ("Once it is established that the substantive law of each class member's state will apply to his or her claims, the case for finding the predominance of common issues and the superiority of trying this case as a class action diminishes to the vanishing point."). Although Plaintiff was confident that the Court could certify a class under the law of a single jurisdiction, the settlement takes the manageability and superiority issues off the table, clearing the way for an excellent nationwide class resolution.

### b. *Bennett* Factors Two and Three: Range of Recovery and the Point at Which a Settlement is Fair.

"The second and third considerations of the *Bennett* test are easily combined." *Behrens,* 118 F.R.D. at 541. A district court must first determine the appropriate standard of damages (in order to calculate the range of recovery), and then determine where in this range of recovery a fair, adequate and reasonable settlement amount lies. *Id.* The existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable. *See id.* at 542 (explaining that "a settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery").

The class members' primary claim is that the Taurus Defendants violated the FDUTPA, which allows consumers to recover "actual damages" only. *See* Fla. Stat. § 501.211(2). "Actual damages" under the FDUTPA are determined based on the "difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). In an extreme case, where a product is rendered completely "valueless" as a result of a defect, the purchase price is the appropriate measure of damages. *Id.* "Actual damages" do not include consequential damages. *See Dorestin v. Hollywood Imports, Inc.*, 45

So.3d 819, 824-25 (Fla. 4th DCA 2010). Thus, an individual class member's potential recovery ranges from $0 to the purchase price of his Class Pistol,[7] plus attorneys' fees and court costs.[8]

Under the Enhanced Warranty option of the Settlement, the Taurus Defendants will repair or replace Class Pistols with a brand new, "G2" model that is functionally and aesthetically equivalent, but free of the alleged Safety Defects, and Taurus will separately pay class counsels' attorney fees and expenses. In this way, the Settlement arguably offers *full satisfaction* of each class members' actual damages under the FDUTPA – all without requiring any pistol owner to prove the existence of or have experienced a defect, and all without even requiring owners to submit a claim form.

This is an extraordinary, if not unprecedented result in a consumer-product class action of this size. Moreover, those class members who opt to receive cash payments will similarly receive a sum that likely exceeds the actual damages a jury could award under *Rollins*. In light of the Taurus Defendants' formidable merits and class certification defenses, the Settlement offers class members a benefit that far exceeds that fair, adequate, and reasonable benchmark.

---

[7] The purchase prices of the Class Pistols vary. The least expensive Class Pistol (the PT-111) and the most expensive Class Pistol (the PT-24/7) were also the most popular, accounting for more than 57% of all Class Pistols distributed in the United States. (Ex. C ¶ 24). The PT-111 Millennium had an M.S.R.P. (manufacturer's suggested retail price) of up to $383. (Exhibit E). A base-model PT-24/7 had an M.S.R.P. of $503, and a high-end PT-24/7 Pro had an M.S.R.P. of up to $617. (Exhibit F).

[8] The FDUTPA does not permit an award of punitive damages, absent some independent basis such as fraud. *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585-86 (Fla Dist. Ct. App. 1984). Plaintiff's fraud claims require proof of reliance, however, which is generally a bar to class certification. *See, e.g., Heffner v. Blue Cross and Blue Shield of Ala., Inc.*, 443 F. 3d 1330, 1344 (11th Cir. 2006).

      c.   ***Bennett* Factor Four: Complexity, Expense, and Duration of the Litigation.**

The law favors compromises in large part because they are often a "speedy and efficient resolution of long, complex, and expensive litigation." *Behrens*, 118 F.R.D. at 543. Moreover, as the Eleventh Circuit has noted, "In these days of increasing congestion within the Federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources." *Cotton*, 559 F.2d at 1331.

The issues in this case, both technical and legal, are highly complex. Plaintiff has already spent thousands of hours investigating and developing the class members' claims, and hundreds of thousands of dollars on expert testing and other discovery. Were this case to proceed to trial (or even appeal), those numbers would increase dramatically for both parties. At the same time, the parties have dealt with unusually difficult legal issues, including navigating foreign discovery, resolving unanswered questions of state and federal law on a range of topics, and planning and preparing for a contentious class certification process.

Perhaps most importantly, delay poses a particular risk here. The Plaintiff's primary goal in bringing this suit was to remove an allegedly dangerous product from the market. Thus, not only would the continuation of this litigation put the class members' potential recoveries at risk, but also their safety and the safety of those around them. This fact should weigh heavily in favor of the settlement.

### d. *Bennett* Factor Five: Substance and Amount of Opposition to the Settlement.

The settlement should also be approved because the Class has overwhelmingly accepted it. "In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).

A low percentage of objections demonstrates the reasonableness of a settlement. *Id.* In *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005), 41 of 9 million class members filed valid objections. The court found that the number of objectors — .0005% — was relatively "infinitesimal" and approved the settlement. *Id.* Here, the percentage of objectors — just over .0004% — is even more miniscule, and equally insignificant. And unlike *Lipuma*, not a single Class Member has opted out.

