# EXHIBIT  A

Plaintiff's Motion for Attorneys' Fees, Costs and Service Award
and Integrated Memorandum of Law in Support

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

CHRIS P. CARTER,
Individually and on behalf of all
others similarly situated,

     *Plaintiffs*,

v.

FORJAS TAURUS S.A.,
TAURUS INTERNATIONAL
MANUFACTURING, INC., and
TAURUS HOLDINGS, INC.,

     *Defendants*.

Case No. 1:13-cv-24583-PAS

**CLASS ACTION**

---

**REPORT OF PROFESSOR CHARLES SILVER ON THE REASONABLENESS OF
CLASS COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES**

---

I, Charles Silver, declare as follows:

## I.    SUMMARY OF OPINIONS

- In the Eleventh Circuit, fee awards from claims-made class action settlements must be a reasonable percentage of the relief made available to the class, and the benchmark for reasonableness is 25%, which may be increased or reduced in light of case-specific factors.

- Taking actual contingent fee agreements negotiated by sophisticated business clients as a guide, a fee exceeding 25% would be reasonable in this case. In large commercial cases of many types, including patent lawsuits, pharmaceutical antitrust lawsuits, and others, sophisticated clients often pay 33%-40% of the recovery as fees.

- A fee equal to or greater than 25% also seems reasonable when compared to fees awarded by judges in other cases with comparable recoveries.

## II.     CREDENTIALS

1.      I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees in the following enormous cases: *Allapattah Services, Inc. v. Exxon Corp.*[1] (30% fee award on recovery exceeding $1 billion); *In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) (fee award of 30% on recovery of $410 million); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *Silverman v. Motorola, Inc.*, No. 07 C 4507 (N.D. Ill. May 7, 2012) (unpublished) (fee award of 27.5% on recovery of $200 million). Most of the cases in which I have appeared have been smaller, of course.

2.      Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

3.      From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's Project on the Principles of Aggregate Litigation.  The ALI's membership approved the final report in 2009 and the published version appeared in 2010.  See ALI, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited THE PRINCIPLES with approval, including the U.S. Supreme Court.

---

[1] See Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, entered in *Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON, S.D. Fla. (July 6, 2006).

4.      I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years.  I have published over 70 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report.  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004).

5.      Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.  In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

6.      I have attached a copy of my resume as Exhibit A to this declaration.

## III.   DOCUMENTS REVIEWED

7.      All documents listed below relate to this lawsuit, unless indicated otherwise.

- Joint Motion and Supporting Memorandum for Preliminary Approval of Class Action Settlement

- Notice of Filing Proposed Class Notices

- [Proposed] Preliminary Approval Order

- Important Safety Information about Your Pistol

- Settlement Agreement and Release

- Website Notice

3

- Order Granting Joint Motion for Preliminary Approval of Class Action Settlement, Preliminarily Approving Class Settlement and Granting Settlement Class Certification, and Setting Final Approval Hearing

- Enhanced Warranty

- Sign-up Form

- Frequently Asked Questions (posted on TaurusCarterSettlement website)

- Declaration of Dr. Andrew Safir

- Declaration of David L. Selby, II in Support of Joint Motion for Preliminary Approval

- Objection to the Class Action Settlement on behalf of Objector Terry Pennigton [sic]

- Objection to Proposed Settlement and Class Certification, and Notice of Intent to Appear at Final Approval Hearing (filed by Steven A. Glaviano)

- Letter of Objection (filed by Richard Louis Jordan)

- Class Member Troy Kenneth Scheffler's Opposition and Objection to Proposed Settlement

## IV.   CASE BACKGROUND

8.      Because the Court is familiar with the history of this lawsuit and the terms of the proposed settlement, I will limit my recitation of the facts to the few that are relevant to this report.

9.      After the Plaintiff, Chris Carter, experienced difficulties with a weapon he owned while serving as a police officer, an initial complaint was filed on his behalf on December 20, 2013 and an amended complaint was filed on September 22, 2014.  The Defendants are Forjas Taurus S.A., Taurus International Manufacturing, Inc, and Taurus Holding, Inc. (collectively "Taurus"), which are accused of statutory violations, tortious conduct, and breach of warranty relating to a

4

variety of pistols (the Class Pistols) that they designed, manufactured, and distributed. The violations are linked to alleged defects in the design of the Class Pistols that cause them to fire when dropped and to fire when the safety is engaged. Extensive discovery regarding the design and safety of the Class Pistols has occurred, including depositions of corporate representatives and lengthy expert testing.

10.     The class has been represented by a team of experienced attorneys. The Declaration of David L. Selby, II in Support of Joint Motion for Preliminary Approval reports that they collectively have about 150 years of experience prosecuting class actions and product liability cases, and handling other complex litigations.

11.     While the litigation was ongoing, the parties explored the possibility of settling. The negotiations, which were presided over by Rodney Max, a certified class action mediator for this District, included 6 sessions that occurred over a period of months. The parties submitted the settlement to the Court for consideration in May of this year.

12.     The proposed settlement requires Taurus to provide three types of relief: an enhanced warranty, safety training, and cash payments. Under the enhanced warranty, any owner of a Class Pistol may send the weapon to Taurus at Taurus' expense for inspection and repair. No charges will be levied for pistols that are repaired. If a weapon cannot be fixed, Taurus will send the owner a new pistol, again at its expense. The safety training program will consist of materials made available to owners free of charge. The materials will also explain how pistols should be stored, packed, and shipped to Taurus when repair or replacement is desired. The cash payments, which are available to class members who choose to send their weapons back, will range from $200 to $150 per pistol, depending on the number of guns that are returned. The total amount that Taurus must refund in cash is limited to $30 million.