These objections, addressed in detail in the parties' Joint Response, are of the sort this Court has encountered before, as "most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to 'have a better deal.'" *See Perez*, 501 F.Supp.2d at 1383. None of the objections warrant rejection of the settlement, particularly considering the implicit endorsement of the nearly one million class members who elected to remain a part of the class.

### e. *Bennett* Factor Six: The Stage of the Proceedings.

A court evaluates the stage of the proceedings at the time of settlement to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation. *See Behrens*, 118 F.R.D. at 544.

This case was filed in 2013. The Plaintiffs filed an amended complaint, conducted substantial discovery, and litigated numerous discovery disputes. In early 2014, the Parties fully

16

briefed the Taurus Companies' motion to dismiss. Plaintiff conducted more than 500 hours of expert testing, and the Parties engaged in six formal mediation sessions. Thus, the Parties were "well aware of the other side's position and the merits thereof" when settlement negotiations commenced. *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d at 1332.

### 2. The Judgment of Experienced Counsel and the Absence of Collusion Further Support the Settlement.

In addition to the *Bennett* factors, a district court may also rely upon the judgment of experienced counsel for the parties. *See Greco v. Ginn Dev. Co., LLC*, No. 14-11443, --- F. App'x ---, 2015 WL 7755673, at *3 (11th Cir. Dec. 2, 2015) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *Perez,* 501 F.Supp.2d at 1384. Absent evidence of fraud or collusion, a court should "be hesitant to substitute its own judgment for that of counsel." *Greco*, - 2015 WL 7755673 at *3.

The Court has already concluded that Class Counsel has the experience to adequately represent the Class in this action, and Taurus's counsel is equally well-versed in class action litigation. (ECF No. 133, at 11.) Further, as the Court also has already concluded, this settlement is the result of arms' length negotiation, including six mediations at the direction of a mediator whose national reputation is well-known to the Court. (*Id.* at 3-4). And where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion. *See, e.g. See Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470 (S.D. Fla. 2002).

Based on its experience, it is Class Counsel's informed position that the Settlement is reasonable, adequate, and fair—indeed, given the significant public safety issues at stake, this is one of the most important settlements with which Counsel has been involved.

CONCLUSION

This Settlement represents an extraordinary result for the members of the class, which is more than fair, adequate, and reasonable. The Plaintiff's motion for Final Approval should be granted.

Respectfully submitted, this 6th day of January, 2016.

/s/ *David L. Selby, II*
David L. Selby, II *(admitted pro hac vice)*
BAILEY & GLASSER, LLP
3000 Riverchase Galleria, Suite 905
Birmingham, Alabama 35244
Tel.:        (205) 988-9253
Email:       dselby@baileyglasser.com

John W. Barrett *(admitted pro hac vice)*
Eric B. Snyder *(admitted pro hac vice)*
Patricia M. Kipnis *(admitted pro hac vice)*
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia  25301
Tel.:        (304) 345-6555
Email:       jbarrett@baileyglasser.com

Todd Wheeles *(admitted pro hac vice)*
MORRIS, HAYNES, HORNSBY & WHEELES
3500 Colonnade Parkway, Suite 100
Birmingham, AL 35243
Tel.:        (205) 324-4008
Email:       twheeles@mhhlaw.net

Angelo Marino, Jr. (FBN 151934)
ANGELO MARINO, JR., P.A.
645 S.E. 5th Terrace
Ft. Lauderdale, Florida  33301
Tel.:        (954) 765-0537
Email:       amjrpamail@aol.com

Carol Finklehoffe (FBN: 15903)
Thomas Scolaro (FBN: 178276)
Ira H. Leesfield (FBN: 140270)
LEESFIELD & PARTNERS, P.A.
2350 South Dixie Highway
Miami, Florida  33131
Tel.:         (305) 854-4900
Email:      finklehoffe@leesfield.com
                 scolaro@leesfield.com
                 leesfield@leesfield.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2016, a copy of the foregoing was served upon all counsel of record through filing this document with the Clerk using the Court's CM/ECF system.  I further certify that copies of the foregoing were served by U.S. Certified Mail to:

Stephen D. Field, Esq.
STEPHEN D. FIELD, P.A.
102 E. 49th Street
Hialeah, FL  33013
Tel.:  (305) 698-3421
Fax:  (305) 698-1930
Email:  steve@field-law.com
Attorney for Objector Pennington

Troy Kenneth Scheffler
965 104th Ave. NW
Coon Rapids, Minnesota  55433

Richard Louis Jordan
2056 Walnut Creek Drive
Flint, Michigan  48532

Steven A. Glaviano
609 W. William David Pkwy
Suite 102
Metairie, Louisiana  70005

/s/ *David L. Selby, II*
David L. Selby, II

19