13.     Class Counsel engaged Recon Research Corporation (RRC), an independent economic consulting firm, to value the package of relief the proposed settlement makes available to the class.  On behalf of RRC, Dr. Andrew Safir submitted a report in which he describes in detail the remedies Taurus has agreed to provide and concludes that that  "the total Settlement value is between $29.9 million and $73.6 million."   *Declaration of Dr. Andrew Safir*, ¶ 32.   I relied upon RRC's report when reaching the conclusions that are offered herein.

14.     Dr. Safir's estimates *exclude* the amount that the Defendants will pay in attorneys' fees, which could be as much as $9 million, and the $1.5 million that will cover administrative costs.  Because these amounts also qualifies as relief for the class (they extinguish the class' obligation to pay attorneys' fees and to secure all other relief), they should be included in the denominator when calculating Class Counsel's fee percentage.  I will therefore treat the value of the settlement as ranging from a low of $40.4 million to a high of $84.1 million, assuming for the sake of analysis that the Court will award the entire $9 million as fees.  Class Counsel's request for $9 million in fees therefore falls somewhere between 10.7% and 22.2% of the total value of the settlement.

15.     The quality of the settlement reflects, among other things, the lawyers' ability and the effort they put into the case.  As the Declaration of David L. Selby, II in Support of Joint Motion for Preliminary Approval explains, the lawyers have extensive backgrounds in consumer protection law and class action litigation.  They and their staffs collectively expended over 5,000 hours and bore over $250,000 in litigation costs, with no guarantee of repayment.  Of special importance were the time and money spent with firearms experts, who testimony would have been crucial to proving that the Class Pistols were defective at trial.

**V.     THE ELEVENTH CIRCUIT USES THE PERCENTAGE APPROACH**

16.     In *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) ("Camden I"), the Eleventh Circuit, after reviewing the state of the law nationally as well as the findings of a Third Circuit Task Force on the topic, held that, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." 946 F.2d at 772-775.

17.     I have submitted two prior reports on attorneys' fees in cases located in the Southern District of Florida.  The first case was *Allapattah Services, Inc. v. Exxon Corp.*, No. 91-0996-CIV-GOLD/SIMONTON (S.D. Fla. 2006), presided over by Judge Alan S. Gold.  When awarding fees, Judge Gold examined Eleventh Circuit case law and reached the following conclusions: "in applying the 'common fund' doctrine, class counsel's attorneys' fees are to be awarded as a percentage of the class' recovery"; the fee "shall be based upon a reasonable percentage of the fund established for the benefit of the class"; "the 'bench mark' percentage is 25%, 'which may be adjusted up or down based on the circumstances of each case'"; and "[t]he lodestar analysis [is] that applicable method used for determining statutory fee-shifting awards." *Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON (S.D. Fla., Order dated July 6, 2006), p. 28 (quoting *Camden I*, 946 F.2d at 773-775).  Judge Gold awarded 31.33% of the recovery as fees.

18.     The second Southern District of Florida case in which I submitted a report was *In re Checking Account Overdraft Litigation*, No. 09-md-2036 (S.D. Fla. 2011), presided over by Judge James Lawrence King.  His assessment of Eleventh Circuit law closely resembled Judge Gold's.  Judge King concluded that "[i]n the Eleventh Circuit, class counsel is awarded a percentage of the fund generated through a class action settlement," the fee "shall be based upon a reasonable percentage of the fund established for the benefit of the class," the court "has

7

substantial discretion in determining the appropriate fee percentage," and "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund." *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330, 1358-1359 (S.D. Fla. 2011) (citing *Camden I*, 946 F.2d at 773-775.  He awarded 30% of the recovery net of expenses as fees.  Judge King also noted that in *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999), the Eleventh Circuit approved of a fee awarded by a district court judge who set 30% as the benchmark and then adjusted the fee award higher based on the circumstances of the case.

19.    *Camden I* is still good law today.  The Eleventh Circuit applied it earlier this year. In *Poertner v. Gillette Co.*, No. 14-13882, 2015 WL 4310896 (11th Cir. July 16, 2015), it relied on the case when finding that the reasoning a district court judge applied when evaluating the reasonableness of a settlement was sound.  Its discussion, quoted in a footnote below, gave no indication of any concerns about *Camden I*.[2]

---

[2]

> To determine whether the settlement's allocation of benefits was fair, the district court concluded that the value of the nonmonetary relief and cy pres award were part of the settlement pie. Neither conclusion rests on an incorrect or unreasonable application of our precedents. For example, in a case involving a class action settlement that created a reversionary common fund, we held that "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class," describing 25 percent as the "bench mark" attorneys' fee award. *Camden I Condo. Ass'n v. Dunkle,* 946 F.2d 768, 770, 774, 775 (11th Cir.1991). But because "the appropriate percentage to be awarded as a fee in any particular case will undoubtedly vary," we concluded that district courts could also consider the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974), *abrogated on other grounds by Blanchard v. Bergeron,* 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), as well as "[o]ther pertinent factors," including "any non-monetary benefits conferred upon the class by the settlement[ ] and the economics involved in prosecuting a class action," in determining the reasonableness of a fee award. 946

20.    To the contrary, in *Poertner* the Eleventh Circuit actually extended *Camden I* to a new category of cases: those with claims-made settlements.  Because the settlement now before the court for approval includes a claims process, the footnote in which the Eleventh Circuit expanded the reach of *Camden I* is worth reading.

> While no published opinion of ours extends *Camden I*'s percentage-of-recovery rule to claims-made settlements, no principled reason counsels against doing so. For, as one learned treatise aptly illustrates, properly understood "[a] claims-made settlement is ... the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant"; indeed, the two types of settlements are "fully synonymous." 4 Rubenstein, *supra,* § 13:7.

*Poertner*, 2015 WL 4310896, at *4 n.2.

21.    It is clear, then, that the percentage method applies to this settlement, that the fee percentage must be reasonable, that 25% of the recovery can serve as a benchmark, and that the Court has discretion to raise or lower the fee percentage as warranted by circumstances peculiar to this case.  In the remainder of this report, I will offer factual information that bears on the reasonableness evaluation.  In my opinion, this information reflects favorably upon Class Counsel's request for $9 million, which constitutes less than 20% of the value of the relief made available to the class.

## VI.    ACTUAL AGREEMENTS SUPPORT THE REASONABLENESS OF CLASS COUNSEL'S FEE REQUEST

---

F.2d at 775.

*Poertner*, 2015 WL 4310896, at *4 n.2 .

22.     I have long believed that judges should take guidance from fee agreements used by real, sophisticated clients when awarding fees in class actions.  The reason is straightforward. When clients are sophisticated, experienced, and can freely choose the lawyers they want, their agreements provide good evidence of the value of the services lawyers supply.  Class members cannot bargain for themselves.  By mimicking the rates sophisticated clients agree to pay, judges essentially use them to bargain on class members' behalf.

23.     Over the years, more and more judges have come to agree with me.  Shortly after my first article on the subject appeared,[3] the Seventh Circuit endorsed my approach by requiring district court judges to take market rates as guides when setting fees in class actions.  *In re Continental Illinois Securities Litigation,* 962 F.2d 566, 568 (7th Cir. 1992) ("[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.") Judges in other circuits followed the Seventh Circuit's lead by recognizing that they can learn valuable lessons about the fees that are appropriate in class actions by studying real transactions between sophisticated clients and lawyers.

24.     The Eleventh Circuit was one of them, as Judge King explained when setting the fee award in the *Checking Account Overdraft Litigation*.  "In *Camden I,* the Eleventh Circuit criticized lodestar and the inefficiencies that it creates" and "'mandate[d] the *exclusive* use of the percentage approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice.'" *In re Checking Account*

---

[3] Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1991).

10

*Overdraft Litig.*, 830 F.Supp.2d 1330, 1363 (S.D. Fla. 2011) (quoting *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir. 2000) (emphasis added by Judge King).

25.     Judge Gold reached the same conclusion when the *Exxon* class action settled. Citing *Camden I* and the Seventh Circuit's decision in *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), he "conclude[d] that the most appropriate way to establish a bench mark is by reference to the market rate for a contingent fee in private commercial cases tried to judgment and reviewed on appeal."   Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, entered in *Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON, S.D. Fla. (July 6, 2006).

26.     Fees provided for in agreements freely entered into by sophisticated clients provide support for the ethical propriety of fee awards too.   "Fees agreed to by clients sophisticated in entering into such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable."   RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 34, Comment *c* (2000).   By mimicking the market in which sophisticated clients retain lawyers, judges have no need to fear that they may run afoul of prevailing ethical standards.

27.     Over many years, I have accumulated an abundance of information about the fees that sophisticated clients agree to pay when they engage lawyers on contingency.   I gathered it from case reports, news articles, academic studies, and other sources.   In some instances, though far from all, I obtained copies of the agreements themselves.   Because the terms of private agreements are often kept confidential, the information I possess is unavoidably anecdotal.   This being admitted, it nonetheless shows quite clearly that sophisticated business clients often pay

contingent fees in the range of 25%-40% of the recovery, substantially more than Class Counsel is requesting.  To my knowledge, no one has ever shown that percentages in this range are uncommon.

**A.    Support for Fees Exceeding 25% of the Recovery in Patent Lawsuits**

28.    There are many anecdotal reports of high fee percentages being paid in patent cases. The most famous one related to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding (WRF), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.  Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement,[4] after securing a $501 million jury award against Boston Scientific.  Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA JOURNAL (May 20, 2008).[5]

29.    The Texas law firm of McKool Smith has a booming contingency practice, mostly

---

[4] In a partial contingent fee agreement, the contingent bonus, usually a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate.  Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide limited guidance for fee percentages in these cases.  At most, they suggest lower bounds that fee awards from common funds should greatly exceed.

[5] The parties later settled the case for $50 million.  AMERICAN LAWYER, *Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents*, April 01, 2011, http://www.dicksteinshapiro.com/sites/default/files/Interest_Award_Brings_Doctors_Judgment_Against_Johnson_and_Johnson_April_1_2011.pdf.  As the title of this article indicates, Dickstein Shapiro also secured a second enormous judgment against Johnson & Johnson.  The terms of that contingent fee representation are unknown.

involving high tech companies.  It reportedly collected over $100 million in fees over a four-year period.  The firm's business model includes both straight contingent fee representations in which it charges 40 percent of the recovery and hybrid representations "in which it charges half of its $250 to $950 standard hourly rate and then gets half of its usual 40 percent contingency."  Cheryl Hall, *Patents and patience pay off for Dallas law firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010, (updated November 26, 2010), http://www.dallasnews.com/business/columnists/cheryl-hall/20100327-Patents-and-patience-pay-off-for-4939.ece.  In 2009, McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc.  Penalties and interest added $90 million to the total.  The firm's share, under a *partial* contingent fee agreement, was reported to be $60 million, assuming the verdict held up.  *Id.*

30.    The reports just mentioned are typical, not aberrations.  Professor David L. Schwartz confirmed this when he interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements that were used in patent cases.  Professor Schwartz reported that, across the board, fee percentages exceeded the fee requested here.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges.  There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates.  As the case continued, the lawyer's percentage increased.  Of the agreements

13

reviewed for this Article that used graduated rates, the average percentage upon

filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA

LAW REVIEW 335, 360 (2012).

31.     Professor Schwartz's findings are also anecdotal.  He did not have a random sample

of engagement contracts used in patent cases to consider.  But his conclusions are consistent with

both the examples discussed above and reports found in patent blogs, case reports, and other

publications.  For example, the following passage appeared in Matt Cutler, *Contingent Fee Patent*

*Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-

rights.com/?page_id=30 (reviewed March 13, 2012), also available at

http://patentlitigationstrategy.com/?page_id=30.

> ***Contingent Fee Arrangements***: In a contingent fee arrangement, the client does
>
> not pay any legal fees for the representation. Instead, the law firm only gets paid
>
> from damages obtained in a verdict or settlement. Typically, the law firm will
>
> receive between 33-50% of the recovered damages, depending on several factors—
>
> a strictly results-based system.

32.     In *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244

(Tex. Appls.—Houston, 2003), which arose out of a patent case, the law firm's fee percentage

varied with the amount recovered.  "Under the fee agreement, Tanox agreed to pay the Lawyers a

contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33

1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200

million, and 25% of recovery over $200 million."  *Id.* at 248-249.  The agreement also contained

other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a

permanent injunction."  "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million."  *Id.* at 249.  Like NTP in the *Blackberry* litigation, Tanox agreed to pay both high percentages and a potentially enormous amount.

33.    The payment of significant contingent fees in patent cases is not a new phenomenon.  In 1993, the AMERICAN LAWYER ran a cover story featuring patent litigator Gerald Hosier, who, by handling cases on contingency, reportedly made over $150 million in a single year, "more than the draws of all the equity partners at New York's Cravath, Swaine & Moore and Chicago's Winston & Strawn combined."  Stewart Yerton, *The Sky's the Limit*, AMERICAN LAWYER (May 1993).  Nor was Hosier alone.  According to an article published in 1997, attorney Alfred Engelberg, who began handling patent cases on contingency in 1985, earned fees in excess of $100 million by handling seven patent challenges on contingency.  "On an hourly basis, even if the cases had been fully staffed, the cases would have produced a total of no more than ten to fifteen million dollars in billing." P.L. Skip Singleton, Jr., *Justice For All: Innovative Techniques for Intellectual Property Litigation*, 37 IDEA 605, 610 (1997).

34.    Clearly, in the segment of the market where sophisticated business clients hire lawyers to litigate patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates.  The reason is obvious.  When waging patent cases on contingency, lawyers must incur enormous risks and costs, so clients must promise them hefty returns.  Clients still prefer this arrangement to bearing the risks and costs of litigation themselves, so they gladly pay the market rate.

**B.    Support for Fees Exceeding 25% of the Recovery in Pharma Antitrust Suits**

35.    I recently learned about a series of cases in which drug manufacturers were accused

of violating the federal antitrust laws by engaging in so-called "pay for delay" settlements with potential generic competitors. The stakes were enormous. Although several of the lawsuits failed, many generated recoveries and seven settled for amounts north of $100 million. The most recent settlement, which occurred in *King Drug. Co. of Florence v. Cephalon, Inc.*, No. 2:06-cv-01797-MSG (E.D. Pa.), generated a recovery of $512 million. The cases with positive recoveries are listed in Exhibit B.

36.     The plaintiffs in these cases were drug wholesalers, several of which were Fortune 500 companies or larger. Although the lawsuits were formally class actions, there were only 20 or so wholesalers in each case, meaning that each had a sizeable stake in both the settlement funds and the fees that the lawyers were paid. And in every case, the claimants submitted letters to the court supporting fee awards that exceeded 25% of the recovery. In most of the cases, they endorsed 33% fees. Here are a few examples.

- In *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340-SLR (Consolidated) (D. Del.), which produced a $250 million common fund, Cardinal Health, Inc.—a Fortune 50 company—submitted a letter through its outside counsel stating that "Cardinal Health fully supports approval of the settlement, and has no objection to class counsel's requested fee of one third of the settlement fund (similar to the fee awarded in the prior cases in which we took part), or to reimbursement of class counsel's expenses." Two other retailers—AmerisourceBergen Corp. and OptiSource LLC (a trade association representing 14 regional drug wholesalers)—also voiced their support for Class Counsel's fee request.

- In *In re Neurontin Antitrust Litig.*, MDL No. 1479, Master File No. 02-1390 (FSH), which produced a $190 million recovery, a 33% fee was also requested and 12 retailers submitted supporting letters: AmerisourceBergen Corp, Burlington Drug Co., Cardinal Health,

Dakota Drug, Inc., Drogueria Betances, Inc., King Drug Company of Florence, Inc., McKesson Corp., Miami-Luken Inc., Prescription Supply, Inc., Rochester Drug Cooperative, JM Smith Corp. d/b/a Smith Drug Co., and Value Drug Co.

- In in *King Drug. Co. of Florence v. Cephalon, Inc*., No. 2:06-cv-01797-MSG (E.D. Pa.), the case with the $512 million settlement, class counsel requested a 27.5% fee and 12 retailers submitted supporting letters: Cardinal Health, AmerisourceBergen Corporation, McKesson Corporation, Drogueria Betances, J M Smith Corporation d/b/a Smith Drug Company, Value Drug Co., Burlington Drug Company, Prescription Supply, Dakota Drug, Miami-Luken, King Drug Company of Florence, and Capital Wholesale Drug.

These were sophisticated business clients with easy access to counsel and large financial stakes. Their willingness to pay contingent fees above 25% conveys a clear message that such fees are reasonable.

37.     One client that was not itself a business entity also hired a law firm to bring a series of antitrust lawsuits against pharma companies that entered into pay-for-delay settlements. The City of Providence, RI signed four contracts with the Motley Rice law firm, which it retained to wage a series of antitrust challenges to pay-for-delay settlements on its own behalf. The first contract capped Motley Rice's fee at 30 percent of the recovery. The second contract, which governed five separate antitrust litigations, provided for fees in the 25 percent to 40 percent range, plus reimbursement of expenses. The third contract, which concerns litigation over a drug named Suboxone, provides for the same compensation. The final contract, which authorizes the firm to commence litigation over the pay-for-delay settlement relating to Provigil, entitles the law firm to 15 percent of the recovery if the lawsuit settles within 90 days of filing and one-third of the recovery if it settles thereafter. Jessica Karmasek, *Providence using plaintiffs bar to become*

*player    in    antitrust    cases*,    LegalNewsline.com,    Sept.    2,    2015, http://legalnewsline.com/stories/510636452-providence-using-plaintiffs-bar-to-become-player-in-antitrust-cases.

### C.    Support for Fees Exceeding 25% of the Recovery in Other Commercial Lawsuits

38.    Turning from patent and pharma antitrust cases to matters of other types, many examples show that fees exceeding 25% of the recovery are common.  A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E).  ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  In a sworn affidavit, Harry Reasoner, then V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome. We were paid 1/3 of all amounts received by way of settlement or judgment.  We litigated the matter for 5 years.  At the conclusion, we had settled with all defendants for a total of $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as contingent legal fees.

Declaration of Harry Reasoner, filed in *In re Washington Public Power Supply System Securities Litigation*, MDL No. 551 (D. Arizona, Nov. 30, 1990).

39.    Several things about this example are noteworthy.  First, the contingency fraction was one-third of the recovery in a massive case.  Second, V&E bore no liability for out-of-pocket expenses, whereas in this case Class Counsel advanced litigation costs and bore the risk associated

18

with the loan until the end of litigation.  Third, the case was enormous, ultimately generating a recovery greater than $600 million and a fee north of $200 million.  Fourth, the client was a sophisticated business with access to the best lawyers in the country.  No claim of pressure or undue influence by V&E could possibly be made.

40.    Based on what lawyers who write about fee arrangements in business cases have said, contingent percentages of one-third or more remain common today.   In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).  The fees mentioned in this report closely resemble those that Professor Schwartz found to be common in patent litigations.

19

41.     A recent case shows, in monetary terms, that lawyers who handle business disputes on contingency can earn enormous premiums over their hourly rates.  In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee a business client owed the law firm of Susman & Godfrey (S&G).  S&G had handled an oil and gas matter for the client on the following terms.  "Under the Fee Agreement, [the client] agreed to pay [S&G] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, (10th Cir. February 16, 2012), available at http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html.  "*[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed*."  *Id.* The fee agreement thus entitled S&G to be paid $50 million for a year's worth of work—and that is what an arbitrator decided S&G should receive, subject to an offset of less than $2 million that, for present purposes, is irrelevant.  The Tenth Circuit ultimately affirmed the attorneys' fee award.

42.     In *Anglo-Dutch Petroleum v. Greenberg Peden*, 352 S.W.3d 445 (Tex. 2011), another oil and gas matter, the plaintiff initially agreed to pay the law firm of McConn & Williams the bargain rate of 20 percent.  The firm's mission was apparently to attempt to settle the case, however.  When it became clear that the case would be tried, McConn & Williams reduced its fee to 16.66 percent and the client brought in John M. O'Quinn & Associates.  O'Quinn charged another 20 percent, bringing the total contingent fee to 36.66 percent.  After the trial, which the plaintiff won, the case settled for $51 million.  The plaintiff's fees came to about $20 million.

43.     Examples of sizeable contingent fees can also be found in cases involving business clients who retained lawyers to participate on their behalf in class actions.  Several appear in an opinion written by Seventh Circuit Judge Frank Easterbrook.  He reported that, *after a settlement*

*was already on the table*,

> a group of more than 100 [third party payers] … contracted with two law firms to
> represent them…. [T]he contracts provided for a 25% contingent fee at maximum.
> The "Porter Wright Group" (18 [third party payers] referred to collectively by their
> law firm's name) also negotiated with and hired counsel. Their setup allowed each
> insurance company to pick one of two fee options. Either the client paid Porter
> Wright's full costs and 70% of its normal hourly fees each month, with a 4% of
> recovery kicker at the end, or the client paid only costs each month but had to pony
> up 15% of the final settlement. Insurers are sophisticated purchasers of legal
> services, and these contracts define the market. Unfortunately, though, they identify
> a market mid-way through the case, after defendants already had agreed to pay
> substantial sums.

*In re Synthroid Marketing Litig.*, 264 F.3d 712, 727 (7th Cir. 2001).  In *Synthroid*, the lawyers'
job was merely to garner as large a portion of the settlement fund as possible for the third party
payers.  They bore minimal risk of non-payment.  Even so, their sophisticated clients promised
them large percentage fees.  An even larger fee is obviously warranted in this case, where the non-
payment risk was enormous, as discussed below

44.     *In re High Fructose Corn Syrup Antitrust Litigation* provides additional examples.
According to Professor John C. Coffee, Jr., a nationally renowned authority on class actions who
served as an expert witness in the case, the two named plaintiffs—Zarda Enterprises and Publix
Supermarkets Inc.—agreed to pay fees of 30 percent and "more than 25%," respectively.  Gray &
Co., an opt-out claimant, promised its lawyers 33-40 percent of the recovery in parallel litigation,
depending on the time of settlement. *Declaration of John C. Coffee, Jr.*, submitted in *In re High*

*Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2.

45.    In recent years, I learned about the that fees a number of sophisticated business clients agreed to pay when serving as lead plaintiffs in three unrelated class actions.  The first case was *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437 (E.D.N.Y. 2014).  In this case, which generated a recovery exceeding $5 billion, I reviewed retainer agreements entered into by 12 class merchants.  Although the agreements varied in important respects—indicating that they were negotiated agreements—they generally provided that class counsel would receive one-third of the class-wide recovery as fees.[6]  Some of the clients agreed to make up from their own recoveries any shortfall between the promised one-third fee and

---

[6] Typical language reads as follows:

(a)  Fees As Class Counsel

(1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

(2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

(b)  Fees Owed If Recovery Is Made Outside Of Class Action.

In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

the actual fee awarded by the court. Others promised to pay a one-third fee from their own recoveries if they settled outside the class action. These promises sent a strong signal that a one-third fee was reasonable in the eyes of sophisticated business clients who were involved in a lawsuits in which billions of dollars in damages were sought.

46.     The second case was *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million. Five sophisticated investors served as named plaintiffs in the case. Two, FURSA Alternative Strategies LLC and RAMIUS LLC, were, respectively, a hedge fund manager and a global investment manager. All five clients agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed. The 35 percent fee was bargained down after initially being set at over 40 percent.

47.     The third case was *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct., Dec. 9, 2014), which produced a $297 million settlement and a one-third fee. One of the named plaintiffs, Thomas & King Inc., was formerly one of the largest operators of Applebee's franchises in the United States and the nation's eighth-largest restaurant franchise company overall, with approximately 7,500 employees. The other named plaintiff, Catholic Healthcare West/Dignity Health, was the fifth largest health system in the nation and the largest provider of non-profit hospital services in California. Both clients were represented by counsel in their fee negotiations with class counsel, and both agreed that the fee award might be as high as 40 percent.

48.     In all three of the cases just discussed, the named plaintiffs were sophisticated businesses with significant resources and ready access to the market for legal services. Their willingness to promise fees ranging from one-third to 40 percent in large commercial class actions

shows clearly that, in their judgment, fees in this range are reasonable.

49.     I could add examples to those already discussed, but the point has been made. When seeking to recover money in risky commercial lawsuits involving large stakes, sophisticated business clients often pay contingent fees equal to or greater than 25% of the recovery.  They pay such percentage fees when the risks and costs of litigation warrant the expenditure, because they are better off hiring lawyers at market rates than giving up on their claims.  To be clear, I am not saying that sophisticated business clients always pay fees in this range; they will pay less when they can hire competent lawyers on more attractive terms.  The point is just that they know how the market for legal services works, and they are know that percentages above 25% are often required.

## VII.   JUDGES OFTEN AWARD FEES EXCEEDING 25% OF THE RECOVERY

50.     There are many empirical studies of fee awards in class actions.[7]  I begin by discussing two recent ones that examine class actions of all types.  Both studies were peer-reviewed. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811 (2010) ("*Fitzpatrick Study*"); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) ("*E&M Study*").  I then briefly discuss

---

[7] See, e.g., Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, RECENT TRENDS IV: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS?, Table 9 (1996); Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 151 (1996); Mukesh Bajaj, et al., SECURITIES CLASS ACTION SETTLEMENTS: AN EMPIRICAL ANALYSIS (Nov. 16, 2000); Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 CLASS ACTION REPORTS 167 (2003); and Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 27, 75 (2004).

studies of securities class actions, including one that I co-authored.

51.    Professor Fitzpatrick collected all class action settlements approved by federal judges in 2006 and 2007, a total of 668 reported and unreported decisions.  The figure below describes the range of fee awards made in cases where judges applied the percentage method, with or without a lodestar cross-check.  As is apparent, awards ranging from 30% to 35% of the recovery constitute the most common category.  Over 30% of the cases in Fitzpatrick's dataset had fee awards this large.  Almost the same fraction had awards in the 25%-30% range.  As is visually apparent, in the vast majority of cases, awards equaled or exceeded 25%.



Figure 4:  The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.

SOURCES: Westlaw, PACER, district court clerks' offices.

Source:  Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 834 (2010).

52.    Professor Fitzpatrick also reported mean fee percentages for settlements by size.  In cases with settlements in the $30 million to $72.5 million range, the average fee award was 24.9% with a standard deviation of 8.4%, meaning that about two-thirds of the cases had awards between 16.5% and 33.3%.  Fitzpatrick Study, at p. 839, Table 10.  The fee requested by Class Counsel

falls at the low end of this range.

53.    The *E&M Study* examined common fund class actions that closed from 1993 to 2008, a total of 689 cases.  The authors drew their sample from Westlaw, Lexis, and other reporters.  For the entire dataset, the average fee-to-recovery ratio was 23%.  *E&M Study*, at pp. 258-259.  For cases with settlements in the $38.3 million to $69.6 million range, the mean fee award was 20.5% with a standard deviation of 10%.  This means that about two-thirds of the cases in this size range had fee awards between 10.5% and 30.5%.  *Id*., at p. 265, Table 7. Class Counsel's fee request falls squarely in the middle of this range.

54.    A study of securities fraud class actions that two coauthors and I recently published in the COLUMBIA LAW REVIEW produced results that were broadly similar to those just described.  Across all 431 cases in our dataset, the average fee award was 23.8% of the recovery with a standard deviation of 7.3%, meaning that two-thirds of the awards fell between 16.5% and 31.1%.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371, 1389 Table 1 (2015).  These results are compatible with those of other studies that focused exclusively on securities cases.  See, e.g., Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 WASHINGTON UNIVERSITY LAW QUARTERLY 869, 897, Table 6A (2005) (finding that fee awards averaged 30% of the recovery in securities fraud class actions led by individual investors and private institutions, and 25% in cases led by public institutions); and Michael Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions,* 9 JOURNAL OF EMPIRICAL LEGAL STUDIES 368, 380, Table 1 (2012) (reporting average fees of 26.6 percent).

26

55.     In my opinion, fee awards in securities class actions should set a floor, not a ceiling, on fee awards in cases of other types.  This is true for many reasons, of which here I mention only two.  First, securities class actions are often filed after the public receives a strong signal of fraud.  The signal may be a sudden, large drop in share price, an earnings restatement, an accounting firm's announcement that it no longer stands behind a prior statement or filing, or an investigation by a government agency like the SEC or the DOJ.  Such signals are often absent in cases of other types.  This means that other lawsuits may be riskier than securities fraud cases, at least at the start.  Second, securities cases have been so numerous for so long that a large body of precedent exists on most of the issues they raise.  The same cannot be said for cases of many other types.  Again, this means that other cases are riskier and that fee awards should be higher.

56.     To be clear, I am not saying that securities fraud class actions are easy to win.  They are not.  They are expensive to wage, and they often turn out badly for plaintiffs.  My point is only that there are reasons to think that awards should be higher in cases of other types, of which this case is one example.

57.     In sum, empirical studies of fee awards in class actions show that fee awards equal to or greater than 25% of the recovery are common in class actions.  By comparison, the fee requested by Class Counsel is low and is clearly within the Court's discretion.

## VIII.  THE FEE AWARD SHOULD BE BASED ON THE QUANTITY OF RELIEF MADE AVAILABLE TO THE CLASS, NOT THE AMOUNT DISTRIBUTED

58.     As stated above, when calculating Class Counsel's requested fee percentage, I added the $9 million that the Defendants have agreed to pay in fees and the $1.5 million they will pay in administrative expenses to Dr. Safir's estimates of the value of the settlement benefits, and arrived at a total recovery between $40.4 million and $84.1 million.  Class Counsel's request for

$9 million in fees therefore falls somewhere between 22.2% of the $40.4 million recovery and 10.7% of the $84.1 million recovery. These are reasonable percentages, even if the smallest estimate of the settlement's value is assumed. Real clients often pay 25% or more when they hire lawyers on contingency, and judges often award fees equal to or greater than 25% in successful class actions.

59.     When reviewing requests for fees in class action settlements with claim processes, judges often wonder how to deal with the possibility that the benefits actually paid out will be worth less than the amount made available because fewer (perhaps far fewer) than all class members will participate. This is an important question, for several reasons. First, claim rates in class actions are predictably low, even when strenuous efforts are made to encourage participation. The small size of class members' claims both creates the need to use of the class action mechanism and ensures that many class members will lack incentives to file claims. I therefore expect far fewer than 100% of the members of this class to participate in the settlement, and have so assumed when preparing this report.

60.     Second, a low claims rate can create a sellout problem. This occurs when a defendant makes a large amount of relief available knowing that the take-up rate will be low, and offers to pay a fee based on a settlement's hypothetical value.

61.     The question at hand, then, is: What weight should a court give to the maximum possible payout and the actual payout when the latter is depressed by a low claim rate? The *Objection to the Class Action Settlement on behalf of Objector Terry Pennigton* [sic] raises this question. Objector Pennington urges the Court to base the fee on the number of filed claims, arguing that otherwise the fee percentage will be unreasonably high.

62.     In cases like this one, which aggregate large numbers of small claims, it is obvious

28

that a rule limiting fee awards to a fraction of the actual payout would weaken, if not destroy, the incentive for lawyers to file class actions while also creating lop-sided litigation incentives in favor of defendants.  This is so because class members' incentive to file claims is directly related to the amount of money they have at stake.  Smaller stakes imply fewer claims.  A rule limiting fee awards to a fraction of the actual claim rate would thus prevent the class action from serving the core function identified by the U.S. Supreme Court, namely, the aggregation of claims that are too small to warrant individual lawsuits.  *See Amchem Products, Inc. v. Windsor* 521 U.S. 591, 617 (1997).

63.     The matter might be different if a claims process could be avoided entirely or the low claim rate was the result of a claims process that was designed to make it difficult for class members to participate.  For example, a claims process might be unnecessary because money could be distributed directly to class members without receiving input from them or obtaining signed releases (neither of which is always true).  Or a claims process could intentionally be designed to be consumer-unfriendly by requiring class members to have their claim forms notarized or to submit original purchase receipts they are unlikely to possess.  When a claims process places obstacles between class members and their money, a court might reasonably refuse to approve a settlement or lay some of the blame for the low take-up rate at class counsel's feet.

64.     Here, however, a claims process is required and no unnecessary obstacles have been placed in class members' way.  The process is required because the (allegedly) defective weapons have to be identified, returned, and fixed or replaced, and because Taurus neither knows who the existing owners are nor has any means of sending them money.

65.     The claims process is also well designed.  Its singular virtue is that Taurus has agreed to cover the cost of shipping guns both ways.  This feature is both unique in my experience

and extremely valuable.  If class members had to bear their own shipping costs, their incentive to participate would be greatly diminished.

66.     Given the preceding, it seems to me that, by giving weight to the number of claims received when setting the fee, the Court would punish Class Counsel for something over which the lawyers have little control.   Beyond making a claims process consumer-friendly and advertising the settlement, there is little lawyers can do to boost the claiming rate in small-claim class actions.  Given this, punishing Class Counsel for a take-up rate below 100% by cutting their fees could only discourage other lawyers from filing small claim cases.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  January 5, 2016

_____
CHARLES SILVER

Exhibit A

# RESUME OF CHARLES SILVER

## CONTACT INFORMATION

Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-2015
    Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
    W. James Kronzer Chair in Trial & Appellate Advocacy
    Cecil D. Redford Professor
    Robert W. Calvert Faculty Fellow
    Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
    Assistant Professor

Harvard Law School, Fall 2011
    Visiting Professor

Vanderbilt University Law School, Fall 2003
    Visiting Professor

University of Michigan Law School, Fall 1994
    Visiting Professor

University of Chicago, 1983-1984
    Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

## PUBLICATIONS

### Special Projects

Associate Reporter, American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, (2010) (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN CLASS ACTION LITIGATION, 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MASS TORT LITIGATION, 42 Tort Trial & Insurance Practice Law Journal 105 (2006), available at http://www.jstor.org/stable/25763828

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, REPORT ON CONTINGENT FEES IN MEDICAL MALPRACTICE LITIGATION (2004) available at http://apps.americanbar.org/tips/contingent/MedMalReport092004DCW2.pdf; published at 25 Rev. Litig. 459 (2006).

Co-Reporter, International Association of Defense Counsel PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

### Books

HEALTH CARE GAMES (with David A. Hyman) (in progress)

TO SUE IS HUMAN: MEDICAL MALPRACTICE LITIGATION IN TEXAS 1988-2010 (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (in progress).

HEALTH LAW AND ECONOMICS, Edward Elgar (coedited with Ronen Avraham and David A. Hyman) (available February 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, 2nd Edition (2012) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (updated 2013 & 2014).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (2012) (with William T. Barker) (updated annually 2013-2015).

### Articles by Subject Area (* indicates Peer Reviewed)

<u>Health Care Law & Policy</u>

1.  "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," in I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds., OXFORD HANDBOOK OF AMERICAN HEALTH LAW (forthcoming 2015) (with David A. Hyman).*

2.  **"Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 <u>DePaul L. Rev.</u> 574 (2014) (with David A. Hyman) (invited symposium).**

3.  "Five Myths of Medical Malpractice," 143:1 <u>Chest</u> 222-227 (2013) (with David A. Hyman).**

4.  "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 <u>New England L. Rev.</u> 101 (2012) (invited symposium).

5.  "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" in Ken Oliphant & Richard W. Wright, eds., MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (2013) (coauthored with David A. Hyman)*; originally published in 87 <u>Chicago-Kent L. Rev.</u> 163 (2012).

6.  "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).**

7.  "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 <u>Vanderbilt L. Rev</u>. 1085 (2006) (with David A. Hyman) (invited symposium).

8.  "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII <u>Widener L. J.</u> 121 (2005) (with David A. Hyman) (invited symposium).

9.  "Speak Not of Error, <u>Regulation</u> (Spring 2005) (with David A. Hyman).

10. "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 <u>Cornell L. Rev.</u> 893 (2005) (with David A. Hyman).

11. "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 <u>Harv. J. L. and Pub. Pol</u>. 107 (2004) (with David A. Hyman) (invited symposium).

12. "You Get What You Pay For: Result-Based Compensation for Health Care," 58 <u>Wash. & Lee L. Rev.</u> 1427 (2001) (with David A. Hyman).

13. "The Case for Result-Based Compensation in Health Care," 29 <u>J. L. Med. & Ethics</u> 170 (2001) (with David A. Hyman).**

<u>Empirical Studies of Medical Malpractice</u>

14. "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010**,**" J. Empirical Legal Stud. (forthcoming 2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

15. "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

16. "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

17. "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

18. "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

19. "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

20. "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

21. **"**Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

22. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

23. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3neva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

24. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

25. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

26.    "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

Empirical Studies of the Law Firms and Legal Services

27.    "The Economics of Plaintiff-Side Personal Injury Practice," U. Il. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

28.    "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

29.    "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

Attorneys' Fees—Empirical Studies and Policy Analyses

30.    "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

31.    "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

32.    "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

33.    "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

34.    "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

35.    "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

36.    "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

37.    "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

38.    "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

39.    "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

40.     "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

Liability Insurance and Insurance Defense Ethics

41.  "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 Rutgers U. L. Rev. (forthcoming 2015) (with William T. Barker) (symposium issue).

42.  "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

43.  "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

44.  "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

45.  "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August   2012)   (with   William   T.   Barker),   available   at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

46.  "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

47.  "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

48.  "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

49.  "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

50.  "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

51.  "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

52.  "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

53.  "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

54. "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

55. "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 Def. L. J. 1 (Spring 1997).

56. "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

57. "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

58. "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

59. "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 Va. L. Rev. 1585 (1991); reprinted in VI INS. L. ANTHOL. 857 (1992).

Class Actions, Mass Actions, and Multi-District Litigations

60. "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

61. "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

62. "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

63. "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

64. "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

65. "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

66. "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

67. "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., INT'L ENCY. OF L. & ECON. (1999).*

68.  "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 <u>Va. L. Rev.</u> 1465 (1998) (with Lynn A. Baker) (invited symposium).

69.  "Mass Lawsuits and the Aggregate Settlement Rule," 32 <u>Wake Forest L. Rev.</u> 733 (1997) (with Lynn A. Baker) (invited symposium).

70.  "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

71.  "Justice in Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman).*

<u>General Legal Ethics and Civil Litigation</u>

72.  "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

73.  "Philosophers and Fiduciaries" (in progress) (presented at several law schools and conferences).

74.  "Fiduciaries and Fees," 79 <u>Fordham L. Rev.</u> 1833 (2011) (with Lynn A. Baker) (invited symposium).

75.  "Ethics and Innovation," 79 <u>George Washington L. Rev.</u> 754 (2011) (invited symposium).

76.  "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross) (invited symposium).

77.  "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

78.  "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

79.  "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

80.  "What's Not To Like About Being A Lawyer?" 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

81.  "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

82.  "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

83.  "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

84.  "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

85.     "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

86.     "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 Law and Contemporary Problems 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

87.     "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

Legal and Moral Philosophy

88.     "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987).*

89.     "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985).*

90.     "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984).*

Practice-Oriented Publications

91.     "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

92.     "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

93.     "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

94.     "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

95.     "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

Miscellaneous

96.     "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro).*

## PERSONAL

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.

Exhibit B

| Recoveries and Fee Awards in Pharmaceutical Antitrust Cases | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug. Co. of Florence v. Cephalon, Inc*., No. 2:06-cv-01797-MSG (E.D. Pa. Oct. 15, 2015) | $512 | 27.5% plus expenses |
| *In re Doryx Antitrust Litig.,* No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15 | 33⅓% plus expenses |
| *In re Neurontin Antitrust Litig.,* No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Skelaxin (Metaxalone) Antitrust Litig.,* No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.,* No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Wellbutrin XL Antitrust Litig.,* No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% plus expenses |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.,* No. 07-142 (D. Del. May 31, 2012) | $17.25 | 33⅓% plus expenses |
| *In re DDAVP Antitrust Litig.,* No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25 | 33⅓% plus expenses |
| *In re Wellbutrin SR Antitrust Litig.,* No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49 | 33⅓% plus expenses |
| *Meijer, Inc. v. Abbott Labs.*, No. C07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52 | 33⅓% plus expenses |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35 | 33⅓% plus expenses |
| *In re Oxycontin Antitrust Litig.,* No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75 | 33⅓% plus expenses |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.,* MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |